UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BES ENTERPRISES, INC. | ) | Civil Action No. 05-10477-GAO |
| | ) | |
| Plaintiff, | ) | MEMORANDUM IN SUPPORT OF |
| | ) | DEFENDANTS' MOTION TO |
| v. | ) | DISMISS OR, IN THE ALTERNATIVE, |
| | ) | FOR VENUE TRANSFER |
| RONY NATANZON, et al. | ) | PURSUANT TO 28 U.S.C. § 1404(a) |
| | ) | |
| Defendants. | ) | |

Defendants Rony Natanzon, Vered Taylor, and ERN Acquisition, LLC (collectively, "Defendants"), by their undersigned counsel, submit this Memorandum in support of their motion to dismiss this action or, in the alternative, for transfer of the action pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the District of Maryland at Baltimore.

## Introduction

Plaintiff BES Enterprises, Inc. ("Plaintiff") filed this action in the Superior Court Department of the Trial Court for Essex County, Massachusetts, and Defendants timely removed the case to this Court on March 14, 2005. Defendants now request dismissal of the action because it arises out of an agreement signed by Plaintiff that contains a forum selection clause. This clause requires that any action by any party to, or arising under or relating to the agreement, must be brought and maintained exclusively in the Baltimore County, Maryland state courts, or in the United States District Court for the District of Maryland at Baltimore.

Even assuming *arguendo*, that this forum selection clause were not enforceable (and it is), this action should be dismissed because this Court lacks personal jurisdiction over Defendants. Moreover, the action is barred as to Defendant ERN Acquisition, LLC, pursuant

to an Order of the United States Bankruptcy Court for the District of Maryland, an Order that has been affirmed by the U.S. Court of Appeals for the Fourth Circuit.

Finally, in the alternative, even if this action could be properly maintained in this Court, this case should nevertheless be transferred pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the District of Maryland at Baltimore.

## Factual Background and Allegations of the Complaint

A.    The Parties

This action arises from a written contract dated March 26, 2002 (the "Agreement") between Plaintiff Bes Enterprises, Inc. and ERN, LLC, d/b/a Nationwide Check Services ("ERN"), a now-bankrupt Maryland company that formerly engaged in the business of facilitating electronic credit card and check processing for merchants.    Complaint ¶ 4. Plaintiff operates several Massachusetts retail establishments under the name "Betsy's".    In April, 2004, ERN filed for Chapter 11 bankruptcy and a bankruptcy Trustee was appointed for it.    ERN is not a party to this action.    Defendant Rony Natanzon, a Maryland resident, is the sole member and was the CEO of ERN.    *Id.* ¶ 5.    Defendant Vered Taylor, the daughter of Defendant Natanzon, is also a Maryland resident.    Defendant Taylor formerly served as ERN's manager of check services    *Id.* ¶ 6.    Defendant ERN Acquisition, LLC ("Acquisition") is a Maryland limited liability company with its principal place of business in Baltimore.    *Id.* ¶ 7.

Acquisition was formed to acquire certain assets that it purchased from ERN's Trustee at an auction sale approved by the United States Bankruptcy Court for the District of Maryland.    The Bankruptcy Court's Sale Order (Ex. 1 hereto) approving this sale ultimately was affirmed by the U.S. District Court for the District of Maryland and by the U.S. Court of Appeals for the Fourth Circuit (Exs. 2 and 3).    *See* Affidavit of Rony Natanzon ("R. Natanzon

Aff."), a copy of which is attached hereto as Ex. 4, ¶¶ 11-13.[1]  Plaintiff alleges that Acquisition is the "successor" to ERN.  Complaint ¶ 69.  The Sale Order approving the Trustee's sale of ERN assets to Acquisition provides, however, at p. 7, that Acquisition "shall not be liable for *any* claims . . . against the Debtor [ERN] or its estate. (Ex. 1, p. 7) (emphasis added).

      B.      The March 26, 2002 Agreement and Its Forum Selection Clause

Plaintiff alleges that ERN, from its former Brookline, Massachusetts office, solicited the business of Plaintiff and caused Plaintiff to enter into a contract for services with ERN.  Complaint ¶ 8.  Plaintiff entered into the Agreement with ERN on March 26, 2002, the front side of one page of which is attached to the Complaint as Ex. A thereto.  In addition to the Agreement, Plaintiff executed a separate processing agreement for each of its stores, copies of which are collectively attached to the Complaint as Ex. B.  *Id.* ¶ 12.

The reverse side of the document that Plaintiff attached as Complaint Ex. A contains a mandatory forum selection provision (§ 15.2) that requires any suit arising from or relating to the parties' agreement to be brought and maintained in the state or federal courts in Maryland.  *See* Ex. 5 hereto.  The reverse side of this page, however, was not attached to the Complaint.  The Affidavit of Amit Natanzon (Ex. 6 hereto), the former manager of ERN's since-closed Brookline, Massachusetts office, confirms that Plaintiff executed the March 26, 2002 Agreement, which was a three-ply form, and that it was ERN's routine practice to provide the merchant (in this case, Plaintiff) with the "Merchant's Copy" of both the front and reverse sides of both pages of the merchant agreement.  The page on which the signature of Plaintiff's

---

[1]  Rony Natanzon's affidavit (Ex. 4, ¶ 21) confirms the authenticity of all of the documents attached as Exhibits hereto.

Treasurer, Clayton Stead, appears acknowledges immediately above his signature that the parties "agree to each of the terms and conditions on the reverse side and acknowledges that such provisions are binding upon each of them, their successors, heirs and assigns." (*See* Ex. 5 hereto and Complaint Ex. A). Hence, both the 3-ply form and the notice on the signature page demonstrate that Plaintiff was aware of the entirety of the contract. *Id.*

C.  Plaintiff's Claims

The Complaint contains the following counts: Count I – "Fraud, Embezzlement & Conversion"; Count II – "Civil Conspiracy"; Count III – "Intentional Interference with Contractual Relations"; Count IV – "Civil Conspiracy to Intentionally Interfere with Contracts and Contractual Relations"; Count V – "Chapter 93A"; Count VI – "RICO"; and Count VII – "Successor Liability (ERN Acquisitions [*sic*], LLC)". In each of these counts Plaintiff requests damages in excess of $230,000.

Plaintiff's core claim is that ERN had an obligation under the Agreement to disburse funds due to Plaintiff from consumer check transactions processed by ERN for Plaintiff, but that Defendants Natanzon and Taylor "intentionally and maliciously directed ERN to retain the collected proceeds of the checks collected on behalf of and owned by the merchants, contrary to state and federal law *and their contractual obligations* and their obligations under the National Automated Clearinghouse Association ('NACHA') Rules." *Id.* ¶14; (emphasis added). The Complaint alleges that Defendants misappropriated and embezzled merchants' collected check funds processed and held by ERN. *Id.* ¶ 16. *See also id.* ¶ 17 ("ERN was . . . required as the merchant's agent and fiduciary . . . to credit the merchant's account with the funds collected, less the agreed processing fee, so the merchant would receive the customer's funds for the goods purchased.")

Plaintiff alleges the existence of a scheme whereby "...merchants, many of whose customers' checks had already been collected using the ACH system and had already been received by ERN in ERN cash accounts, would be denied payment and their funds embezzled." *Id.* ¶ 18. The Complaint repeatedly references the Agreement. For example, Plaintiff alleges that Defendants Natanzon and Taylor "knew of the existence of the ERN contracts with merchants, *including the contract with Plaintiff, and the contractual obligations and undertakings* memorialized therein", and that Natanzon and Taylor conspired to aid "ERN in the breaching of the contractual obligations and undertakings memorialized in the contract . . . ." *Id.* ¶ 27. *See also* ¶ 28 ("Rony Natanzon and Vered Natanzon [Taylor] acted overtly to breach the ERN agreement, including without limitation, knowingly embezzling merchant's check funds...."); ¶ 29 ("... Natanzon and ERN became unable to perform the contractual obligations and undertakings under the contract"); ¶ 30 ("... conspiracy to breach the contract and embezzle Plaintiff's funds..."); ¶ 33 (Natanzon and . . . Taylor knew of the existence of the contracts . . . between Plaintiff and ERN, and . . . between Plaintiff and its customers . . ."); ¶ 34 (". . . Natanzon and Vered Taylor . . . intentionally interfered with those contractual relations . . ."); ¶ 41 (allegation that Natanzon and Taylor conspired to intentionally interfere with contract between Plaintiff and ERN); ¶ 65 "ERN Acquisitions [*sic*], LLC assumed and performed the contract between plaintiff and ERN and performed all the services to be performed by ERN as if the ERN contract with plaintiff were a contract between plaintiff and ERN Acquisition, LLC. ERN Acquisitions, [*sic*], LLC used the same name, address, phone numbers, forms and stationery as ERN in performing the contract"); ¶ 67 ("[b]y its conduct, ERN Acquisitions [*sic*], LLC has impliedly assumed the contract between plaintiff and ERN and is therefore liable to plaintiff for all amounts due plaintiff from ERN, including the more

than $230,000 collected by ERN but not transferred into plaintiff's bank account").  Plaintiff nowhere makes any allegations of wrongful conduct by Acquisition, but instead avers that Acquisition is liable for ERN's alleged wrongful acts as ERN's "successor".  *See* Complaint ¶ 69.

## Argument

I.   **THIS ACTION SHOULD BE DISMISSED PURSUANT TO THE FORUM SELECTION CLAUSE IN THE MARCH 26, 2002 AGREEMENT SIGNED BY PLAINTIFF**

Plaintiff's Complaint fails to acknowledge the existence of the forum selection clause set forth in § 15.2 of the Agreement between Plaintiff and ERN.  Section 15.2 provides:

> This Agreement shall be construed and enforced in accordance with the laws of the State of Maryland without reference to choice of law rules.  Any legal action filed, whether in law, equity, small claims or otherwise, including an original complaint or third party claim, by and in the right of any party to this Agreement, or any action arising under or related to this Agreement, including but not limited to, a claim for payment under this Agreement, the claim for payment under any applicable Merchant Processing Agreement, and also including any non-contract claim, including, but not limited to, tort claims, shall be brought and maintained solely and exclusively in the State Courts located in the County of Baltimore, State of Maryland, or the Federal District Court in Baltimore City, State of Maryland, and expressly agree to such forum for the bringing of any suit, action, or proceeding out of obligations herein and expressly waive any objection or defense related to personal jurisdiction, process or venue brought in either of such courts.

(Ex. 5, § 15.2)

This forum selection clause appears on the reverse side of the single page of the four-page Agreement that Plaintiff attached to its Complaint as Ex. A thereto.  *See* **Rony Natanzon Aff. ¶¶ 18-19 (Ex. 4).**  *See also* **Amit Natanzon Aff. ¶¶ 5-13 (Ex. 6)** (March 26, 2002 Agreement was the standard form of ERN merchant agreement; was a three-ply form, and it

was ERN's and Amit Natanzon's habitual practice to provide the merchant the "Merchant Copy" of both the front and reverse sides of each page of the Agreement). Immediately above the signature of Plaintiff's Treasurer Clayton Stead appears an express acknowledgment that the parties agreed "to the terms and covenants on the reverse side and agre[e] to be bound by those provisions." *See also* Complaint Ex. A.

It is beyond dispute that the § 15.2 forum selection provision applies here. The provision expressly requires the filing and maintenance in Maryland of "[a]ny legal action filed...by or in the right of any party to this Agreement, or any action arising under or related to this Agreement, including, but not limited to, a claim for payment under this Agreement, the claim for payment under any applicable Merchant Processing Capital Agreement, and also including any non-contract claim, including, but not limited to, tort claims...." (Ex. 5, § 15.2) Plaintiff is unquestionably a "party" to the Agreement. *See* Complaint ¶ 12 ("Plaintiff entered into a written contract dated March 26, 2002, a copy of which is attached hereto as Ex. A"). It is also beyond dispute that this action is one "arising under or related to this Agreement" within the meaning of § 15.2. Thus, the Complaint attaches one page of the four-page Agreement as Complaint Ex. A and refers to the agreement throughout the Complaint: ¶¶ 8, 11, 12, 18, 26, 27, 28, 29, 30, 31, 33, 34, 36, 37, 38, 40, 41, 42, 44, 46, 47, 65, 66, and 67. Given Plaintiff's core claim that the Defendants are responsible for the breach or non-fulfillment of the obligation set forth in the Agreement to pay Plaintiff the amounts collected from customers' checks that were processed by ERN, as well as the Complaint's numerous references to that Agreement, it is beyond question that this is an "action arising under or related to this Agreement", within the scope of the § 15.2 forum selection clause.

The federal, Massachusetts, and Maryland courts readily enforce forum selection clauses similar to the one signed by this Plaintiff. Massachusetts enforces forum selection clauses so long as they are fair and reasonable. *See Jacobson v. Mail Boxes, Etc. U.S.A.*, **419 Mass. 572, 574-75 (1995),** *Cambridge Biotech Corp. v. Pasteur Sanofi Diagnostics,* **433 Mass. 122, 130 (2000);** *see also V. Bremen v. Zapata Off-Shore Co.,* **407 U.S. 1, 18 (1972)** (for court to conclude that forum selection clause is unfair or unreasonable, party seeking to escape consequences of clause must show that "trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in Court"); *Gilman v. Wheat, First Securities, Inc.,* **692 A.2d. 454, 462-63 (Md. 1997)** (forum selection clause is presumptively valid and enforceable and party resisting it has the burden of demonstrating that it is unreasonable).

In *Silva v. Encyclopedia Britannica, Inc.* **239 F.3d 385, 388 (1st Cir. 2001),** the First Circuit observed that a forum selection clause will be upheld unless "enforcement would be unreasonable and unjust, or . . . the clause [is] invalid for such reasons as fraud or overreaching." **239 F.3d at 388,** quoting *Zapata,* **407 U.S. at 15.** In *Silva*, the plaintiff filed suit against his former employer, Encyclopedia Britannica, in the Puerto Rico federal district court. A forum selection clause in the plaintiff's employment contract required the suit to be brought and maintained in Illinois. The plaintiff argued that the contract contained "boiler plate provisions not subject to negotiation and that the forum-selection clause was in small print on the back of the contract. He also placed great weight on the 'overwhelming bargaining power and influence' of the employer in the hiring process to support his view that the clause was unenforceable." *Id.* The First Circuit rejected those arguments, holding that "[t]hese

reasons fall far short of meeting the required criteria for establishing 'fraud or overreaching' nor do these reasons render the enforcement of the clause 'unreasonable and unjust'." *Id*.

The court explained, in a passage that applies with equal force to the forum-selection clause here:

> First, that the forum-selection clause is a boiler plate provision does not *ipso facto* render it invalid. It is not the law that one must bargain for each and every written term of a contract. Similarly the placement of the clause on the reverse side of the contract is of little consequence where, as here, it is printed clearly in plain language and in a contract of reasonable length. Finally, Britannica's alleged bargaining power is not relevant on these facts. Britannica used its bargaining power to do nothing more than offer an appealing employment opportunity to appellant, and no evidence suggests that he was coerced into entering the agreement. All that remains, then, is an arms-length transaction, the terms of which are binding on both parties. As such, the enforcement of those terms is not unreasonable, and hence the case was properly dismissed.

*Silva*, 239 F.3d at 388 (internal citations omitted).

Application of these principles here is straightforward. The Agreement's forum selection clause is enforceable because Plaintiff cannot make a clear showing that enforcement would be unreasonable, that the clause was induced by fraud or overreaching, that the contractually selected forum of Maryland is so unfair and inconvenient as (for all practical purposes) to deprive Plaintiff of a remedy or of its day in court, or that enforcement would contravene a strong public policy of Massachusetts. Plaintiff, a sophisticated company with multiple retail store locations, that had counsel readily available to it, expressly agreed to be bound by the "terms and covenants" appearing on the reverse of the Agreement that its Treasurer signed. *See* Ex. A. There is no suggestion that Plaintiff was unaware of the clause's existence or its meaning. *Id*. Plaintiff was not obliged to deal with ERN if it objected to the clause. Nor can Plaintiff suggest any significant inconvenience in litigating its case in a

Maryland court. Maryland is hardly a remote, alien forum. Most of the relevant documents pertaining to this matter are in Maryland, and relevant information, both documentary and testimonial, is more likely to be in Maryland than in Massachusetts. *See, e.g., Gilman*, 692 A.20 at 463-64.

There was good reason for ERN to select Maryland as the chosen forum. ERN was headquartered in Maryland. The agreement calls for Maryland substantive law to apply and, notwithstanding that Maryland law could be applied by this Court, it is not unreasonable to assume that the Maryland courts would be most familiar with it. There is no strong public policy of Massachusetts that would be violated by enforcing the clause, as Massachusetts and federal courts readily enforce forum selection clauses. Accordingly, this action should be dismissed without prejudice pursuant to Fed. R. Civ. P. 12(b)(6) so that it may be re-filed in the appropriate Maryland court.[2]

II. **THE COMPLAINT FAILS TO STATE A CLAIM AGAINST ACQUISITION UPON WHICH RELIEF CAN BE GRANTED, BECAUSE (1) THE BANKRUPTCY COURT ORDER BARS LIABILITY BY ACQUISITION FOR CLAIMS AGAINST ERN; AND BECAUSE (2) ACQUISITION DOES NOT OWN PLAINTIFF'S ACCOUNTS, UPON WHICH THE COMPLAINT IS BASED AS IT DID NOT PURCHASE THOSE PARTICULAR ACCOUNTS FROM ERN**

Plaintiff's only claim in the Complaint against Acquisition is Count VII, for so-called "successor liability". Plaintiff alleges that Acquisition "assumed and performed the contract between plaintiff and ERN and performed all the services to be performed by ERN as if the ERN contract with plaintiff were a contract between plaintiff and ERN Acquisition, LLC." Complaint ¶ 65. Plaintiff further alleges in Count VII that "[b]y its conduct, ERN

---

[2] *Silva* holds that in the First Circuit, a motion to dismiss based upon a forum-selection clause "is treated as one alleging the failure to state a claim for which relief can be granted under Fed. R. Civ. P. 12(b)(6)." 239 F.3d at 387.

Acquisitions [*sic*], LLC, has impliedly assumed the contract between plaintiff and ERN and is therefore liable to plaintiff for all amounts due plaintiff from ERN . . . ." *Id.* ¶ 67. Plaintiff avers that "ERN Acquisitions [*sic*], LLC is a mere continuation of the business of ERN, LLC." *Id.* ¶ 67. Plaintiff alleges that Acquisition "was established for the purpose of fraudulently continuing the business of ERN without liability for the debts of ERN" (*id.* ¶ 68), and that Acquisition "as the successor of ERN, is indebted to plaintiff in an amount in excess of $230,000 which [*sic*] has failed and refused to pay to plaintiff." *Id.* ¶ 69.

Plaintiff's claim against Acquisition is untenable as a matter of law and undisputed fact. Acquisition was formed in July, 2004 for the purpose of purchasing and holding certain assets of ERN that ERN's bankruptcy Trustee sold at an auction sale. (R. Natanzon Aff. Ex. 4 ¶ 11). The Bankruptcy Court for the District of Maryland approved the Trustee's sale of ERN assets to Acquisition pursuant to a July 9, 2004 Order.[3] *See* Order Granting Chapter 11 Trustee's Emergency Motion for Order Authorizing Trustee to Sell Assets of the Debtor Free and Clear of Liens, Claims, Encumbrances, and Other Interests (the "Sale Order"), a copy of which is attached hereto as Ex. 1. The first decretal paragraph on p. 7 of the Sale Order further provides in pertinent part as follows:

> ORDERED that (a) Acquisition LLC, its successors and assigns shall not be liable for any claims (including but not limited to any and all 'claims' as defined in section 101(5) of the Bankruptcy Code and any and all rights and claims under any bulk transfer statutes and similar laws) against the Debtor [i.e. ERN] or its estate, except for the debts of the Assumed Secured Creditors to the extent set forth in any assumption agreements, and (b) Acquisition LLC is not assuming nor shall Acquisition LLC or

---

[3] To the extent that Defendants' reliance upon the Sale Order and other documents outside the pleadings attached hereto requires conversion of Defendants' instant Rule 12(b)(6) motion to dismiss as to Acquisition into one for summary judgment under Rule 56, Defendants request, in the alternative, that the Court grant summary judgment dismissing all claims against Acquisition.

> successors and assigns be in any way whatsoever be liable or
> responsible, as successor or otherwise, for any other liabilities,
> debts or obligations of the Debtors except as set forth by the
> terms of this Order and the Bid....[4]

The quoted provision of the Sale Order thus bars Plaintiff's Count VII claim against Acquisition, because that claim is based on the (incorrect) notion that Acquisition, as the alleged "successor" of ERN is liable under a theory of successor liability. Accordingly, Count VII should be dismissed with prejudice.

Moreover, ERN Acquisition did *not* purchase Plaintiff's account with ERN which account is the basis for Plaintiff's claims against Acquisition. This is demonstrated by Complaint Ex. A, the "Check Service Data" page signed by Plaintiff, which provides that Plaintiff ordered "check conversation" and "conversion/guarantee" services from ERN. The Bill of Sale (Ex. 7) that memorialized the Trustee's sale of certain ERN assets to Acquisition specifies in § 1(c), a subsection of the "Purchased Assets" section, that Acquisition was not purchasing all of ERN's merchant agreements. Rather, § 1(c) provides that Acquisition was purchasing only the following merchant agreements:

> (c) Any and all of the Debtor's right, title and interest to
> merchant agreements with respect to "Option 1", "Option 3" and
> "Option 6" processing only, including, but not limited to, leases,
> accounts receivable, equipment and causes of actions relating
> thereto.

(Ex. 7 hereto).

---

[4] A creditor of ERN, Baron Financial Corp ("Baron") appealed the Sale Order to the United States District Court for the District of Maryland. That court (per Garbis, J.) affirmed the Sale Order. *See* Ex. 2. The Trustee for ERN agreed at the direction of District Judge Garbis to request the Bankruptcy Court in Maryland to modify a different provision of the Sale Order, and that request is pending. *Id.*

The Rony Natanzon Aff. ¶ 13 (Ex. 4 hereto) explains that the "Check Conversion" and "Conversion/Guarantee" services that Plaintiff ordered from ERN pursuant to the "Check Service Data" page of the ERN/Plaintiff March 26, 2002 Agreement (*see* Complaint Ex. A) are "Option 2" and "Option 4" processing services, respectively.  *See also* Ex. 8 hereto. (ERN's account statement to Plaintiff for March, 2003, showing types of services provided). Thus, Plaintiff's agreement and account with ERN was simply not purchased by Acquisition in the Conveyance Instrument.   Plaintiff's successor liability claim against Acquisition must therefore also fail because Acquisition is not ERN's successor with respect to Plaintiff, as well as because the claim against Acquisition is barred by the Bankruptcy Court Sale Order.

### III. EVEN ASSUMING, ARGUENDO, THAT THE FORUM SELECTION CLAUSE IS NOT ENFORCED, THE COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS UNDER THE MASSACHUSETTS LONG ARM STATUTE

Defendants also move pursuant to Fed. R. Civ. P. 12(b)(2) for dismissal of this action for lack of personal jurisdiction, as none of them come within the reach of the Massachusetts long-arm statute.

Plaintiff asserts that personal jurisdiction exists over each Defendant pursuant to the Massachusetts long arm statute, Mass. Gen. Laws Ch. 223A, § 3(a), (b) and (d), averring that "[e]ach of the defendants, through Massachusetts employees [*sic*], ERN, LLC and ERN Acquisition, LLC has transacted substantial business with plaintiff and numerous other Massachusetts businesses . . .[and] have caused tortuous [*sic*] injuries in Massachusetts." Complaint ¶ 8.  The plain language of the long arm statute and its well-established judicial construction, however, make clear that Defendants are not amenable to personal jurisdiction in Massachusetts.

The Massachusetts long arm statute provides, in pertinent part, that:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's

(a) transacting any business in this commonwealth;

(b) contracting to supply services or things in this commonwealth;

(d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth;

Mass. Gen. Laws Ch. 223A, § 3(a), (b) and (d).

As the Complaint makes clear, personal jurisdiction over individual Defendants Natanzon and Taylor is sought solely on the basis of their having been employees of ERN at the time of the alleged wrongdoing, not on actions taken by either of them in Massachusetts involving Plaintiff. It could not be otherwise, as their extremely attenuated contacts with Massachusetts – which took the form of a handful of visits to visit Amit Natanzon as well as Taylor's infrequent telephone contact with Plaintiff from Maryland (*see* R. Natanzon Aff. ¶ 7, 9; Taylor Aff. (Ex. 9) ¶ 4, 7-10) – are constitutionally insufficient to confer personal jurisdiction, as those activities bear no relationship to the specific wrongs alleged in the Complaint. *See Interface Group–Massachusetts, LLC v. Rosen*, 256 F. Supp. 2d 103, 107-09 (D. Mass. 2003).

Moreover, personal jurisdiction over a non-resident corporate officer or employee may not be based on jurisdiction over the corporation itself. *Id.* at 105, 107. Hence, even though Plaintiff could theoretically obtain personal jurisdiction over ERN in this state (were ERN, which is in bankruptcy, amenable to suit), Plaintiff would still be left with the burden of

establishing jurisdiction over those individuals based on their individual contacts with the state and the relationship of those contacts in the alleged wrongdoing.  As set forth above, Plaintiff cannot meet that burden.

Nor can personal jurisdiction be conferred over Defendant Acquisition based on acts allegedly committed by its purported predecessor, ERN.  Personal jurisdiction does not exist over a corporate purchaser or assignee of another corporation's assets simply because personal jurisdiction would have existed over the original corporate owner of those assets.  *See Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, **338 F.3d 773, 784-85 (7th Cir. 2003);** *see also Bouley v. American Cyanamic Company*, **1986 WL 13400 at \*2 (D. Mass. Nov. 19, 1986)** (noting precedents that court will assume personal jurisdiction over a successor corporation only when liability is premised on a theory of succession by merger).  As explained in greater detail in Part II, *supra*, Acquisition is not ERN's successor. Acquisition was not even formed until July, 2004, after ERN's bankruptcy filing in April, 2004 and after the appointment of a Trustee.  R. Natanzon Aff. ¶ 11.  Because Acquisition merely purchased certain assets (not including Plaintiff's account) of ERN from ERN's Trustee, *see* Sale Order and Bill of Sale and Closing Agreement, Exs. 1 and 7 hereto, whatever contacts ERN may have had with Massachusetts cannot, as a matter of law, be ascribed to Acquisition.

Not being able to vicariously assign personal jurisdiction from ERN to Acquisition, Plaintiff is thus left with relying upon Acquisition's own contacts with Massachusetts under the long arm statute.  However, Plaintiff's instant causes of action do not arise from *Acquisition* transacting business in Massachusetts (§ 3(a)); from *Acquisition* contracting to supply services in Massachusetts (§ 3(b)); or from *Acquisition* causing tortious injury in Massachusetts by act or omission from outside Massachusetts (§ 3(d)).  Plaintiff's Complaint is abundantly clear that

it is suing for alleged wrongs committed by *ERN* from Maryland.  As explained in Part II, *supra*, these claims fail on the merits both because the bankruptcy Sale Order precludes the transfer of liability from ERN to Acquisition as a matter of law, and because, as a matter of fact, Plaintiff's accounts with ERN were not among those acquired by Acquisition.  And, as just discussed, *supra*, there can likewise be no transfer of personal jurisdiction from ERN to Acquisition.

In short, none of the Defendants fall within the ambit of the Massachusetts long arm statute in their own right, and, as a matter of law, personal jurisdiction cannot be obtained over them by vicariously assigning to them the jurisdiction Massachusetts would have been able to exercise over ERN, the now-bankrupt party with whom Plaintiff had a legally cognizable relationship.  Accordingly, in the absence of personal jurisdiction, the Defendants should be dismissed from this suit without prejudice.

## IV. THE DISTRICT OF MARYLAND IS THE ONLY FORUM WHERE PROPER VENUE AND PERSONAL JURISDICTION CAN BE OBTAINED OVER DEFENDANTS UNDER RICO, 18 U.S.C. § 1965

Though not yet raised, Plaintiff may assert that personal jurisdiction and proper venue exist in this District under Complaint Count VI, a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, *et seq.*  RICO authorizes nationwide service of process.  *See* 18 U.S.C. § 1965.  However, the RICO personal jurisdiction/venue statute[5] may be invoked to accomplish personal jurisdiction and venue over non-resident defendants only if no district is available where those exist as to all defendants.  In this case,

---

[5]  The statute's expansive language permitting suit has caused the courts to largely conflate the personal jurisdiction and venue analyses.  *See* 18 U.S.C. § 1965.

because personal jurisdiction and proper venue exist as to all Defendants in the District of Maryland, Plaintiff may not rely on § 1965 to accomplish those ends here.

In pertinent part, § 1965 provides:

> (a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

> (b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. § 1965(a) and (b).  Read together, these provisions are construed to mean that if a single RICO defendant "resides, is found, has an agent, or transacts his affairs" in a given district under § 1965(a), proper venue for the action lies in that district and personal jurisdiction may then be exercised in that district over all other defendants as "the ends of justice require" under § 1965(b), which provision means that there must be *no district* in which personal jurisdiction otherwise exists over *all* of the defendants    *See PT United Can Co., Ltd. v. Crown Cork & Seal Co.*, **138 F.3d 65, 70-72 (2d Cir. 1998);** *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, **788 F.2d 535, 539 (9th Cir. 1986);** *see also Gutierrez v. Givens*, **989 F.Supp. 1033, 1038 (S.D. Cal. 1998);** *Hawkins v. Upjohn Co.*, **890 F. Supp. 601, 605-09 (E.D. Texas 1994);** *LeDuc v. Kentucky Central Life Ins. Co.*, **814 F. Supp. 820, 826 (N.D. Cal. 1992).**  Put in simplest terms, RICO permits suit to be brought against non-residents of a district based on the residency of at least one defendant in that district *provided that there is no other district in which all of the defendants might otherwise be sued.*

Here, even assuming, *arguendo*, that Acquisition "transacts [its] affairs"[6] in the District of Massachusetts, the fact is that all three Defendants may have personal jurisdiction exercised over them in the District of Maryland, whereas, as explained in Part II, *supra*, no personal jurisdiction whatsoever exists over Natanzon and Taylor in this District. Accordingly, Plaintiff cannot invoke § 1965 to obtain collective personal jurisdiction and venue over these Defendants in this District. Pursuant to Fed. R. Civ. P. 12(b)(2) and (3), Plaintiff's Complaint must thus be dismissed for lack of personal jurisdiction and improper venue.

## V. IN THE ALTERNATIVE, THIS ACTION SHOULD BE TRANSFERRED PURSUANT TO 28 U.S.C. § 1404(a) TO THE DISTRICT OF MARYLAND FOR THE CONVENIENCE OF THE PARTIES AND WITNESSES AND IN THE INTEREST OF JUSTICE

In the alternative, should the Court not dismiss this action, Defendants move pursuant to 28 U.S.C. § 1404(a) for the transfer of this action to the United States District Court for the District of Maryland. Section 1404(a) provides:

> (a) For the convenience of parties and witnesses, and in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a).

Courts consider the following non-exclusive factors in deciding § 1404(a) motions:

> (i) the plaintiff's original choice of forum, (ii) where the events at issue in the lawsuit took place, (iii) the convenience of the parties, (iv) the convenience of the witnesses, (v) the comparative availability of compulsory process to compel the attendance of unwilling witnesses, (vi) the location of the physical evidence, (vii) the enforceability of the judgment, (viii) in which forum can the case be tried more inexpensively and expeditiously, (ix) the relative court congestion in the two forums, (x) the public interest in local adjudication of local controversies, (xi) the relative

---

[6] Acquisition plainly does not reside, is not found, and does not have an agent in Massachusetts.

> familiarity of the courts with the applicable law, (xii) whether
> transfer is in the "interest of justice," (xiii) which forum would
> better serve judicial economy, and (xiv) whether a contractual
> clause specifies a specific forum to resolve contractual disputes.

*See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,* **184 F. Supp. 2d 55, 87-88 n.10 (D. Mass. 2001).  As a general matter, a plaintiff's choice of forum is presumptively favored and the burden of proof rests with the party seeking transfer.  *Id.* at 86-87.**

Here, however, application of these factors strongly favors transfer of this action to the District of Maryland.  Although Plaintiff's chosen forum was Massachusetts, the core alleged events (i.e. defendants' alleged scheme withholding payments from Plaintiff) took place in Maryland.  Of the four parties to this action, only one (Plaintiff) is a Massachusetts resident, while the three Defendants are all from Maryland.  Defendants' witnesses are numerous and virtually all located in Maryland.  Rony Natanzon Aff. ¶ 14.  Most of the documentary evidence, i.e. ERN's records concerning its account with Plaintiff, also are located in Maryland, either in hard copy or in computer form.  *Id.* ¶ 15.  The District of Maryland has already committed substantial judicial resources to litigation involving ERN and Rony Natanzon.  Now pending in the District of Maryland is the lawsuit entitled *Baron Financial Corporation v. ERN, LLC, et al.*, Civil Action No. 1-03-cv-03563 – WDQ. *Id.* ¶ 16. The Complaint in the Maryland action (Ex. 10 hereto) contains similar, overlapping allegations concerning ERN's alleged withholding of funds allegedly due to merchants as asserted here.

As previously noted, the United States Bankruptcy Court for the District of Maryland is handling ERN's bankruptcy proceeding, and has appointed a Trustee for ERN, and the Fourth Circuit recently affirmed the Maryland Bankruptcy Court's Sale Order in connection with the Trustee's sale of ERN assets to Acquisition.  Thus, there has already been and will continue to be, a substantial commitment of judicial resources in Maryland to addressing claims relating to

ERN and the Natanzon family.  It would make little sense for the claims in this case – similar to claims asserted in the Maryland action – to be addressed by the Massachusetts federal courts.  Thus, transfer would better serve judicial economy.

Crucially, Plaintiff has already agreed to Maryland as the appropriate forum to resolve disputes concerning the contract between Plaintiff and ERN and its alleged successor, as specified in § 15.2 of the Agreement.  The contract also contains a Maryland choice of law clause and, as previously-noted, judicial economy is served by having a Maryland court apply Maryland law.  In sum, for the convenience of the parties and witnesses and in the interest of justice, Defendants respectfully suggest that this Court should exercise is discretion to transfer this action to the District of Maryland.

### Conclusion

For the foregoing reasons, Defendants respectfully request that this action be dismissed. In the alternative, Defendants respectfully request that this action be transferred pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the District of Maryland.

Respectfully submitted,

RONY NATANZON, VERED TAYLOR and
ERN ACQUISITION, LLC,

By their attorneys,

Of Counsel:

Paul M. Sandler                          /s/ Erik P. Bartenhagen_____
Robert B. Levin                          John P. Driscoll, Jr. (BBO #135360)
Trey Mayfield                            Erik P. Bartenhagen (BBO #640003)
Shapiro Sher Guinot & Sandler            Nutter, McClennen & Fish, LLP
36 South Charles Street, Suite 2000      World Trade Center West
Baltimore, Maryland 21201                155 Seaport Boulevard
(410) 385-0202                           Boston, MA 02210
                                         (617) 439-2000
Dated:  March 21, 2005

# Exhibits 1-5

to Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for the
Venue Transfer Pursuant to 28 U.S.C. § 1404(a)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BES ENTERPRISES, INC.       )
                               )   Civil Action No. 05-10477 GAO
      Plaintiff,       )
                               )
v.                         )
                               )   **INDEX OF EXHIBITS**
RONY NATANZON, et al.     )
                               )
      Defendants.     )

1.    Order Granting Chapter 11 Trustee's Emergency Motion for Order Authorizing Trustee to Sell Assets of the Debtor Free and Clear of Liens, Claims, Encumbrances and Other Interests ("Sale Order")

2.    Order Affirming Bankruptcy Court

3.    Decision of U.S. Court of Appeals for Fourth Circuit dismissing appeals re: Sale Order

4.    Affidavit of Rony Natanzon

5.    March 26, 2002 Agreement between Bes Enterprises, Inc. and ERN, LLC

6.    Affidavit of Amit Natanzon

7.    Bill of Sale, Assignment of Intangibles and Assumption of Liabilities and Closing Agreement dated July 19, 2004 between ERN's (t/a Nationwide Check Services) Trustee and ERN Acquisition, LLC

8.    ERN (Nationwide Check Services) statement to Plaintiff (Betsy's) for March 2003

9.    Affidavit of Vered Taylor

10.   Second Amended Complaint in Baron Financial Corporation v. Rony Natanzon, et al. MJG03-cv-3563 (now WDQ-03-CV-3563)

# Exhibit 1

to Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for the
Venue Transfer Pursuant to 28 U.S.C. § 1404(a)

**ORDERED**

**te signed July 09, 2004**



*James F. Schneider*
**JAMES F. SCHNEIDER**
**U. S. BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

In re:                  *

**ERN, LLC**            *       Case No. 04-20521-JS
                          (Chapter 11)
        Debtor.          *

                                *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**ORDER GRANTING CHAPTER 11 TRUSTEE'S EMERGENCY
MOTION FOR ORDER AUTHORIZING TRUSTEE TO SELL ASSETS
OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS,
<u>ENCUMBRANCES AND OTHER INTERESTS</u>**

Upon the Emergency Motion filed by Lawrence D. Coppel, Chapter 11 Trustee

(the "Trustee") for the bankruptcy estate of ERN, LLC (the "Debtor"), pursuant to 11 U.S.C.

§§ 105, 363(b) and (f) and 365 and Fed. R. Bankr. P. 2002(a)(2) and (c), 6004 and 6006, for an

Order, *inter alia*, (i) Authorizing Trustee to Sell Assets of the Debtor Free and Clear of Liens,

Claims, Encumbrances and Other Interests, and (ii) Establishing Bidding Procedures in

Connection with Such Sale (the "Emergency Sale Motion") and this Court's June 25, 2004 Order

Approving Bidding Procedures With Respect To Chapter 11 Trustee's Emergency Motion for

Order, Inter Alia, (i) Authorizing Trustee to Sell Assets of the Debtor Free and Clear of Liens,

Claims, Encumbrances and Other Interests, and (ii) Establishing Bidding Procedures in

Connection with Such Sale (the "Bidding Procedure Order"), and it appearing under the

circumstances that appropriate notice of the Emergency Sale Motion and the Bidding Procedure

Order have been given to interested parties, and it further appearing that the relief requested in

the Emergency Sale Motion is warranted by good and sufficient cause and is in the best interest

of the Debtor, its bankruptcy estate, creditors and parties in interest, the Court hereby finds and

concludes as follows:

        A.      The Trustee has filed the Emergency Sale Motion, pursuant to Sections

105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9019,

requesting authorization, *inter alia*, to sell assets of the Debtor (as defined in the Motion, the

"Assets") at an auction sale (the "Auction").

        B.      The Trustee has complied with all applicable procedures for providing

notice of the sale of the Assets and the Auction. Proper, timely and sufficient notice of the

Emergency Sale Motion and the hearings thereon was provided, and such notice was properly

served on all required persons and entities, including, but not limited to, all creditors, all parties

requesting notice in accordance with the Bankruptcy Rules, and all persons claiming any interest

in or related to the Assets.

        C.      Proper, timely, adequate and sufficient notice of the Emergency Sale

Motion, the hearing thereon, and the Auction and Bidding Procedures proposed therein has been

provided in accordance with 11 U.S.C. § 105(a), 363 and 365 and Rules 2002, 6004, 6006 and

9019 of the Bankruptcy Rules. The notice adequately discloses the full terms of the proposed

auction sale process, the justification for the proposed auction sale process and the likelihood that,

following the conclusion of the proposed auction sale, the Debtor's operations will be terminated and its remaining Assets liquidated.

      D.      Pursuant to the terms of the Emergency Sale Motion and the Bidding Procedure Order, the Auction was conducted on July 6, 2004.

      E.      Pursuant to the terms of the Emergency Sale Motion and the Bidding Procedure Order, there were three Qualified Bids to purchase the Assets of the Debtor submitted in conjunction with the Auction: (i) Baron Financial Corp. or its nominee ("Baron") , (ii) Rony Natanzon or his designee ("Acquisition LLC"), and (iii) Global eTelecom ("Global").

      F.      At the conclusion of the Auction, the Trustee concluded that the bid of Acquisition LLC as revised and submitted at the Auction in the form attached hereto as Exhibit A (the "Acquisition Agreement") was the highest and best bid for the Assets.

      G.      The conveyance of the Assets pursuant to the terms and conditions set forth in the Acquisition Agreement, including the assumption and/or rejection of any unexpired leases and executory contracts required pursuant to the terms of the in the Acquisition Agreement, represents the valid and reasonable exercise of the Trustee's business judgment. The Trustee has demonstrated both (i) good, sufficient and sound business purpose and justification pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, for the consummation of the Auction and the sale to Acquisition LLC, and (ii) compelling circumstances to warrant approval of the Acquisition Agreement recommended by the Trustee pursuant to 11 U.S.C. § 363(b) prior to, and outside of, a plan of reorganization.

      H.      The bid of Acquisition LLC and the Acquisition Agreement were negotiated, proposed and entered into by the parties without collusion, in good faith, and from arm's length bargaining positions. Acquisition LLC is a good faith purchaser under section

363(m) and 363(n) of the Bankruptcy Code and, as such, is entitled to the protections afforded thereby.

I.    No party, including but not limited to the Trustee and Acquisition LLC has engaged in any conduct that would cause or permit the Asset sale to Acquisition LLC resulting from the Auction to be voided under 11 U.S.C. § 363(n).

J.    The consideration to be paid by Acquisition LLC (i) is fair and reasonable in relation to the value of Assets to be conveyed to Acquisition LLC, (ii) will provide greater recovery for the Debtor's creditors than would be provided by any other available alternative disposition of such Assets, and (iii) constitutes reasonably equivalent value and fair consideration for such sale.

K.    Except with respect to the secured debts of David M. Rombro and Antwerpen Motor Cars, Ltd. as set forth below, the Trustee may sell the Assets free and clear of any and all liens, claims, encumbrances and other interests (collectively, the "Interests") within the meaning of 11 U.S.C. § 363(f), regardless of how or when any such Interests may have arisen or arise.

L.    The sale to Acquisition LLC recommended by the Trustee as a result of the Auction is in the best interests of the Debtor's creditors and its bankruptcy estate.

**NOW, THEREFORE,** based upon the findings of fact and conclusions of law set forth above and the pleadings and proceedings of record at the hearings on the Emergency Sale Motion, it is hereby:

**ORDERED** that the Emergency Sale Motion is granted in its entirety. The sale to Acquisition LLC pursuant to the terms of the Acquisition Agreement, as recommended by the Trustee is approved in all respects and such sale is hereby authorized, *inter alia,* under Sections

105(a), 363(b), 363(m) and 365 of the Bankruptcy Code. To the extent any objections to the Emergency Sale Motion and the recommendations of the Trustee have not been withdrawn, waived or resolved, such objections are hereby overruled; and it is further

ORDERED that the findings of fact and conclusions of law set forth above and as stated at the conclusion of the hearing shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014; and it is further

ORDERED that the Trustee is authorized to consummate the sale to Acquisition LLC pursuant to the terms of the Acquisition Agreement, to execute all agreements and documents contemplated thereby and to sell all of the estate's right, title and interest in and to the Assets to be purchased by Acquisition LLC, free and clear of any and all liens, claims, encumbrances and other interests, in accordance with the terms of the Emergency Sale Motion, the Bidding Procedure Order and this Order, provided that Acquisition, LLC shall assume the secured debts of David M. Rombro and Antwerpen Motor Cars, Ltd. (the "Assumed Secured Creditors") and the Assumed Secured Creditors shall be deemed to have released the bankruptcy estate from any liability on their secured claims upon the assumption of their debts; and it is further

ORDERED that pursuant to Section 363(f) of the Bankruptcy Code and this Court's equitable powers and authority, the Trustee shall convey and deliver to Acquisition LLC good, marketable and transferable title to the Assets purchased pursuant to the terms of the Acquisition Agreement, which shall be free and clear of any and all liens, claims, encumbrances and other interests, including, without limitation, all security interests in and all liens upon such Assets except as set forth with respect to the claims of the Assumed Secured Creditors as set

forth above. Any and all any and all liens, claims, encumbrances and other interests, which have not been assumed and/or waived pursuant to the terms of the Acquisition Agreement shall attach to the cash proceeds from the sale of Assets in order of their priority and with the same validity, force and effect which they now have as against the Assets. The Trustee's distribution of such cash proceeds shall be subject to the Court's further approval; and it is further

ORDERED that, pursuant to Sections 365(b) and (f) of the Bankruptcy Code, the Trustee is authorized to assume and assign such executory contracts or unexpired leases as are purchased pursuant to the terms of the Acquisition Agreement subject to the curing of any monetary defaults; and it is further

ORDERED that except as provided for in the Acquisition Agreement, this Order, or any separate assumption agreement entered into with Acquisition LLC, all persons and entities holding any liens, claims or interests of any kind and nature with respect to the Assets acquired pursuant to the terms of the Acquisition Agreement are hereby barred from asserting such liens, claims or interests against Acquisition LLC, its successors or assigns, or the acquired Assets; and it is further

ORDERED that Acquisition LLC is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections afforded thereby; and it is further

ORDERED that the Trustee is authorized to execute and deliver such documents, take or perform such acts, and do such other things as may be necessary to effect and carry out the provisions of the Emergency Sale Motion, the Bidding Procedure Order and the terms and conditions of the Acquisition Agreement and this Order; and it is further

ORDERED that (a) Acquisition LLC, its successors and assigns shall not be liable for any claims (including, but not limited to any and all "claims" as defined in section 101(5) of the Bankruptcy Code and any and all rights and claims under any bulk transfer statutes and similar laws) against the Debtor or its estate, except for the debts of the Assumed Secured Creditors to the extent set forth in any assumption agreements, and (b) Acquisition LLC is not assuming nor shall Acquisition LLC or successors and assigns be in any way whatsoever be liable or responsible, as successor or otherwise, for any other liabilities, debts or obligations of the Debtors except as set forth by the terms of this Order and the Bid; and it is further

ORDERED that except as provided for in any separate assumption agreements entered into with Acquisition LLC, all of the Debtor's claimants and equity security holders, the Trustee and any subsequently appointed trustee shall be barred from asserting, prosecuting, enforcing or collecting against or from Acquisition LLC, its successors and assigns or its property, including, without limitation, the acquired Assets, any claims or causes of action that the bankruptcy estate may have against the Debtor, Rony Natanzon or his family members; and it is further

ORDERED that the Trustee may terminate the Debtor's operations and liquidate any of the Debtor's Assets that remain unsold at the conclusion of the auction, the hearing on the Emergency Sale Motion and the entry of this Order; and it is further

ORDERED that this Order shall be binding upon and enforceable against any subsequently appointed trustee in this case or in any case to which this case may be converted. No plan of reorganization or liquidation filed or confirmed in this case shall alter in any way the terms of this Order, including (without limitation) any of the rights of any auction sale purchaser

whose purchase of Assets is approved by this Order. The provisions of this Order shall remain in full force and effect notwithstanding the confirmation of any plan; and it is further

      **ORDERED** that Acquisition LLC and Rony Natanzon shall continue to make the Debtor's books, records, documents and papers (collectively, the "Business Records") whether in writing or stored electronically, available to the Trustee and his representatives as required by the Trustee. No Business Records may be destroyed or removed without the Trustee's approval.

      **ORDERED** that this Order shall be effective immediately upon its entry and shall not be subject to any automatic stay, including, without limitation any automatic stay which otherwise might apply pursuant to Fed. R. Bankr. P. 6004(g) or Fed. R. Bankr. P. 6006(d); and it is further

      **ORDERED** that this Court retains sole and exclusive jurisdiction to resolve any and all matters or disputes arising under or relating to the Emergency Sale Motion, the sale of the Assets, the administration of the sales proceeds by the Trustee, and the implementation, interpretation or enforcement of this Order, and the relief and protection afforded to auction sale purchaser by this Order.

cc:

      Lawrence D. Coppel, Chapter 11 Trustee
      Gordon, Feinblatt, Rothman,
        Hoffberger & Hollander, LLC
      233 East Redwood Street
      Baltimore, MD 21202

      Bradley J. Swallow, Esquire
      Gordon, Feinblatt, Rothman,
        Hoffberger & Hollander, LLC
      233 East Redwood Street
      Baltimore, MD 21202

Brooke Schumm, Esquire
Daneker, McIntire, Schumm et al.
The Blaustein Building
1 North Charles Street, Suite 2450
Baltimore, MD 21201


Joel I. Sher, Esquire
Shapiro, Sher, Guinot & Sandler
36 South Charles Street
Baltimore, MD 21201

Gary R. Greenblatt, Esquire
Mehlman, Greenblatt & Hare, LLC
1838 Greene Tree Road
Suite 360
Baltimore, MD 21208

Deborah Devan, Esquire
Cynthia Leppert, Esquire
Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.
One South Street, 27th Floor
Baltimore, MD 21202

Sylvia Brokos, Esquire
Comptroller of Maryland
301 West Preston Street
Baltimore, Maryland 21201-1904

Edmund Goldberg, Esquire
Office of the United States Trustee
300 West Pratt Street
Suite 350
Baltimore, MD 21201

James A. Vidmar, Esquire
Linowes & Blocher
7200 Wisconsin Avenue
Suite 800
Bethesda, MD 20814


**End of Order**

# Exhibit 2

to Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for the
Venue Transfer Pursuant to 28 U.S.C. § 1404(a)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

\*

In re ERN, LLC                    \*   Civil Action No. MJG-04-2111

                                  \*

\*       \*       \*       \*       \*       \*       \*       \*       \*

ORDER AFFIRMING
BANKRUPTCY COURT

For the reasons stated on the record of proceedings on
July 20, 2004,[1] the Order granting Chapter 11 Trustee's
Emergency Motion for Order Authorizing Trustee to Sell Assets
of the Debtor Free and Clear of Liens, Claims, Encumbrances
and Other Interests  signed July 9, 2004 is hereby AFFIRMED.

SO ORDERED, on Tuesday, July 20, 2004.

_____/ s /_____
Marvin J. Garbis
United States District Judge

---

[1]    The said record also contains the representation of
counsel for Appellees that, at the conclusion of the instant
appellate process, they would request the Bankruptcy Court to
clarify the said Order as agreed upon by counsel at the
hearing of this date, nunc pro tunc to the date of issuance.

# Exhibit 3

to Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for the Venue Transfer Pursuant to 28 U.S.C. § 1404(a)

**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 04-1834

In Re:  ERN, LLC,

Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

BARON FINANCIAL CORPORATION,

Appellant,

versus

RONY NATANZON,

Party in Interest - Appellee,

and

LAWRENCE D. COPPEL,

Trustee - Appellee,

and

UNITED STATES TRUSTEE FOR THE DISTRICT OF
MARYLAND,

Trustee.

No. 04-1951

In Re: ERN, LLC,

Debtor.

------------------------------

BARON FINANCIAL CORPORATION,

Appellant,

versus

RONY NATANZON; ACQUISITION, LLC,

Parties in Interest - Appellees,

and

LAWRENCE D. COPPEL,

Trustee - Appellee,

and

UNITED STATES TRUSTEE FOR THE DISTRICT OF
MARYLAND,

Trustee.

Appeals from the United States District Court for the District of
Maryland, at Baltimore. Marvin J. Garbis, Senior District Judge.
(CA-04-2111-MJG; BK-04-20521)

- 2 -

Submitted:  January 12, 2005          Decided:  January 31, 2005

————————————

Before NIEMEYER, KING, and DUNCAN, Circuit Judges.

————————————

Dismissed by unpublished per curiam opinion.

————————————

Brooke Schumm, III, David Bart Goldstein, DANEKER, MCINTIRE, SCHUMM, PRINCE, GOLDSTEIN, MANNING & WIDMANN, PC, Baltimore Maryland, for Appellant. Joel I. Sher, Paul M. Sandler, Robert B. Levin, SHAPIRO, SHER, GUINOT & SANDLER, Baltimore, Maryland; Bradley J. Swallow, GORDON, FEINBLATT, ROTHMAN, HOFFBERGER & HOLLANDER, LLC, Baltimore, Maryland, for Appellees.

————————————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

- 3 -

PER CURIAM:

Baron Financial Corporation appeals from the district court's orders: (1) denying its motion for stay pending appeal (No. 04-1834); and (2) affirming the bankruptcy court's order authorizing the sale of the debtor's assets in the underlying bankruptcy proceeding (No. 04-1951). Because the assets have been transferred in accordance with the bankruptcy court's order and Baron Financial has failed to obtain a stay pending appeal, we grant the motion to consolidate these appeals and dismiss the appeals as moot. See 11 U.S.C. § 363(m) (1994); Willemain v. Kivitz, 764 F.2d 1019, 1021-24 (4th Cir. 1985) (holding that sale of property to secured creditor while appeal was pending rendered appeal moot); see also In re Stadium Mgmt. Corp., 895 F.2d 845, 847 (1st Cir. 1990) ("absent a stay, the court must dismiss a pending appeal as moot because the court has no remedy that it can fashion even if it would have determined the issues differently"). We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

DISMISSED

- 4 -

# Exhibit 4

to Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for the
Venue Transfer Pursuant to 28 U.S.C. § 1404(a)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BES ENTERPRISES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 05-10477 GAO |
| | ) | |
| v. | ) | |
| | ) | **AFFIDAVIT OF RONY NATANZON** |
| RONY NATANZON, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Rony Natanzon declares and affirms under penalty of perjury:

1.      I am one of the Defendants in this action. I have personal knowledge of all of the facts set forth in this affidavit and, if called to testify in this matter, I could and would competently testify to each of the facts set forth. I am over 18 years of age.

2.      I submit this affidavit in support of Defendants' motion to dismiss this action, or, in the alternative, to transfer it to the United States District Court for the District of Maryland.

3.      I was formerly the CEO and am the sole member of ERN, LLC ("ERN"). ERN is no longer in business, having filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Maryland on or about April 28, 2004.

4.      The Bankruptcy Court subsequently appointed a Trustee for ERN.

5.      ERN opened and operated an office in Brookline, Massachusetts in approximately September, 2001, and closed that office approximately 2 ½ years later. Amit Natanzon was the manager of the Brookline office. ERN never had any other Massachusetts office or location.

6.     Plaintiff Bes Enterprises, Inc. was a customer of ERN, for which ERN processed checks and/or credit card transactions.

7.     I visited Massachusetts only approximately once or twice to visit Amit Natanzon in the Brookline office.  During these infrequent visits to Boston, I discussed ERN business with Amit and visited with him and his fiancée.  To the best of my recollection I did not discuss the Plaintiff or take any action concerning the Plaintiff while I was in Massachusetts.

8.     To the best of my knowledge, I have never met or spoken with any of the Plaintiff's officers, employees or other representatives.

9.     I had regular email and telephone contact with Amit in Massachusetts, but mainly Amit came to Baltimore every 3-4 weeks to discuss business.

10.     I have had no other personal contact with Massachusetts, own no property there, do not hold any licenses there and have never resided there.

11.     ERN Acquisition, LLC ("Acquisition") was not formed until July, 2004, after ERN had filed for bankruptcy and the Trustee had been appointed.  Acquisition was formed for the purpose of purchasing and holding certain assets of ERN that ERN's Trustee sold at a Bankruptcy Court–approved auction sale.  Acquisition has no office, employees, or agents in Massachusetts.

12.     Certain ERN assets were purchased by Acquisition pursuant to the Sale Order issued by the Bankruptcy Court in Maryland on July 9, 2004.

13.     ERN Acquisition, LLC did not purchase Plaintiff's account with ERN. The Conveyance Instrument that memorialized the ERN Trustee's sale of certain ERN assets to Acquisition specifies in § 1(c) that Acquisition was purchasing only ERN's

right, title and interest to merchant agreements with respect to "Option 1, Option 3 and Option 6 processing only". Plaintiff purchased "check conversion" and "conversion/ guarantee" services, as indicated on the "Check Service Data" page of the March 26, 2002 Agreement. As shown on ERN's monthly transaction statement for Plaintiff for March, 2003, the services Plaintiff ordered were only Option 2 (check conversion) and Option 4 (conversion/ guarantee) services. The March, 2003 statement of Plaintiff's account with ERN is representative of the entire relationship between ERN and Plaintiff, and demonstrates that ERN did not perform Option 1, Option 3 or Option 6 processing for Plaintiff, but only Option 2 and Option 4 for processing. Plaintiff's account was not the type of account that was acquired by Acquisition and Plaintiff's account was not, in fact, acquired by Acquisition.

14.     The witnesses and documents necessary to defend this case are located in the State of Maryland. The former employees of ERN with knowledge of facts relevant to this case are all resident in the State of Maryland and include: Rony Natanzon (former CEO), Martin Taylor (Vice President, Business and Product Development); Vered Taylor (Manager, Check Services); Amit Natanzon (former manager of Brookline, Massachusetts office); and Beth Cooper (Comptroller). In addition, ERN's former accountant, Harold Rothman, CPA who practices in Maryland, will be a necessary witness. ERN's bankruptcy trustee, Lawrence Coppel also is located in Maryland.

15.     The analysis and defense of this case will require review of voluminous documentation both in hard copy and in computerized form, all of which are located in Maryland.

3

16.     A lawsuit is pending in the U.S. District Court for the District of

Maryland, titled *Baron Financial Corporation v. ERN, LLC, et al.*, Civil Action No.

1:03-cv-03563-WDQ. The defendants in that case include Rony Natanzon, Vered

Taylor and ERN Acquisition, LLC, the Defendants in the above-captioned case. The

Maryland action is stayed as to ERN, LLC because of its bankruptcy filing. The

Complaint in this Maryland action includes allegations similar to those alleged in

Plaintiff's Complaint. That case is being vigorously defended.

17.     Attached to Plaintiff's Complaint in this action as Exhibit A is the first

page of a 4 page of a written agreement dated March 26, 2002 between Plaintiff and

ERN, LLC d/b/a as Nationwide Check Services (the "March 26, 2002 Agreement").

Missing from Complaint Exhibit A are the "Merchant Data" page, consisting of a front

side and a reverse side: the front side contains contact, ownership, bank and other

information filled in with respect to Plaintiff, and the reverse side contains Sections 1-6

of the general terms and covenants of the parties' agreement.

18.     Also not attached to Complaint Exhibit A was the reverse side of the

"Check Service Data" page of the March 26, 2002 Agreement page, the front side only of

which made up Complaint Exhibit A. The reverse side of the "Check Service Data" page

of the March 26, 2002 Agreement, (i.e. the reverse of the page attached as Complaint

Exhibit A) consists of the remaining general terms and covenants of the March 26, 2002

Agreement, i.e., Sections 7 through 15 thereof.

19.     A true copy of the complete, four page March 26, 2002 Agreement is

attached to the Memorandum in Support of Defendants' Motion to Dismiss or, in the

Alternative, to Transfer this Action to the United States District Court for the District of

4

Maryland. Section 15.2 of the reverse side of the Check Service Data page is the forum selection provision of the Parties' agreement.

20.    It was ERN's routine and customary practice to give the merchant its "Merchant Copy" of the standard ERN/merchant agreement, which was a three ply form.

21.    All of the documents attached to Defendants' motion to dismiss are authentic copies of that which they purport to be.

I DECLARE AND AFFIRM UNDER PENALTY OF PERJURY THAT THE CONTENTS OF THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT.

Rory Natanzon

Dated: 03/14/05

# Exhibit 5

to Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for the
Venue Transfer Pursuant to 28 U.S.C. § 1404(a)

3102 Timanus Lane
Suite 101
Baltimore, MD 21244
Phone: 800-910-2265
Fax: 800-930-3940

**WIDE
services
...ion of ERN, LLC**

## Merchant Data

| Rep. Code | | Rep. Name | AMIT NATHANZON | Rep. Phone | | | Date 3/26/02 |
|---|---|---|---|---|---|---|---|

| Merchant Legal Name | | Entity: ☒ Corporation ☐ Proprietorship ☐ Partnership ☐ LLC ☐ Other |
|---|---|---|

**BES Enterprises**

| Merchant D/B/A Name (if different than legal name) | Federal Tax ID | 04-281-6864 |
|---|---|---|

**Betsy's**

| | Business Type | Women's Clothing |
|---|---|---|
| Billing Address 26 Bessom St. | Suite # (if any) | |
| | Years in Business | 18 Years | # Locations | 7 |
| City MARBLEHEAD | State MA | Zip 01945 | This Location No. | 1 | ☒ Owned ☐ Leased |
| Phone No. 781-631-7000 | Fax No. 781-639-1181 | | Landlord Name | |
| Location Address (if different than billing address) | | Landlord Phone No. | |

## Officer/Owner/Partner/Member (1) Information:

| First Name Clayton | | Middle Initial E | Last Name STEAD | | |
|---|---|---|---|---|---|
| Title | ☐ President ☒ Vice President (TREASURER) ☒ Owner ☐ Partner ☐ Member | | Driver's License S00285725 | State MA |
| Date of Birth | Month 02 Day 15 Year 1962 | Social Security No. 0 2 2 6 0 0 6 6 1 | | |
| Home Address 137 Tedesco St. | City Marblehead | State MA | Zip 01945 |
| Home Phone 781-631-0276 | Years at Home 7 Years | ☒ Own ☐ Rent |

## Officer/Owner/Partner/Member (2) Information (if needed):

| First Name | | Middle Initial | Last Name | | State |
|---|---|---|---|---|---|
| Title | ☐ President ☐ Vice President ☐ Owner ☐ Partner ☐ Member | | Driver's License | |
| Date of Birth | Month Day Year | Social Security No. | | |
| Home Address | City | State | Zip |
| Home Phone | Years at Home Years | ☐ Own ☐ Rent |

## Bank Information:

| Bank Name | Account Number | Savings | Phone No. |
|---|---|---|---|
| Baybank | 12562233 | N/A | |

## Trade Reference Information:

| | Trade Reference Name | Account Number (if any) | Contact | Phone No. |
|---|---|---|---|---|
| 1 | Willow | N/A | NANCY | 215-766-0987 |
| 2 | ON YOUR BACK | N/A | JODI | 215-230-7717 |

Merchant hereby personally guarantees all obligations set forth in this agreement and acknowledges that all of the above-provided information is true and correct; and merchant hereby authorizes ERN, LLC and/or its agent(s) to submit and disclose such information to all necessary sources including banks, financial institutions, leasing companies and/or credit bureaus and merchant hereby authorizes such entities to perform all necessary credit investigations in connection with merchant application(s).

| Officer/Owner/Partner/Member (1): | Officer/Owner/Partner/Member (2): (if needed): |
|---|---|
| Signature: _____ Title: Treasurer | Signature: _____ Title: _____ |
| Name: CLAYTON E STEAD Date: 3/26/02 | Name: _____ Date: _____ |

| Title: ☐ President ☐ Vice President | Title: ☐ President ☐ Vice President |
|---|---|
| ☐ Owner ☐ Partner | ☐ Owner ☐ Partner |
| ☐ Member | ☐ Member |

# NATIONWIDE CHECK SERVICES AGREEMENT

Nationwide Check Services ("NCS"), a division of ERN, LLC, a Maryland limited liability company, and the undersigned ("Subscriber") agree as follows:

1. **Primary Conditions.** Subscriber engages NCS to act as its agent for the sole purpose of providing check authorization and/or conversion services in accordance with this Check Services Agreement ("Agreement") and to assist Subscriber with the origination and acceptance of check transactions and with check sales risk management.

2. **Term.** This Agreement is non-cancelable and shall be in full force and effect for twelve (12) consecutive months from the date service is initiated. The Agreement shall be automatically renewed for a like term unless either party provides to the other thirty (30) days prior written notification of an intent to cancel agreement at term's end. NCS retains the absolute and continuing right to cancel this Agreement at any time for cause provided NCS sends seven (7) days prior, written notice to Subscribers of their decision to cancel.

3. **Fees.** Subscriber shall pay NCS the fees listed in Schedule of Charges.

4. **Authorization.**

   4.1 Except as set forth below, Subscriber shall request authorization from NCS exclusively for all checks drawn on U.S. domiciled financial institutions ("Institutions") in U.S. dollars ("checks") presented by businesses or individuals (collectively, "Checkwriters") at any of the listed facilities or those listed in an attachment to this Agreement (collectively, "Locations") prior to Checkwriters leaving the Locations (not applicable to wireless subscribers).

   4.2 If a Check is authorized, Subscriber shall record the applicable authorization number on the Check, but if not authorized, Subscriber shall politely and discreetly advise Checkwriter of this fact and provide Checkwriter with an NCS-supplied card, highlighted in accordance with NCS' directions, describing how to contact NCS directly.

   4.3 Subscriber shall not request authorization from NCS for a Check that:

   (a) is a traveler's check, money order, payroll check, counter check, third party check, credit card check, starter check, check series number below 101, post-dated check, pre-dated check, sight draft, is payable to "cash" or "bearer", is exchanged in whole or part for cash, or is one of multiple Checks presented to Subscriber as payment for a single transaction;

   (b) was previously denied authorization based upon the same or different information or was previously the subject of a referral message from NCS;

   (c) is given as a substitute for a Check previously presented, whether or not the previous Check was authorized by NCS or is presented as a replacement Check following a decline, referral or other message from NCS regarding the same or related transaction, even if for a different dollar amount; or

   (d) is presented for goods and/or services not concurrently provided, or where ownership is not concurrently conveyed, to Checkwriter including any Check given for a rental, lease or other similar transaction.

   4.4 Any Check described in subsection 4.3 shall be deemed unauthorized and ineligible for warranty coverage, even if an authorization number is obtained.

   4.5 Subscriber recognizes and agrees that in order for NCS to (i) control losses due to dishonored checks and (ii) maintain the Rate, Subscriber must maintain and enforce at all times a check acceptance policy which includes all of the requirements listed below (the "Check Policy"). Accordingly, Subscriber shall maintain and enforce, and train its staff to comply with, the Check Policy to ensure that the requirements of this subsection 4.5 are followed.

   (a) The MICR number, Check number and name of Checkwriter are all commercially imprinted on the Check; and Checkwriter is not an employee or agent of Subscriber;

   (b) Checkwriter's U.S. street address, zip code and 10-digit telephone number are either commercially imprinted or written on the Check at the time of authorization;

   (c) The Check is dated within 1 day of the date Subscriber requested authorization;

   (d) The corresponding NCS authorization number and the License Number of Checkwriter was written on the Check at the time of authorization;

   (e) The Check, by itself, or in combination with a form of payment other than another Check, was received by Subscriber as full payment in a current and final transaction involving Checkwriter (if the Check was for goods, the goods must not be returned or repossessed and if the Check was for services, the services must be fully performed); and

   (f) The Check does not contain erasures and was not altered, unless the erasures or alterations were initiated by Checkwriter at the time of authorization.

5. **Limited Warranty.**

   5.1 NCS warrants to Subscriber that an authorized Check or ACH item will be honored by the Institution when presented for payment if:

   (a) the Check or ACH item was authorized by NCS based upon information accurately provided by Subscriber and the Check or ACH item is not presented as a consequence of fraudulent activity by Subscriber or its agents;

   (b) the Check is payable exclusively to Subscriber, is authorized, processed, assigned and endorsed in accordance with the terms of this Agreement, and is not otherwise excluded from authorization and/or warranty coverage; and the Check is not deemed "non-negotiable" by the Institution (e.g.; not honored due to missing or incomplete signatures or other information);

   (c) Checkwriter does not "stop payment" or revoke ACH debit authority on the Check or ACH item;

   (d) the service charge notice was posted in compliance with section 10 of this Agreement; and

   (e) Subscriber complies with all the requirements of subsection 4.5.

   5.2 In the event that a Check or ACH item that complies with subsection 5.1 is not honored by the Institution, NCS shall pay Subscriber the face amount of the Check upon receipt of the Check. All Conversion/Guarantee Checks must be received by NCS on or before the seventh day of the month following the date of the conversion, (any converted Checks received after this date will be ineligible for Warranty coverage). All non-converted Guarantee checks must be sent to NCS immediately upon Subscriber's receipt of said checks, (any returned checks postmarked more than 60 days from the date of the check will be ineligible for warranty coverage). If Checks are forwarded to NCS by someone other than Subscriber, Subscriber shall remain responsible for compliance with all terms of this Agreement.

   5.3 Subscriber should exercise its own judgment in determining whether or not to accept a Check and should not draw any adverse conclusions about the credit worthiness of a Checkwriter if his Check is not authorized. THIS SECTION IS A LIMITED WARRANTY AND PAYMENT OF WARRANTY CLAIMS SHALL SATISFY ANY AND ALL OBLIGATIONS OF NCS IN CONNECTION WITH THIS WARRANTY. NCS MAKES NO OTHER WARRANTIES IN CONNECTION WITH THIS AGREEMENT, EITHER EXPRESS OR IMPLIED.

6. **Stop Payment Coverage.** NCS, for the added fee stated in Schedule of Charges (and applied to all checks), shall honor Checks that are not honored by the Institution as a result of the following: (i) stop payment; (ii) refer to maker; (iii) unauthorized ACH debit item; or (iii) revoked ACH debit item. Stop Payment Coverage must have been selected by Subscriber prior to the returned Check or ACH item in order for Coverage to apply. Stop payment coverage shall not extend to Checks for goods where the goods are returned, repossessed, non-conforming, defective or not fully delivered, and if the Check was for services, the services must be fully performed (NCS fully expects all legitimate merchants to stand behind their goods and services). NCS shall be the sole and final arbiter in all merchant /consumer stop payment coverage disputes. At NCS's request (as defined below), Subscriber shall submit a copy of the sales contract or lease agreement signed by the Checkwriter, a copy of the applicable repair order, or any parts receipt related to the transaction.



**NATIONWIDE**
**check services**
a division of ERN, LLC

3102 Timanus Lane
Suite 101
Baltimore, MD 21244
Phone: 800-910-2265
Fax: 800-930-3940

## Check Service Data

| Check Set-up Fee $100.00 | Make ALL Checks Payable to: Nationwide Check Services |
|---|---|

| Service Ordered: | Discount Rate | Transaction Fee | |
|---|---|---|---|
| ☐ Check Verification | None | ¢ | Monthly Check Volume: $ 80k - 100k comb. |
| ☒ Check Conversion | None | 30 ¢ | Average Check Ticket: $ 250 |
| ☐ Check Guarantee | % | ¢ | High Check Amount: $ 3,000 |
| ☒ Conversion/Guarantee | 1.00 % | 30 ¢ | Stop Payment Coverage ☐ Yes ☒ No (additional discount rate charge of 0.50% applies to all checks processed) |

| Voice Authorization Fee: | Statement Fee: | Monthly Minimum: |
|---|---|---|
| 75¢ | $10.00 | $25.00 |

### EQUIPMENT REQUIREMENT

**Standard**
☒ ValuePak 700
☐ ValuePak 710
☐
☐
☐

**Wireless**
☐ ValuePak 720   ☐ ValuePak (Cellular)
Mann# _____
ESN# _____
ACT. Fee _____
Monthly Fee _____
Trans Fee _____
Merchant Initials _____

**Check Reader Only**
☐ _____

**List Current Equipment:**
_____
_____
_____
_____
_____

### CREDIT CARD INFORMATION

| Average Ticket $ 170 | Monthly Volume $ 320K - TOTAL | Percent Keyed 90 % |
|---|---|---|

### MERCHANT MUST LEASE VALUEPAK AND ENROLL IN THE OPTIONAL NATIONWIDE REBATE PROGRAM

☒ **"ValuePak":** Merchant has leased an integrated credit card terminal, electronic check reader and debit Pin Pad (ValuePak) from Nationwide and shall be entitled to a $5.00 rebate for every $5,000.00 in Visa/MasterCard, Check Guarantee and/or Check Conversion/Guarantee volume processed through Nationwide per month, not to exceed the amount of the monthly lease payment.† (excludes taxes & insurance) $10.00 monthly check statement fee waived for ValuePak Lessees subscribing to Visa/MasterCard and Check Services through Nationwide.

**"Mini ValuePak":** Merchant has leased an electronic check reader from Nationwide and shall be entitled to a $5.00 rebate for every $5,000.00 in Check Guarantee and/or Check Conversion/Guarantee volume processed through Nationwide per month, not to exceed the amount of the monthly lease payment. ** (excludes taxes & insurance)

† Rebates sent monthly by check along with a statement outlining all merchant processing volume.
* An initial $75.00 Rebate Processing Fee applies to the "ValuePak" Rebate Program. Rebate valid on current 48 month leases up to 48 months. Rebate offer applies as long as Visa/MasterCard and Check Services are being provided through Nationwide.
** An initial $50.00 Rebate Processing Fee applies to the "Mini ValuePak" Rebate Program. Rebate valid on current 48 month leases up to 48 months.

### BANK DRAFT/DEBIT AUTHORIZATION AGREEMENT

Merchant, in accordance with this Agreement, hereby authorizes ERN, LLC [D/B/A Nationwide Check Services] and/or its authorized agent(s) or bank(s) in accordance with this and/or any other agreements or obligations owed to ERN, LLC [D/B/A Nationwide Check Services] or its agent(s), assigns, or successors; now or in the future, to draft or initiate debit/credit entries to merchant's checking account, as indicated below, or any other account maintained by merchant at any bank that is a receiving member of an Automated Clearing House (ACH). If merchant's draft or debit returns unpaid, a return fee, pursuant to state law, may be charged to merchant's account either electronically or by draft.

**BANK** Bay bank   **ROUTING NO.** 0 1 1 3 0 2 4 3 8   **ACCOUNT NO.** 12562233

The parties hereto agree to each of the terms and covenants set forth on the reverse side and acknowledge that such provisions are binding upon each of them, their successors, heirs and assigns. In witness whereof, the MERCHANT hereto sets its hand as of this date.

Signature: _____   Title: Treasurer   Name: CLAYTON ESTEN   Date: 3/26/07

Signature: _____   Title: _____   Name: _____   Date: _____

ATTACH VOID CHECK

SALES OFFICE COPY

7. Security Interest, Subrogation and Assignment. Subscriber grants to NCS a first priority security interest in and lien upon all authorized Checks to secure all obligations owed by Subscriber pursuant to the terms of this Agreement. NCS shall have all rights of a secured party under applicable law immediately upon authorization of Check. Subscriber is authorized to negotiate and be paid for Checks it receives in the ordinary course of its business unless otherwise instructed in writing by NCS following an "Event of Default", as defined below. Subscriber's submission or Conversion/Guarantee of a Check shall be deemed an immediate assignment and subrogation of all right, title and interest in the corresponding Check to NCS. Subscriber shall do whatever is necessary to secure NCS's right, title and interest in Checks; shall cooperate with NCS in its confirmation of such right, title and interest; shall do nothing to prejudice such right, title or interest; and shall do nothing to impair NCS's ability to collect those Checks. In its capacity as assignee, subrogee and/or secured party, NCS is authorized to collect authorized Checks in its own name and on its own account. Subscriber irrevocably authorizes and appoints NCS as its attorney-in-fact to: (i) prepare, execute and file UCC-1 financing statements, notices to institutions and other papers which NCS deems appropriate to acknowledge, confirm or perfect its rights and/or security interest in authorized Checks; (ii) sign any law enforcement reports, affidavits or other papers which are necessary to prosecute Checkwriters; and (iii) collect returned Checks, together with service charges and permissible damages. Subscriber shall, upon request, reasonably cooperate with and assist in collection efforts and/or the prosecution of Checkwriters, including making its employees and agents reasonably available to testify.

8. Advertising and Displays. NCS shall have the right to identify Subscriber as a user of its service in its marketing materials.

9. Notification of Payment and Return of Goods. Subscriber shall notify NCS' Customer Service Department immediately by telephone, with Checkwriter's identity, of (i) any payment received on a Check that has been guaranteed by NCS and (ii) any goods returned by a Checkwriter where Checkwriter paid for the goods with a Check that was guaranteed by NCS. Subscriber shall comply with NCS' instructions for processing such payment or return of goods. When a Checkwriter of a dishonored Check claims to have paid the Subscriber directly or claims to have returned the goods, in whole or in part, to Subscriber, Subscriber shall provide any and all available information requested by NCS to verify the status of the claim within 30 days of receipt of that request (the "Request"). In the event Subscriber fails to comply with the Request, NCS may treat that claim as paid in full by Checkwriter and, at its election, offset or recoup any amount NCS paid to Subscriber from any amount owed Subscriber.

10. Service Charges. Subscriber shall display NCS-supplied service charge notices at each point-of-sale at each of its Locations as well as in its catalogs and order forms so that they are clearly visible to all Checkwriters.

11. Hold Check Program. All checks representing part or all of the down payment on a motor vehicle, mobile home or boat shall be covered by the separate terms and conditions of NCS's "Hold Check Guidelines."

12. Indemnification. The parties, in recognition of valuable consideration each has received, and subject to subsection 15.4 of the Agreement, shall indemnify, defend and hold the other party and their officers, agents and employees harmless from and against any and all losses, claims, demands, actions, causes of action, suits, costs, attorney's fees, damages, expenses, compensation, penalties, liabilities and obligations of any kind asserted by a third party resulting from, arising out of, or incurred in connection with the indemnifying party's: (i) negligence; (ii) misuse of or improper access to Check or Checkwriter data; (iii) failure to comply with applicable law; or (iv) failure to comply with the terms of this Agreement.

13. Additional Remedies. In addition to any other remedies at law or in equity to which it is entitled, NCS reserves the right to suspend its performance or terminate this Agreement during any period in which Subscriber is in default for more than 10 days, is the subject of a bankruptcy action, suffers the appointment of a receiver either voluntarily or involuntarily, or commits an act with the intent to defraud NCS (collectively, "Event of Default"). Due to the likelihood of irreparable injury, NCS shall be entitled to any injunction prohibiting any continuing breach of sections 9 or 12. NCS may offset or recoup the amount of any erroneous payments to Subscriber or other amounts due NCS against or from any amounts owed Subscriber for payment of Checks or otherwise, or at its election, obtain reimbursement from Subscriber on demand. NCS shall at all times be entitled to suspend payment of amounts due Subscriber to determine the amount subject to any offset or recoupment. In addition, Subscriber shall pay NCS a monthly late charge equal to the lesser of 1.5%, or the maximum allowed by law, for any amount remaining unpaid 30 days after invoice. NCS reserves the right to charge Subscriber its then-current rates for reports or other services not specified in this Agreement.

14. Modifications. This Agreement may be modified by NCS upon seven (7) days prior, written notice to Subscriber or otherwise only by the written agreement of the parties.

15. Miscellaneous.

15.1 Subscriber shall not subcontract, assign, subrogate or transfer any interest, obligation or right under this Agreement without prior written consent. Any dissolution, merger, consolidation, reorganization or transfer of substantially all assets or a controlling percentage of the corporate stock of Subscriber, shall constitute an assignment of this Agreement. NCS may assign this Agreement and the rights and obligations therein, at any time, without notification. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties and their successors or assigns.

15.2 This Agreement shall be construed and enforced in accordance with the laws of the State of Maryland without reference to choice of law rules. Any legal action filed, whether in law, equity, small claims or otherwise, including an original complaint or third party claim, by or in the right of any party to this Agreement, or any action arising under or related to this Agreement, including, but not limited to, a claim for payment under this Agreement, the claim for payment under any applicable Merchant Processing Agreement, and also including any non-contract claim, including, but not limited to, tort claims, shall be brought and maintained solely and exclusively in the State Courts located in the County of Baltimore, State of Maryland, or the Federal District Court in Baltimore City, State of Maryland, and expressly agree to such forum for the bringing of any suit, action, or proceeding out of obligations herein and expressly waive any objection or defense related to personal jurisdiction, process or venue brought in either of such courts.

15.3 Neither party shall, by the mere lapse of time, without giving notice or taking other action, be deemed to have waived any of its rights under this Agreement. No waiver of a breach of this Agreement shall constitute a waiver of any prior or subsequent breach of this Agreement.

15.4 NCS shall not be liable for any special, punitive, exemplary, incidental or consequential damages, including lost profits. In addition, neither party shall be liable for any loss or damage due to causes beyond its control, including earthquake, terrorism, war, fire, flood, power failure, acts of God or other catastrophes.

15.5 Each party, and each person signing on behalf of a party, represents and warrants that they have the full legal capacity and authority to enter into and perform the obligations of this Agreement without any further approval.

15.6 This Agreement constitutes the entire understanding of the parties with respect to the subject matter of this Agreement, and all prior agreements, understandings and representations are canceled in their entirety.

15.7 If there is a conflict between a part of this Agreement and any present or future law or regulation, the part of this Agreement that is affected shall be curtailed only to the extent necessary to bring it within the requirements of the law or regulation.

15.8 All notices shall be delivered to the appropriate party as its address set forth in this Agreement or, in the alternative, in the case of the Subscriber, to the same address as invoices are sent under this agreement.

15.9 Sections 9, 12, 13 and 15.2 shall survive any termination of this Agreement.

# Exhibits 6-8

to Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for the Venue Transfer Pursuant to 28 U.S.C. § 1404(a)

# Exhibit 6

to Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for the
Venue Transfer Pursuant to 28 U.S.C. § 1404(a)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BES ENTERPRISES, INC. ) | |
| ) | Civil Action No. 05-10477 GAO |
| Plaintiff, ) | |
| ) | |
| v. ) | **AFFIDAVIT OF AMIT NATANZON** |
| ) | |
| RONY NATANZON, et al. ) | |
| ) | |
| Defendants. ) | |
| ) | |

Amit Natanzon declares and affirms under penalty of perjury:

1.      I have personal knowledge of all of the facts set forth in this affidavit and, if called to testify in this matter, I could and would competently testify to each of the facts set forth. I am over 18 years of age.

2.      I submit this affidavit in support of Defendants' motion to dismiss this action, or, in the alternative, to transfer it to the United States District Court for the District of Maryland.

3.      I was formerly the regional manager of the Brookline, Massachusetts office of ERN, LLC ("ERN").

4.      I signed up Bes Enterprises, Inc., a company whose merchant d/b/a name is "Betsy's", to an ERN check processing agreement.

5.      The agreement was signed by Clayton E. Stead on behalf of Bes Enterprises, Inc., and is dated March 26, 2002.

6.      The standard form of agreement that ERN used was a three-ply form consisting of 4 pages. The front side of the Merchant Data page had contact and bank information regarding the merchant on the front, and the reverse contains paragraphs 1-

6 of the general "terms and covenants" of the agreement. The agreement form also included a Check Service Data form, on the front side of which the merchant would indicate the particular services and equipment it was ordering, and the ERN fees would be listed. The reverse side of the Check Service Data page contained the remaining paragraphs, 7-15, of the general terms and covenants.

7.      The signature of Clayton Stead appears on both the Merchant Data and Check Service Data pages dated March 26, 2002.

8.      I recall meeting with "Clay" of Bes Enterprises. I met him in one of the Boston northeast suburban areas such as Marblehead or Gloucester. I also had telephone conversations with Clay.

9.      It was ERN's and my regular practice that, after a merchant signed the agreement and all paperwork had been filled in, the merchant then would be provided either by personal delivery or by mail the "merchant copy" of the three-ply form, consisting of both the front and reverse sides of the agreement pages.

10.     The form was three-ply because there was one "sales office" copy for ERN, a "merchant copy", and an "ISO" copy. The merchant copy was usually pink in color, although there was one production run in which the merchant copy was yellow.

11.     The ISO copy was for any independent sales organization ("ISO") which might have solicited a merchant. No ISO was involved with Bes Enterprises, because I dealt directly with Bes Enterprises on behalf of ERN.

12.     Immediately above Mr. Stead's signature on the Check Service Data page appears the following language: "The parties hereto agree to each of the terms and covenants set forth on the reverse side and acknowledge that such provisions are

2

binding upon each of them, their successors, heirs and assigns. In witness whereof, the MERCHANT hereto sets its hand as of this date."

13. It was ERN's regular practice to require the merchant to sign the original of the three-ply agreement form containing both front and reverse sides. Mr. Stead thus, by having signed the front page of the Check Service Data form, necessarily had the opportunity to review the entire original form, which had both the front and reverse sides of the Merchant Data and Check Service Data pages.

A true copy of the front and reverse sides of the Merchant Data and Check Service Data pages, comprising the agreement signed by Clayton Stead on behalf of Bes Enterprises, Inc., is attached to this Affidavit as Exhibit A.

3

I DECLARE AND AFFIRM UNDER PENALTY OF PERJURY THAT THE
CONTENTS OF THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT.

Amit Natanzon

Dated: 3/14/05



**NATIONWIDE check services** a division of ERN, LLC

3102 Timanus Lane
Suite 101
Baltimore, MD 21244
Phone: 800-910-2265
Fax: 800-930-3940

## Merchant Data

| Rep. Code | Rep. Name AMIT NATANZON | Rep. Phone | Date 3/26/02 |
|---|---|---|---|

| Merchant Legal Name BES Enterprises | Entity: ☒ Corporation ☐ Proprietorship ☐ Partnership ☐ LLC ☐ Other |
|---|---|

| Merchant D/B/A Name (if different than legal name) Betsy's | Federal Tax ID 04-281-6864 |
|---|---|

| Billing Address 26 Bessom St. | Suite # (if any) | Business Type Women's Clothing |
|---|---|---|

| City MARBLEHEAD | State MA | Zip 01945 | Years in Business 18 Years  # Locations 1 |
|---|---|---|---|

| | | | This Location No. 1  ☒ Owned ☐ Leased |
|---|---|---|---|

| Phone No. 781-631-7000 | Fax No. 781-639-1181 | Landlord Name |
|---|---|---|

| Location Address (if different than billing address) | Landlord Phone No. |
|---|---|

## Officer/Owner/Partner/Member (1) Information:

| First Name Clayton | Middle Initial E | Last Name STEAD |
|---|---|---|
| Title ☐ President ☒ Vice President (TREASURER) ☒ Owner ☐ Partner ☐ Member | Driver's License S00285725 | State MA |
| Date of Birth Month 02  Day 15  Year 1962 | Social Security No. 022 60 0661 | |
| Home Address 137 Tedesco St. | City Marblehead | State MA  Zip 01945 |
| Home Phone 781-631-0276 | Years at Home 7 Years | ☒ Own ☐ Rent |

## Officer/Owner/Partner/Member (2) Information (if needed):

| First Name | Middle Initial | Last Name | State |
|---|---|---|---|
| Title ☐ President ☐ Vice President ☐ Owner ☐ Partner ☐ Member | Driver's License | |
| Date of Birth Month  Day  Year | Social Security No. | |
| Home Address | City | State  Zip |
| Home Phone | Years at Home  Years | ☐ Own ☐ Rent |

## Bank Information:

| Baybank | 12562233 | N/A |
|---|---|---|

## Trade Reference Information:

| 1 | Willow | N/A | NANCY | 215-766-0987 |
|---|---|---|---|---|
| 2 | ON YOUR BACK | N/A | JODI | 215-230-7717 |

Merchant hereby personally guarantees all obligations set forth in this agreement and acknowledges that all of the above-provided information is true and correct; and merchant hereby authorizes ERN, LLC and/or its agent(s) to submit and disclose such information to and various sources including banks, financial institutions, leasing companies and/or credit bureaus and merchant hereby authorizes such entities to perform all necessary credit investigations in connection with merchant application(s).

**Officer/Owner/Partner/Member (1):**

Signature: _____  Title: Treasurer

Name: CLAYTON E STEAD  Date: 3/26/02

Title: ☐ President  ☐ Vice President
☐ Owner  ☐ Partner  ☐ Member

**Officer/Owner/Partner/Member (2): (if needed):**

Signature: _____  Title: _____

Name: _____  Date: _____

Title: ☐ President  ☐ Vice President
☐ Owner  ☐ Partner  ☐ Member

Nationwide Check Services ("NCS"), a division of ERN, LLC, a Maryland limited liability company, and the undersigned ("Subscriber") agree as follows:

1. <u>Primary Conditions</u>. Subscriber engages NCS to act as its agent for the sole purpose of providing check authorization and/or conversion services in accordance with this Check Services Agreement ("Agreement") and to assist Subscriber with the origination and acceptance of check transactions and with check sales risk management.

2. <u>Term</u>. This Agreement is non-cancelable and shall be in full force and effect for twelve (12) consecutive months from the date service is initiated. The Agreement shall be automatically renewed for a like term unless either party provides to the other thirty (30) days prior written notification of an intent to cancel agreement at term's end. NCS retains the absolute and continuing right to cancel this Agreement at any time for cause provided NCS sends seven (7) days prior written notice to Subscribers of their decision to cancel.

3. <u>Fees</u>. Subscriber shall pay NCS the fees listed in Schedule of Charges.

4. <u>Authorization</u>.

4.1 Except as set forth below, Subscriber shall request authorization from NCS exclusively for all checks drawn on U.S. domiciled financial institutions ("Institutions") in U.S. dollars ("checks") presented by businesses or individuals (collectively, "Checkwriters") at any of the listed facilities or those listed in an attachment to this Agreement (collectively, "Locations") prior to Checkwriters leaving the Locations (not applicable to wireless subscribers).

4.2 If a Check is authorized, Subscriber shall record the applicable authorization number on the Check, but if not authorized, Subscriber shall politely and discreetly advise Checkwriter of this fact and provide Checkwriter with an NCS-supplied card, highlighted in accordance with NCS' directions, describing how to contact NCS directly.

4.3 Subscriber shall not request authorization from NCS for a Check that:

   (a)  is a traveler's check, money order, payroll check, counter check, third party check, credit card check, starter check, check series number below 101, post-dated check, pre-dated check, sight draft, is payable to "cash" or "bearer", is exchanged in whole or part for cash, or is one of multiple Checks presented by Subscriber as payment for a single transaction;

   (b)  was previously denied authorization based upon the same or different information or was previously the subject of a referral message from NCS;

   (c)  is given as a substitute for a Check previously presented, whether or not the previous Check was authorized by NCS or is presented as a replacement Check following a decline, referral or other message from NCS regarding the same or related transaction, even if for a different dollar amount; or

   (d)  is presented for goods and/or services not concurrently provided, or where ownership is not concurrently conveyed, to Checkwriter including any Check given for a rental, lease or other similar transaction.

4.4 Any Check described in subsection 4.3 shall be deemed unauthorized and ineligible for warranty coverage, even if an authorization number is obtained.

4.5 Subscriber recognizes and agrees that in order for NCS to (i) control losses due to dishonored checks and (ii) maintain the Rate, Subscriber must maintain and enforce at all times a check acceptance policy which includes all of the requirements listed below (the "Check Policy"). Accordingly, Subscriber shall maintain and enforce, and train its staff to comply with, the Check Policy to ensure that the requirements of this subsection 4.5 are followed.

   (a)  The MICR number, Check number and name of Checkwriter are all commercially imprinted on the Check, and Checkwriter is not an employee or agent of Subscriber;

   (b)  Checkwriter's U.S. street address, zip code and 10-digit telephone number are either commercially imprinted or written on the Check at the time of authorization;

   (c)  The Check is dated within 1 day of the date Subscriber requested authorization;

   (d)  The corresponding NCS authorization number and the License Number of Checkwriter was written on the Check at the time of authorization;

   (e)  The Check, by itself, or in combination with a form of payment other than another Check, was received by Subscriber as full payment in a current and final transaction involving Checkwriter (if the Check was for goods, the goods must not be returned or repossessed and if the Check was for services, the services must be fully performed); and

   (f)  The Check does not contain erasures and was not altered, unless the erasures or alterations were initiated by Checkwriter at the time of authorization.

5. <u>Limited Warranty</u>.

5.1 NCS warrants to Subscriber that an authorized Check or ACH item will be honored by the Institution when presented for payment if:

   (a)  the Check or ACH item was authorized by NCS based upon information accurately provided by Subscriber and the Check or ACH item is not presented as a consequence of fraudulent activity by Subscriber or its agents;

   (b)  the Check is payable exclusively to Subscriber, is authorized, processed, assigned and endorsed in accordance with the terms of this Agreement, and is not otherwise excluded from authorization and/or warranty coverage; and the Check is not deemed "non-negotiable" by the Institution (e.g., not honored due to missing or incomplete signatures or other information);

   (c)  Checkwriter does not "stop payment" or revoke ACH debit authority on the Check or ACH item;

   (d)  the service charge notice was posted in compliance with section 10 of this Agreement; and

   (e)  Subscriber complies with all the requirements of subsection 4.5.

5.2 In the event that a Check or ACH item that complies with subsection 5.1 is not honored by the Institution, NCS shall pay Subscriber the face amount of the Check upon receipt of the Check. All Conversion/Guarantee Checks must be received by NCS on or before the seventh day of the month following the date of the conversion. (any converted Checks received after this date will be ineligible for warranty coverage). All non-converted Guarantee checks must be sent to NCS immediately upon Subscriber's receipt of said checks, (any returned checks postmarked more than 60 days from the date of the check will be ineligible for warranty coverage). If Checks are forwarded to NCS by someone other than Subscriber, Subscriber shall remain responsible for compliance with all terms of this Agreement.

5.3 Subscriber should exercise its own judgment in determining whether or not to accept a Check and should not draw any adverse conclusions about the credit worthiness of a Checkwriter if his Check is not authorized. THIS SECTION IS A LIMITED WARRANTY AND PAYMENT OF WARRANTY CLAIMS SHALL SATISFY ANY AND ALL OBLIGATIONS OF NCS IN CONNECTION WITH THIS WARRANTY. NCS MAKES NO OTHER WARRANTIES IN CONNECTION WITH THIS AGREEMENT, EITHER EXPRESS OR IMPLIED.

6. <u>Stop Payment Coverage</u>. NCS, for the added fee stated in Schedule of Charges (and applied to all checks), shall honor Checks that are not honored by the institution as a result of the following: (i) stop payment; (ii) refer to maker; (iii) unauthorized ACH debit item; or (iii) revoked ACH debit item. Stop Payment Coverage must have been selected by Subscriber prior to the returned Check or ACH item in order for Coverage to apply. Stop payment coverage shall not extend to Checks for goods where the goods are returned, repossessed, non-conforming, defective or not fully delivered, and if the Check was for services, the services must be fully performed (NCS fully expects all legitimate merchants to stand behind their goods and services). NCS shall be the sole and final arbiter in all merchant /consumer stop payment coverage disputes. At NCS's request (as defined below), Subscriber shall submit a copy of the sales contract or lease agreement signed by the Checkwriter, a copy of the applicable repair order, or any parts receipt related to the transaction.



**NATIONWIDE**
check services
a division of ERN, LLC

3102 Timanus Lane
Suite 101
Baltimore, MD 21244
Phone: 800-910-2265
Fax: 800-930-3940

## Check Service Data

| Check Set-up Fee $100.00 | Make ALL Checks Payable to: Nationwide Check Services |
|---|---|

| Service Ordered: | Discount Rate | Transaction Fee |
|---|---|---|
| ☐ Check Verification | None | ¢ |
| ☒ Check Conversion | None | 30 ¢ |
| ☐ Check Guarantee | % | ¢ |
| ☒ Conversion/Guarantee | 1.00 % | 30 ¢ |

Monthly Check Volume: $ 80k-100k comb.
Average Check Ticket: $ 250
High Check Amount: $ 3,000
Stop Payment Coverage  ☐ Yes  ☒ No (additional discount rate charge of 0.50% applies to all checks processed)

| Voice Authorization Fee: | Statement Fee: | Monthly Minimum: |
|---|---|---|
| 75¢ | $10.00 | $25.00 |

### Standard
☒ ValuePak 700
☐ ValuePak 710
☐
☐

### Wireless
☐ ValuePak 720   ☐ ValuePak (Cellular)
Mann# _____
ESN# _____
ACT. Fee _____
Monthly Fee _____
Trans Fee _____
Merchant Initials _____

### Check Reader Only
☐ _____

### List Current Equipment:
_____
_____
_____
_____

Average Ticket $ 170    Monthly Volume $ 320K -TOTAL    Percent Keyed 90 %

☒ **"ValuePak":** Merchant has leased an integrated credit card terminal, electronic check reader and debit Pin Pad (ValuePak) from Nationwide and shall be entitled to a $5.00 rebate for every $5,000.00 in Visa/MasterCard, Check Guarantee and/or Check Conversion/Guarantee volume processed through Nationwide per month, not to exceed the amount of the monthly lease payment.* (excludes taxes & insurance) $10.00 monthly check statement fee waived for ValuePak Lessees subscribing to Visa/MasterCard and Check Services through Nationwide.

**"Mini ValuePak":** Merchant has leased an electronic check reader from Nationwide and shall be entitled to a $5.00 rebate for every $5,000.00 in Check Guarantee and/or Check Conversion/Guarantee volume processed through Nationwide per month, not to exceed the amount of the monthly lease payment. ** (excludes taxes & insurance)

† Rebates sent monthly by check along with a statement outlining all merchant processing volume.
* An initial $75.00 Rebate Processing Fee applies to the "ValuePak" Rebate Program. Rebate valid on current 48 month leases up to 48 months. Rebate offer applies as long as Visa/MasterCard and Check Services are being provided through Nationwide.
** An initial $50.00 Rebate Processing Fee applies to the "Mini ValuePak" Rebate Program. Rebate valid on current 48 month leases up to 48 months.

Merchant, in accordance with this Agreement, hereby authorizes ERN, LLC [D/B/A Nationwide Check Services] and/or its authorized agent(s) or bank(s) in accordance with this and/or any other agreements or obligations owed to ERN, LLC [D/B/A Nationwide Check Services] or its agent(s), assigns, or successors; now or in the future, to draft or initiate debit/credit entries to merchant's checking account, as indicated below, or any other account maintained by merchant at any bank that is a receiving member of an Automated Clearing House (ACH). If merchant's draft or debit returns unpaid, a return fee, pursuant to state law, may be charged to merchant's account either electronically or by draft.

BANK  Baybank    ROUTING NO. 011302438    ACCOUNT NO. 12562233

The parties hereto agree to each of the terms and covenants set forth on the reverse side and acknowledge that such provisions are binding upon each of them, their successors, heirs and assigns. In witness whereof, the MERCHANT hereto sets its hand as of this date.

Signature: _____    Title: Treasurer    Name: CLAYTON ESTEY    Date: 2/26/07

Signature: _____    Title: _____    Name: _____    Date: _____

SALES OFFICE COPY

ATTACH VOID CHECK

7. <u>Security Interest, Subrogation and Assignment.</u> Subscriber grants to NCS a first priority security interest in and lien upon all authorized Checks to secure all obligations owed by Subscriber pursuant to the terms of this Agreement. NCS shall have all rights of a secured party under applicable law immediately upon authorization of Check. Subscriber is authorized to negotiate and be paid for Checks it receives in the ordinary course of its business unless otherwise instructed in writing by NCS following an "Event of Default", as defined below. Subscriber's submission or Conversion/Guarantee of a Check shall be deemed an immediate assignment and subrogation of all right, title and interest in the corresponding Check to NCS. Subscriber shall do whatever is necessary to secure NCS's right, title and interest in Checks; shall cooperate with NCS in its confirmation of such right, title and interest; shall do nothing to prejudice such right, title or interest; and shall do nothing to impair NCS's ability to collect those Checks. In its capacity as assignee, subrogee and/or secured party, NCS is authorized to collect authorized Checks in its own name and on its own account. Subscriber irrevocably authorizes and appoints NCS as its attorney-in-fact to: (i) prepare, execute and file UCC-1 financing statements, notices to institutions and other papers which NCS deems appropriate to acknowledge, confirm or perfect its rights and/or security interest in authorized Checks; (ii) sign any law enforcement reports, affidavits or other papers which are necessary to prosecute Checkwriters; and (iii) collect returned Checks, together with service charges and permissible damages. Subscriber shall, upon request, reasonably cooperate with and assist in collection efforts and/or the prosecution of Checkwriters, including making its employees and agents reasonably available to testify.

8. <u>Advertising and Displays.</u> NCS shall have the right to identify Subscriber as a user of its service in its marketing materials.

9. <u>Notification of Payment and Return of Goods.</u> Subscriber shall notify NCS' Customer Service Department immediately by telephone, with Checkwriter's identity, of (i) any payment received on a Check that has been guaranteed by NCS and (ii) any goods returned by a Checkwriter where Checkwriter paid for the goods with a Check that was guaranteed by NCS. Subscriber shall comply with NCS' instructions for processing such payment or return of goods. When a Checkwriter of a dishonored Check claims to have paid the Subscriber directly or claims to have returned the goods, in whole or in part, to Subscriber, Subscriber shall provide any and all available information requested by NCS to verify the status of the claim within 30 days of receipt of that request (the "Request"). In the event Subscriber fails to comply with the Request, NCS may treat that claim as paid in full by Checkwriter and, at its election, offset or recoup any amount NCS paid to Subscriber from any amount owed Subscriber.

10. <u>Service Charges.</u> Subscriber shall display NCS-supplied service charge notices at each point-of-sale at each of its Locations as well as in its catalogs and order forms so that they are clearly visible to all Checkwriters.

11. <u>Hold Check Program.</u> All checks representing part or all of the down payment on a motor vehicle, mobile home or boat shall be covered by the separate terms and conditions of NCS's 'Hold Check Guidelines.'

12. <u>Indemnification.</u> The parties, in recognition of valuable consideration each has received, and subject to subsection 15.4 of the Agreement, shall indemnify, defend and hold the other party and their officers, agents and employees harmless from and against any and all losses, claims, demands, actions, causes of action, suits, costs, attorney's fees, damages, expenses, compensation, penalties, liabilities and obligations of any kind asserted by a third party resulting from, arising out of, or incurred in connection with the indemnifying party's: (i) negligence; (ii) misuse of or improper access to Check or Checkwriter data; (iii) failure to comply with applicable law; or (iv) failure to comply with the terms of this Agreement.

13. <u>Additional Remedies.</u> In addition to any other remedies at law or in equity to which it is entitled, NCS reserves the right to suspend its performance or terminate this Agreement during any period in which Subscriber is in default for more than 10 days, is the subject of a bankruptcy action, suffers the appointment of a receiver either voluntarily or involuntarily, or commits an act with the intent to defraud NCS (collectively, "Event of Default"). Due to the likelihood of irreparable injury, NCS shall be entitled to any injunction prohibiting any continuing breach of sections 9 or 12. NCS may offset or recoup the amount of any erroneous payments to Subscriber or other amounts due NCS against or from any amounts owed Subscriber for payment of Checks or otherwise, or at its election, obtain reimbursement from Subscriber on demand, NCS shall at all times be entitled to suspend payment of amounts due Subscriber to determine the amount subject to any offset or recoupment. In addition, Subscriber shall pay NCS a monthly late charge equal to the lesser of 1.5%, or the maximum allowed by law, for any amount remaining unpaid 30 days after invoice. NCS reserves the right to charge Subscriber its then-current rates for reports or other services not specified in this Agreement.

14. <u>Modifications.</u> This Agreement may be modified by NCS upon seven (7) days prior, written notice to Subscriber or otherwise only by the written agreement of the parties.

15. <u>Miscellaneous.</u>

15.1 Subscriber shall not subcontract, assign, subrogate or transfer any interest, obligation or right under this Agreement without prior written consent. Any dissolution, merger, consolidation, reorganization or transfer of substantially all assets or a controlling percentage of the corporate stock of Subscriber, shall constitute an assignment of this Agreement. NCS may assign this Agreement and the rights and obligations therein, at any time, without notification. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties and their successors or assigns.

15.2 This Agreement shall be construed and enforced in accordance with the laws of the State of Maryland without reference to choice of law rules. Any legal action filed, whether in law, equity, small claims or otherwise, including an original complaint or third party claim, by or in the right of any party to this Agreement, or any action arising under or related to this Agreement, including, but not limited to, a claim for payment under this Agreement, the claim for payment under any applicable Merchant Processing Agreement, and also including any non-contract claim, including, but not limited to, tort claims, shall be brought and maintained solely and exclusively in the State Courts located in the County of Baltimore, State of Maryland, or the Federal District Court in Baltimore City, State of Maryland, and expressly agree to such forum for the bringing of any suit, action, or proceeding out of obligations herein and expressly waive any objection or defense related to personal jurisdiction, process or venue brought in either of such courts.

15.3 Neither party shall, by the mere lapse of time, without giving notice or taking other action, be deemed to have waived any of its rights under this Agreement. No waiver of a breach of this Agreement shall constitute a waiver of any prior or subsequent breach of this Agreement.

15.4 NCS shall not be liable for any special, punitive, exemplary, incidental or consequential damages, including lost profits. In addition, neither party shall be liable for any loss or damage due to causes beyond its control, including earthquake, terrorism, war, fire, flood, power failure, acts of God or other catastrophes.

15.5 Each party, and each person signing on behalf of a party, represents and warrants that they have the full legal capacity and authority to enter into and perform the obligations of this Agreement without any further approval.

15.6 This Agreement constitutes the entire understanding of the parties with respect to the subject matter of this Agreement, and all prior agreements, understandings and representations are canceled in their entirety.

15.7 If there is a conflict between a part of this Agreement and any present or future law or regulation, the part of this Agreement that is affected shall be curtailed only to the extent necessary to bring it within the requirements of the law or regulation.

15.8 All notices shall be delivered to the appropriate party as its address set forth in this Agreement or, in the alternative, in the case of the Subscriber, to the same address its invoices are sent under this agreement.

15.9 Sections 9, 12, 13 and 15.2 shall survive any termination of this Agreement.

# Exhibit 7

to Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for the
Venue Transfer Pursuant to 28 U.S.C. § 1404(a)

BILL OF SALE, ASSIGNMENT OF INTANGIBLES AND ASSUMPTION OF LIABILITIES

THIS BILL OF SALE, ASSIGNMENT OF INTANGIBLES AND ASSUMPTION OF LIABILITIES (this "Instrument") is made this 9th day of July, 2004, by and between LAWRENCE D. COPPEL AS CHAPTER 11 TRUSTEE FOR THE BANKRUPTCY ESTATE OF ERN, LLC, a Maryland limited liability company ("Seller") and ERN ACQUISITION LLC, a Maryland limited liability company ("Buyer"), pursuant to the Order of the United States Bankruptcy Court for the District of Maryland, Baltimore Division entered on July 9, 2004 in Case No. 04-20521-JS (Chapter 11) (the "Order") and pursuant to a Closing Agreement of even date herewith between Seller and Buyer.

1.    Purchased Assets. For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Seller does hereby grant, bargain, sell, transfer, assign and convey to Buyer, and Buyer does hereby purchase and acquire from Seller, all of the right, title and interest of ERN, LLC (the "Debtor") in and to the following assets (the "Purchased Assets"):

(a)    All Visa and Mastercard portfolios and any contact rights relating thereto.

(b)    Any and all of the Debtor's right, title and interest to inactive merchant agreements, including, but not limited to, leases and equipment associated therewith.

(c)    Any and all of the Debtor's right, title and interest to merchant agreements with respect to "Option 1", "Option 3" and "Option 6" processing only, including, but not limited to, leases, accounts receivable, equipment and causes of actions relating thereto.

(d)    All inventory.

(e)    All furniture, fixtures and equipment, including, but not limited to, office equipment, office furniture and computer hardware and software.

(f)    Any and all of the Debtor's claims against, or accounts receivable due from ERN Israel, LLC.

(g)    Any and all intangible assets, including, but not limited to, goodwill, chattel paper, customer lists (which Buyer may receive electronically), books and records relating to the acquired assets, trademarks, intellectual properties, telephone and facsimile numbers, license and permits, patents, trade names and the like.

(h)    The leases and equipment leased thereby, as set forth on Exhibit 1 attached hereto.

2.    Excluded Assets. The Purchased Assets do not include any right, title or interest in or to any asset of the Debtor not described in Section 1 above or any right, title or interest of the Debtor in any of the assets set forth on Exhibit 2 attached hereto.

3.    Condition of Purchased Assets. Buyer is acquiring the Purchased Assets AS-IS and WHERE-IS, without any representation or warranty whatsoever from Seller or any other person, express or implied, including any representation or warranty as to merchantability or

COR2966-C502-03.doc

fitness for a particular purpose; *provided, however*, that pursuant to Section 363(f) of the Bankruptcy Code and the Order, Seller hereby represents and warrants that Seller is conveying good, marketable and transferable title to the Purchased Assets free and clear of any and all liens, claims, encumbrances and other interests, including, without limitation, all security interests in and all liens upon such Purchased Assets, except for the liens and claims of David M. Rombro as described in Section 4(a) below and the liens and claims of Antwerpen Motorcars, Ltd. as described in Section 4(b) below.    Buyer acknowledges that Seller has not obtained any consents which may be required for the assignment of any contract or agreement, and Buyer shall have no recourse resulting from the failure to obtain any such consent.

4.    <u>Assumption of Liabilities</u>.  Buyer hereby assumes the performance of all of the terms, covenants and conditions of the Debtor's liabilities and obligations described or referenced below (the "Assumed Liabilities"), and covenants to Seller that Buyer shall well and truly pay and perform all of the Assumed Liabilities as and when due, and that the Assumed Liabilities shall be as effective and binding upon the Buyer as if the Buyer had been an original obligor in the place of the Debtor.  Buyer covenants and agrees to defend, indemnify and hold Seller, the Debtor and Rony Natanzon as the Debtor's member, harmless from and against any and all claims, demands, causes of action, losses, costs (including, without limitation, court costs and reasonable attorney's fees), liabilities and damages of any kind or nature whatsoever that any of them may sustain by reason of Buyer's breach or non-performance (whether by action or inaction) of any Assumed Liability.  The Assumed Liabilities are:

(a)    Debtor's liabilities and obligations under that certain Loan and Security Agreement dated April 1, 1996 between Debtor and David M. Rombro and the Line of Credit Promissory Note made pursuant thereto in the original principal amount of $1,050,000 payable to the order of David M. Rombro dated April 1, 1996, as modified by a Modification and Restatement of Loan and Security Agreement dated September 15, 1999 and a Modification and Restatement of Line of Credit Promissory Note dated September 15, 1999, and all documents and instruments executed and delivered in connection therewith or pursuant thereto.

(b)    Debtor's liabilities and obligations under that certain Secured Promissory Note dated December 20, 2003 made by Debtor and payable to the order of Antwerpen Motorcars, Ltd. in the original principal amount of $300,000, provided, however, that Debtor's liabilities and obligations to Antwerpen pursuant to the Check Service Agreement, which is attached to the Secured Promissory Note as Exhibit B, if any, are not being assumed and shall remain the obligations of the Debtor's bankruptcy estate.

(c)    All payroll obligations of Debtor or Debtor's bankruptcy estate (including salary, benefits, employment taxes, withholdings, and similar costs and expenses) which are unpaid as of the date of this Instrument, regardless of when incurred.

(d)    The leases set forth on Exhibit 2 attached hereto, as to which Buyer covenants to promptly pay all amounts required to cure Debtor's default thereunder.

(e)    All sales taxes payable as a result of the sale of furniture and equipment included in the Purchased Assets.

COR2966-C502-03.doc                                    2

(f)    All unpaid post-petition payables owed by the Debtor or the Debtor's bankruptcy estate to vendors, suppliers or employees, including but not limited to those substantially set forth on Exhibit 3 attached hereto.

(g)    All liabilities and obligations of the Debtor or the Debtor's bankruptcy estate under any contract or agreement assigned to and assumed by Buyer pursuant to Section 1 above.

5.    Miscellaneous.

(a)    This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Maryland, excluding any conflicts of law principle that would apply the law of another jurisdiction.

(b)    This Agreement represents the entire, integrated agreement of the parties with respect to the subject matter hereof.

(c)    This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto and their respective successors and assigns.

In Witness Whereof, this Instrument is made on the date set forth above.

SELLER:

Lawrence D. Coppel, as Chapter 11 Trustee
of the Bankruptcy Estate of ERN, LLC

BUYER:

ERN ACQUISITION LLC

By: _____
Rony Natanzon, Authorized Person

COR2966-C502-03.doc                    3

-834-

Exhibit 1
Equipment Leases

|  | Buy-Out Amount | Monthly Payment | Type |
|---|---|---|---|
| GE Capital | $10,912.39 | $330.00 | Copy Machine |
| One Source | $15,000.00 | $399.00 | Color Copier |
| CIT Technology | $28,738.80 | $1,105.30 | UPS Backup |

COR2966-C502-03.doc

4

Exhibit 2
Excluded Assets

1. Accounts receivable other than (i) merchant agreement receivables, including bad check receivables, (ii) lease receivables and (iii) the receivable from ERN Israel, LLC. Excluded receivables include, but are not limited to, receivables from present and former employees and from entities affiliated with Debtor or Debtor's member or Debtor's member's family.

2. Cash on hand as of the Closing.

3. The telephone system equipment that is described under the equipment lease from First Sierra Financial, Inc. to Debtor. American Express Business Finance is the successor to First Sierra.

4. All claims and causes of action of Debtor's bankruptcy estate against any person, including, without limitation, claims arising under Chapter 5 of the Bankruptcy Code, but excluding claims against ERN Israel, LLC.

   5. A 2003 Chevrolet Tahoe subject to a lien of M&T Bank.

COR2966-C502-03.doc                    5

Exhibit 3
Non-exhaustive List of Post-Petition Payables

| Vendor | Amounts due | Due Date |
|---|---|---|
| A Cup Above | 116.00 | 5/28/2004 |
| A Cup Above | 58.00 | 6/12/2004 |
| A T & T Wireless | 100.20 | 6/24/2004 |
| ADP | 108.55 | 5/17/2004 |
| ADP | 99.85 | 5/31/2004 |
| ADP | 260.30 | 6/15/2004 |
| ADP | 99.85 | 6/30/2004 |
| Aflac | 820.60 | 5/26/2004 |
| Aflac | 532.36 | 6/24/2004 |
| Amex Bus Finance | 2,833.11 | 5/12/2004 |
| At Once | 1,388.10 | 6/20/2004 |
| At Once | 1,348.20 | 7/20/2004 |
| BGE | 1,807.25 | 6/14/2004 |
| BGE | 7,583.00 | 6/11/2004 |
| BGE | 2,570.37 | 7/18/2004 |
| Carefirst | 7,340.20 | 6/1/2004 |
| Chyrsler Financial | 250.30 | 6/4/2004 |
| Cingular Interactive | 242.16 | 6/1/2004 |
| Cingular Interactive | 240.86 | 7/1/2004 |
| CIT Technology | 96.10 | 6/7/2004 |
| CIT Technology | 1,260.79 | 6/20/2004 |
| CIT Technology | 1,260.79 | 7/20/2004 |
| CIT Technology | 96.10 | 7/7/2004 |
| C.N.A. | 8,031.60 | 7/14/2004 |
| Comcast | 73.91 | 6/7/2004 |
| Comcast | 78.92 | 7/7/2004 |
| Danone Waters | 39.19 | 5/29/2004 |
| Efunds | 3,336.25 | 6/9/2004 |
| Efunds | 3,336.25 | 7/9/2004 |
| Experian | 458.79 | 6/30/2004 |
| Fedex | 1,115.98 | 6/25/2004 |
| Fedex | 892.34 | 6/30/2004 |
| Fedex | 958.91 | 7/8/2004 |
| Fedex | 1,362.62 | 7/15/2004 |
| Fedex | 27.89 | 7/14/2004 |
| GE Capital | 387.30 | 6/24/2004 |
| Global Telcom | 951.80 | 7/15/2004 |
| Humana Dental | 742.69 | 6/1/2004 |
| Lynden Air Freight | 2,130.49 | 5/7/2004 |
| Lynden Air Freight | 947.80 | 6/8/2004 |
| MCI | 26,425.38 | 6/28/2004 |
| MCI | 399.20 | 7/1/2004 |

| | | |
|---|---|---|
| MCI Colocation | 2,902.00 | 5/31/2004 |
| MCI Colocation | 2,902.00 | 6/30/2004 |
| Nextel | 1,027.52 | 6/16/2004 |
| Nextel | 1,092.00 | 7/16/2004 |
| Office Equip Finance | 612.70 | 6/27/2004 |
| One Source | 578.00 | 6/1/2004 |
| Payroll&taxes thru 7/12 | 32,000.00 | 7/16/2004 |
| Accrued Benefits | 9,000.00 | 7/12/2004 |
| Pithey Bowes CC | 2,233.29 | 7/6/2004 |
| Plantscape | 456.75 | 6/1/2004 |
| Plantscape | 456.75 | 7/1/2004 |
| Shared Tech | 1,160.00 | 5/30/2004 |
| Timanus Lane | 20,985.08 | 6/1/2004 |
| Timanus Lane | 20,985.08 | 7/1/2004 |
| Unum Life Ins | 494.25 | 5/1/2004 |
| Unum Life Ins | 558.10 | 6/1/2004 |
| US Wireless | 198.00 | 6/6/2004 |
| Verizon CABS | 340.99 | 5/30/2004 |
| Verizon CABS | 340.99 | 6/30/2004 |
| Verizon MA | 24.88 | 6/1/2004 |
| Verizon MD | 46.77 | 6/15/2004 |
| Verizon MD | 46.48 | 6/10/2004 |
| | | |
| **Total:** | 180,651.98 | |

# CLOSING AGREEMENT

THIS CLOSING AGREEMENT (this "Agreement") is made this 14ᵗʰ day of July, 2004, by and between LAWRENCE D. COPPEL AS CHAPTER 11 TRUSTEE FOR THE BANKRUPTCY ESTATE OF ERN, LLC, a Maryland limited liability company ("Seller") and ERN ACQUISITION LLC, a Maryland limited liability company ("Buyer") to set forth the agreement of Seller and Buyer regarding the transactions necessary to implement the Order of the United States Bankruptcy Court for the District of Maryland, Baltimore Division entered on July 9, 2004 in Case No. 04-20521-JS (Chapter 11).

1.    <u>Closing Transactions</u>.  Seller and Buyer agree that at a closing held concurrently with the execution and delivery of this Agreement (the "Closing"), the following transactions shall occur, and the Closing shall not be deemed to have been completed, and such transactions shall not be deemed to have occurred, unless each and all of such transactions have occurred:

(a)    Buyer shall pay to Seller the sum of Two Hundred Thousand Dollars ($200,000) by federal funds wire transfer or intra-bank transfer to an account designated in writing by Seller, less the deposit of Twenty-Five Thousand Dollars ($25,000) already paid by Buyer to Seller, which deposit shall be retained by Seller as part of the purchase price for the assets conveyed by Seller to Buyer.

(b)    Buyer shall pay to Seller, for Seller's remittance to the State of Maryland, sales tax due with respect to the transactions effected by the Conveyance Instrument (as defined below).  Buyer and Seller agree to use for the purpose of calculating such sales tax the appraisal of furniture and equipment obtained by Seller which indicates a forced liquidation value of $75,095, exclusive of the telephone system which is not being sold to Buyer.  In the event that the State of Maryland disagrees with such valuation or assesses any additional sales tax, such additional assessment shall be paid by Buyer, subject to Buyer's right to contest any such additional assessment.

(c)    Seller and Buyer shall execute and deliver a Bill of Sale, Assignment of Intangibles and Assumption of Liabilities in mutually satisfactory form (the "Conveyance Instrument").

(d)    David M. Rombro shall execute and deliver to the Seller a Release in form satisfactory to Seller, releasing the bankruptcy estate of ERN, LLC (the "Debtor") from the obligations and liabilities of the Debtor to David M. Rombro which are being assumed by Buyer.

(e)    Antwerpen Motorcars, Ltd. shall execute and deliver to the Seller a Release in form satisfactory to Seller, releasing the bankruptcy estate of the Debtor from the obligations and liabilities of the Debtor to Antwerpen Motorcars, Ltd. which are being assumed by Buyer.

(f)    Rony Natanzon shall execute and deliver to the Seller a Release in form satisfactory to Seller, releasing the bankruptcy estate of the Debtor from the alleged secured liability of the Debtor to Rony Natanzon.

COR2969-C502-02.doc

(g)    Buyer shall execute and deliver to Seller a Security Agreement and Financing Statement in form satisfactory to Seller, as security for Buyer's obligation to pay all unpaid post-petition payables owed by the Debtor or the Debtor's bankruptcy estate to vendors, suppliers or employees (including employment related expenses such as benefit costs and employment taxes).

2.    <u>Certain Covenants and Agreements</u>.  The parties covenant and agree as follows:

(a)    Seller shall not enforce any judgments against or seek a disgorgement or turnover of the assets conveyed to Buyer in the Conveyance Instrument, or otherwise take any action to upset or rescind the sale to Buyer effected by the Conveyance Instrument, based solely upon the claims, if any, that Seller may have against Rony Natanzon.

(b)    Buyer shall offer at-will employment to the Debtor's employees as of the Closing.

(c)    Buyer shall pay the amounts required to cure any defaults of the Debtor under the leases assigned by Seller to Buyer in the Conveyance Instrument.

(d)    Buyer shall pay all unpaid post-petition payables owed by the Debtor or the Debtor's bankruptcy estate to vendors, suppliers or employees (including employment related expenses such as benefit costs and employment taxes).

3.    <u>Miscellaneous</u>.

(a)    This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Maryland, excluding any conflicts of law principle that would apply the law of another jurisdiction.

(b)    This Agreement represents the entire, integrated agreement of the parties with respect to the subject matter hereof.

(c)    This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto and their respective successors and assigns.

In Witness Whereof, this Instrument is made on the date set forth above.

SELLER:

Lawrence D. Coppel, as Chapter 11 Trustee
of the Bankruptcy Estate of ERN, LLC


BUYER:

ERN ACQUISITION LLC

By: _____
    Rony Natanzon, Authorized Person

COR2969-C502-02.doc

3

# Exhibit 8

to Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for the
Venue Transfer Pursuant to 28 U.S.C. § 1404(a)



**Nationwide Services**
**3102 Lord Baltimore Dr., Suite 101**
**Baltimore, MD 21244**
**Phone: (866) 298-5191**

**BETSY'S 26 BESSOM STREET**
**26 BESSOM ST**
**MARBLEHEAD , MA 01945**

### Monthly Transaction Statement For March/2003
### For Merchant [204873] BETSY'S 26 BESSOM STREET

**Merchant Fee Information**

| | Option 7 (recovery) | Option 6 (hold check conversion/guarantee) | Option 5 (hold check guarantee) | Option 4 (conversion/guarantee) | Option 3 (insurance) | Option 2 (conversion) | Option 1 (verification) |
|---|---|---|---|---|---|---|---|
| **From 01/01/1995** | | | | | | | |
| **Fee** | 0.00 | 0.00 | 0.00 | 0.30 | 0.00 | 0.30 | 0.00 |
| **Disc.Rate** | 0.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 |

**Total For Merchant [BETSY'S 26 BESSOM STREET]**

| | # Auth. | # NotAuth. | Auth.Volume | Disc.Rate | Net Deposits | Trans.Fee | Voice Auth. |
|---|---|---|---|---|---|---|---|
| **Option 2** | 167 | 10 | 29,945.67 | 0.00 | 29,945.67 | 53.10 | 0.00 |
| **Totals** | 167 | 10 | 29,945.67 | 0.00 | 29,945.67 | 53.10 | 0.00 |

| | |
|---|---|
| **Total Transaction Fee:** | 53.10 |
| **Total Voice Auth. Fee:** | 0.00 |
| **Statement Fee:** | 0.00 |
| **Balance Disc. Rate:** | 0.00 |
| **Total Balance:** | 78.10 |
| **Balance Due:** | 0.00 |

**Monthly Minimum Disc. Rate:**    25.00

### This is not an invoice
### Please do not mail a payment to NCS

Within our continuing effort to provide our customers quality service support, for both your administrative and technical needs, may we remind you our customer service and technical support departments are available to assist you; Monday thru Friday, 9:00 am to 6:00pm, eastern time. Out toll free number (866) 298-5191. Thank you for your cooperation, as we appreciate your patronage

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204873 | 2/modem | 02/28/2003 | 2933661 | 0475 | 200.00 | 200.00 | |
| 204873 | 2/modem | 02/28/2003 | 1824R00 | 0712 | 491.25 | 491.25 | |
| 204873 | 2/modem | 02/28/2003 | 2516692 | 0713 | 27.00 | 27.00 | |
| 204873 | 2/modem | 02/28/2003 | 3647563 | 6844 | 36.25 | 36.25 | |
| » | | | | # of Trans: 4 | Disc Rate: $0.00 | Amt: $754.50 | Net: $754.50 |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204873 | 2/modem | 03/01/2003 | 8314979 | 3095 | 58.75 | 58.75 | |
| » | | | | # of Trans: 1 | Disc Rate: $0.00 | Amt: $58.75 | Net: $58.75 |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204873 | 2/modem | 03/06/2003 | | 153 | 0.00 | 0.00 | |
| 204873 | 2/modem | 03/06/2003 | | 173 | 0.00 | 0.00 | |
| 204873 | 2/modem | 03/06/2003 | 9405SR3 | 173 | 54.00 | 54.00 | |
| » | | | | # of Trans: 3 | Disc Rate: $0.00 | Amt: $54.00 | Net: $54.00 |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204873 | 2/modem | 03/07/2003 | | 4057 | 0.00 | 0.00 | |
| 204873 | 2/modem | 03/07/2003 | 9785996 | 4057 | 100.00 | 100.00 | |
| » | | | | # of Trans: 2 | Disc Rate: $0.00 | Amt: $100.00 | Net $100.00 |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204873 | 2/modem | 03/14/2003 | 5051430 | 0626 | 105.10 | 105.10 | |
| 204873 | 2/modem | 03/14/2003 | 5737124 | 2794 | 195.00 | 195.00 | |
| 204873 | 2/modem | 03/14/2003 | 3779357 | 3029 | 56.50 | 56.50 | |
| 204873 | 2/modem | 03/14/2003 | 4D6816R | 7543 | 90.00 | 90.00 | |
| » | | | | # of Trans: 4 | Disc Rate: $0.00 | Amt: $446.60 | Net: $446.60 |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204873 | 2/modem | 03/21/2003 | 9319255 | 6121 | 118.80 | 118.80 | |
| 204873 | 2/modem | 03/21/2003 | 9055660 | 0740 | 26.40 | 26.40 | |
| » | | | | # of Trans: 2 | Disc Rate: $0.00 | Amt: $145.20 | Net: $145.20 |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204873 | 2/modem | 03/22/2003 | 1679494 | 0504 | 174.60 | 174.60 | |
| 204873 | 2/modem | 03/22/2003 | 1926008 | 1686 | 39.50 | 39.50 | |
| » | | | | # of Trans: 2 | Disc Rate: $0.00 | Amt: $214.10 | Net: $214.10 |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204874 | 2/modem | 02/25/2003 | 7151650 | 2353 | 82.68 | 82.68 | |
| 204874 | 2/modem | 02/25/2003 | 6620291 | 7608 | 93.28 | 93.28 | |
| » | | | | # of Trans: 2 | Disc Rate: $0.00 | Amt: $175.96 | Net: $175.96 |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204874 | 2/modem | 02/28/2003 | 3111779 | 3715 | 40.00 | 40.00 | |
| » | | | | # of Trans: 1 | Disc Rate: $0.00 | Amt: $40.00 | Net: $40.00 |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204874 | 2/modem | 03/01/2003 | 8759748 | 3168 | 65.00 | 65.00 | |
| 204874 | 2/modem | 03/01/2003 | 7818342 | 4879 | 200.60 | 200.60 | |
| 204874 | 2/modem | 03/01/2003 | 8107594 | 5819 | 38.00 | 38.00 | |
| 204874 | 2/modem | 03/01/2003 | 7473191 | 7043 | 206.90 | 206.90 | |
| » | | | | # of Trans: 4 | Disc Rate: $0.00 | Amt: $510.50 | Net: $510.50 |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204874 | 2/modem | 03/03/2003 | 1335384 | 2N594 | 342.52 | 342.52 | |
| » | | | | # of Trans: 1 | Disc Rate: $0.00 | Amt: $362.52 | Net: $362.52 |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204874 | 2/modem | 03/05/2003 | 7012351 | 1095 | 90.10 | 90.10 | |
| 204874 | 2/modem | 03/05/2003 | 6357691 | 1319 | 174.90 | 174.90 | |
| » | | | | # of Trans: 2 | Disc Rate: $0.00 | Amt: $265.00 | Net: $265.00 |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204874 | 2/modem | 03/07/2003 | 279210 | 2352 | 90.10 | 90.10 | |
| 204874 | 2/modem | 03/07/2003 | 205421 | 4893 | 96.00 | 96.00 | |
| » | | | | # of Trans: 2 | Disc Rate: $0.00 | Amt: $186.10 | Net: $186.10 |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204874 | 2/modem | 03/08/2003 | 2481628 | 1121 | 172.70 | 172.70 | |
| 204874 | 2/modem | 03/08/2003 | 2728142 | 5267 | 82.15 | 82.15 | |
| 204874 | 2/modem | 03/08/2003 | 2086050 | 6729 | 141.16 | 141.16 | |
| » | | | | # of Trans: 3 | Disc Rate: $0.00 | Amt: $396.01 | Net: $396.01 |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |

| 204874 | 2/modem | 03/10/2003 | 5785812 | 1112 | 184.72 | 184.72 | |
| 204874 | 2/modem | 03/10/2003 | | 4897 | 0.00 | 0.00 | |
| 204874 | 2/modem | 03/10/2003 | 6444361 | 4897 | 48.00 | 48.00 | |
| 204874 | 2/modem | 03/10/2003 | 7137448 | 4899 | 143.10 | 143.10 | |
| 204874 | 2/modem | 03/10/2003 | 6961553 | 5716 | 141.00 | 141.00 | |
| » | | # of Trans: 5 | | Disc Rate: $0.00 | Amt: $516.82 | Net: $516.82 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204874 | 2/modem | 03/12/2003 | 597591 | 4412 | 249.10 | 249.10 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $249.10 | Net: $249.10 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204874 | 2/modem | 03/14/2003 | 4939073 | 6750 | 151.16 | 151.16 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $151.16 | Net: $151.16 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204874 | 2/modem | 03/17/2003 | 1684768 | 5446 | 963.54 | 963.54 | |
| 204874 | 2/modem | 03/17/2003 | 756846 | 5270 | 50.00 | 50.00 | |
| 204874 | 2/modem | 03/17/2003 | 170466 | 9245 | 86.92 | 86.92 | |
| 204874 | 2/modem | 03/17/2003 | 1600361 | 9037 | 415.52 | 415.52 | |
| » | | # of Trans: 4 | | Disc Rate: $0.00 | Amt: $1,515.98 | Net: $1,515.98 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204874 | 2/modem | 03/18/2003 | 3248211 | 9063 | 100.70 | 100.70 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $100.70 | Net: $100.70 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204874 | 2/modem | 03/19/2003 | 5180071 | 2123 | 135.00 | 135.00 | |
| 204874 | 2/modem | 03/19/2003 | 4577910 | 6707 | 245.90 | 245.90 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $380.90 | Net: $380.90 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204874 | 2/modem | 03/20/2003 | 6433753 | 3093 | 118.72 | 118.72 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $118.72 | Net: $118.72 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204874 | 2/modem | 03/22/2003 | 1981907 | 0682 | 2616.12 | 2616.12 | |
| 204874 | 2/modem | 03/23/2003 | 2057184 | 3187 | 195.04 | 195.04 | |
| 204874 | 2/modem | 03/23/2003 | 897468 | 3732 | 153.70 | 153.70 | |
| » | | # of Trans: 3 | | Disc Rate: $0.00 | Amt: $2,964.86 | Net: $2,964.86 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204874 | 2/modem | 03/24/2003 | 5484347 | 3523 | 84.80 | 84.80 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $84.80 | Net: $84.80 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204875 | 2/modem | 03/25/2003 | 6643929 | 0315 | 79.80 | 79.80 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $79.80 | Net: $79.80 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204875 | 2/modem | 03/26/2003 | 7553564 | 1889 | 120.00 | 120.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $120.00 | Net: $120.00 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204875 | 2/modem | 03/27/2003 | 1322405 | 3986 | 231.15 | 231.15 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $231.15 | Net: $231.15 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204875 | 2/modem | 03/28/2003 | 2866942 | 1039 | 56.70 | 56.70 | |
| 204875 | 2/modem | 03/28/2003 | 3885606 | 1729 | 72.00 | 72.00 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $128.70 | Net: $128.70 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204875 | 2/modem | 03/06/2003 | 7782392 | 2001 | 53.00 | 53.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $53.00 | Net: $53.00 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204875 | 2/modem | 03/07/2003 | 639268 | 0441 | 310.61 | 310.61 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $310.61 | Net: $310.61 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204875 | 2/modem | 03/11/2003 | 8793019 | 1356 | 34.50 | 34.50 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $34.50 | Net: $34.50 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204875 | 2/modem | 03/13/2003 | 3301235 | 1359 | 153.00 | 153.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $153.00 | Net: $153.00 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204875 | 2/modem | 03/14/2003 | 5081243 | 1859 | 155.00 | 155.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $155.00 | Net: $155.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204875 | 2/modem | 03/18/2003 | 3667316 | 2123 | 340.00 | 340.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $340.00 | Net: $340.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204875 | 2/modem | 03/24/2003 | 4970077 | 2254 | 137.60 | 137.60 | |
| 204875 | 2/modem | 03/24/2003 | 5632106 | 4977 | 283.00 | 283.00 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $420.60 | Net: $420.60 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204876 | 2/modem | 02/25/2003 | 6087708 | 1688 | 36.75 | 36.75 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $36.75 | Net: $36.75 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204876 | 2/modem | 02/26/2003 | 8339875 | 0888 | 138.60 | 138.60 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $138.60 | Net: $138.60 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204876 | 2/modem | 03/01/2003 | 8368207 | 0458 | 63.00 | 63.00 | |
| 204876 | 2/modem | 03/01/2003 | 8105731 | 1031 | 56.70 | 56.70 | |
| » | | # of Trans: 2 | | Disc Rate: $2.00 | Amt: $119.70 | Net: $119.70 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204876 | 2/modem | 03/03/2003 | | 1567 | 0.00 | 0.00 | |
| 204876 | 2/modem | 03/03/2003 | | 1567 | 0.00 | 0.00 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $0.00 | Net: $0.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204876 | 2/modem | 03/07/2003 | 367344 | 0427 | 162.75 | 162.75 | |
| 204876 | 2/modem | 03/07/2003 | 9920774 | 2312 | 110.00 | 110.00 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $272.75 | Net: $272.75 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204876 | 2/modem | 03/12/2003 | 41024 | 0672 | 103.95 | 103.95 | |
| 204876 | 2/modem | 03/12/2003 | 138476 | 3363 | 34.93 | 34.93 | |
| 204876 | 2/modem | 03/12/2003 | 129158 | 4913 | 37.80 | 37.80 | |
| » | | # of Trans: 3 | | Disc Rate: $0.00 | Amt: $176.68 | Net: $176.68 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204876 | 2/modem | 03/13/2003 | 2614797 | 9105 | 75.60 | 75.60 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $75.60 | Net: $75.60 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204876 | 2/modem | 03/14/2003 | 4926030 | 5667 | 75.90 | 75.90 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $75.90 | Net: $75.90 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204876 | 2/modem | 03/16/2003 | | 1077 | 0.00 | 0.00 | |
| 204876 | 2/modem | 03/16/2003 | 9559305 | 3264 | 247.80 | 247.80 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $247.80 | Net: $247.80 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204876 | 2/modem | 03/17/2003 | 1073607 | 0813 | 201.60 | 201.60 | |
| 204876 | 2/modem | 03/17/2003 | 890317 | 1918 | 94.40 | 94.40 | |
| 204876 | 2/modem | 03/17/2003 | 981001 | 7931 | 50.40 | 50.40 | |
| » | | # of Trans: 3 | | Disc Rate: $0.00 | Amt: $346.40 | Net: $346.40 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204876 | 2/modem | 03/18/2003 | 2908395 | 0209 | 256.20 | 256.20 | |
| 204876 | 2/modem | 03/18/2003 | 3455659 | 0970 | 50.40 | 50.40 | |
| 204876 | 2/modem | 03/18/2003 | 2333195 | 7655 | 15.23 | 15.23 | |
| » | | # of Trans: 3 | | Disc Rate: $0.00 | Amt: $321.83 | Net: $321.83 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204876 | 2/modem | 03/19/2003 | 5041125 | 3491 | 117.60 | 117.60 | |
| 204876 | 2/modem | 03/19/2003 | 5096465 | 4122 | 94.50 | 94.50 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $212.10 | Net: $212.10 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204876 | 2/modem | 03/21/2003 | 8521764 | 2656 | 15.23 | 15.23 | |
| 204876 | 2/modem | 03/21/2003 | 9560925 | 4353 | 66.15 | 66.15 | |
| 204876 | 2/modem | 03/21/2003 | 8868337 | 4625 | 115.50 | 115.50 | |
| » | | # of Trans: 3 | | Disc Rate: $0.00 | Amt: $196.88 | Net: $196.88 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204876 | 2/modem | 03/22/2003 | 880699 | 0432 | 48.30 | 48.30 | |
| 204876 | 2/modem | 03/22/2003 | 2159169 | 2847 | 155.40 | 155.40 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $203.70 | Net: $203.70 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204877 | 2/modem | 02/18/2003 | 2571982 | 1820 | 132.00 | 132.00 | |
| 204877 | 2/modem | 02/28/2003 | 2702972 | 2565 | 48.00 | 48.00 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $180.00 | Net: $180.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204877 | 2/modem | 03/01/2003 | 8996587 | 1086 | 26.25 | 26.25 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $26.25 | Net: $26.25 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204877 | 2/modem | 03/03/2003 | 3012911 | 1075 | 110.00 | 110.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $110.00 | Net: $110.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204877 | 2/modem | 03/10/2003 | 5565942 | 0R91 | 340.00 | 340.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $340.00 | Net: $340.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204877 | 2/modem | 03/14/2003 | 5263287 | 2160 | 40.00 | 40.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $40.00 | Net: $40.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204877 | 2/modem | 03/19/2003 | 7529615 | 1059 | 130.00 | 130.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $130.00 | Net: $130.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204877 | 2/modem | 03/22/2003 | 1593223 | 2899 | 47.08 | 47.08 | |
| 204877 | 2/modem | 03/22/2003 | 1411738 | 6584 | 279.00 | 279.00 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $326.08 | Net: $326.08 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204877 | 2/modem | 03/24/2003 | 5167927 | 4000 | 82.00 | 82.00 | |
| 204877 | 2/modem | 03/24/2003 | 5124171 | 6188 | 408.00 | 408.00 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $490.00 | Net: $490.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204878 | 2/modem | 02/26/2003 | 9553763 | 5755 | 416.00 | 416.00 | |
| 204878 | 2/modem | 02/26/2003 | 8852282 | 0998 | 46.00 | 46.00 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $462.00 | Net: $462.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204878 | 2/modem | 02/27/2003 | 9951090 | 2087 | 156.00 | 156.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $156.00 | Net: $156.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204878 | 2/modem | 02/28/2003 | 1992496 | 0179 | 194.25 | 194.25 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $194.25 | Net: $194.25 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204878 | 2/modem | 03/01/2003 | 7622392 | 0102 | 134.00 | 134.00 | |
| 204878 | 2/modem | 03/01/2003 | 8490688 | 4789 | 28.80 | 28.80 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $162.80 | Net: $162.80 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204878 | 2/modem | 03/03/2003 | 4906020 | 2629 | 131.00 | 131.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $131.00 | Net: $131.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204878 | 2/modem | 03/05/2003 | 6255793 | 0590 | 106.00 | 106.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $106.00 | Net: $106.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204878 | 2/modem | 03/10/2003 | 7443029 | 1901 | 240.00 | 240.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $240.00 | Net: $240.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204878 | 2/modem | 03/12/2003 | 619203 | 0451 | 210.00 | 210.00 | |
| 204878 | 2/modem | 03/12/2003 | 1442224 | 1002 | 149.00 | 149.00 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $359.00 | Net: $359.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204878 | 2/modem | 03/13/2003 | 3231548 | 045R | 227.00 | 227.00 | |
| 204878 | 2/modem | 03/13/2003 | 3043555 | 2322 | 94.00 | 94.00 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $521.00 | Net: $521.00 | |
| 204878 | 2/modem | 03/14/2003 | 6049008 | 2339 | 115.10 | 115.10 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $115.10 | Net: $115.10 | |
| 204878 | 2/modem | 03/16/2003 | 9032757 | 0292 | 78.30 | 78.30 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $78.30 | Net: $78.30 | |
| 204878 | 2/modem | 03/17/2003 | 773616 | 001160 | 176.40 | 176.40 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $176.40 | Net: $176.40 | |
| 204878 | 2/modem | 03/19/2003 | 6093329 | 1015 | 30.00 | 30.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $30.00 | Net: $30.00 | |
| 204878 | 2/modem | 03/21/2003 | R877591 | 1246 | 80.00 | 80.00 | |
| 204878 | 2/modem | 03/21/2003 | 9510616 | 3868 | 65.00 | 65.00 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $145.00 | Net: $145.00 | |
| 204878 | 2/modem | 03/23/2003 | 2993118 | 3003 | 38.00 | 38.00 | |
| 204878 | 2/modem | 03/23/2003 | 4319786 | 3159 | 269.00 | 269.00 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $307.00 | Net: $307.00 | |
| 204878 | 2/modem | 03/24/2003 | 6543258 | 1894 | 55.00 | 55.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $55.00 | Net: $55.00 | |
| 204879 | 2/modem | 03/25/2003 | 6157209 | 1557 | 72.21 | 72.21 | |
| 204879 | 2/modem | 03/25/2003 | 6979608 | 1686 | 250.00 | 250.00 | |
| 204879 | 2/modem | 02/25/2003 | 6479000 | 4928 | 202.00 | 202.00 | |
| » | | # of Trans: 3 | | Disc Rate: $0.00 | Amt: $524.21 | Net: $524.21 | |
| 204879 | 2/modem | 02/26/2003 | R359808 | 0107 | 76.50 | 76.50 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $76.50 | Net: $76.50 | |
| 204879 | 2/modem | 02/27/2003 | 90246A | 1325 | 1000.00 | 1000.00 | |
| 204879 | 2/modem | 02/27/2003 | 157149 | 2615 | 199.50 | 199.50 | |
| 204879 | 2/modem | 02/27/2003 | 890729 | 3432 | 197.05 | 197.05 | |
| 204879 | 2/modem | 02/27/2003 | P844674 | 4026 | 456.50 | 456.50 | |
| » | | # of Trans: 4 | | Disc Rate: $0.00 | Amt: $1,853.05 | Net: $1,853.05 | |
| 204879 | 2/modem | 02/28/2003 | | 0222 | 0.00 | 0.00 | |
| 204879 | 2/modem | 02/28/2003 | 2225409 | 1497 | 262.50 | 262.50 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $262.50 | Net: $262.50 | |
| 204879 | 2/modem | 03/01/2003 | R648510 | 1629 | 163.75 | 163.75 | |
| 204879 | 2/modem | 03/01/2003 | R353804 | 3091 | 441.60 | 441.60 | |
| 204879 | 2/modem | 03/01/2003 | 8390070 | 4835 | 148.60 | 148.60 | |
| » | | # of Trans: 3 | | Disc Rate: $0.00 | Amt: $753.95 | Net: $753.95 | |
| 204879 | 2/modem | 03/03/2003 | 1972073 | 3239 | 170.00 | 170.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $170.00 | Net: $170.00 | |
| 204879 | 2/modem | 03/04/2003 | 4487599 | 0965 | 113.00 | 113.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $113.00 | Net: $113.00 | |
| 204879 | 2/modem | 03/05/2003 | 7009124 | 3055 | 96.00 | 96.00 | |
| 204879 | 2/modem | 03/05/2003 | 6268091 | 3640 | 565.78 | 565.78 | |
| 204879 | 2/modem | 03/05/2003 | 5790528 | 4096 | 381.05 | 381.05 | |
| » | | # of Trans: 3 | | Disc Rate: $0.00 | Amt: $1,042.83 | Net: $1,042.83 | |
| 204879 | 2/modem | 03/06/2003 | 001775R | 0199 | 500.00 | 500.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $500.00 | Net: $500.00 | |

| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
|---|---|---|---|---|---|---|---|
| 204879 | 2/modem | 03/07/2003 | 707210 | 0640 | 409.15 | 409.15 | |
| 204879 | 2/modem | 03/07/2003 | 9879360 | 4683 | 112.00 | 112.00 | |
| 204879 | 2/modem | 03/07/2003 | 269335 | 7874 | 175.00 | 175.00 | |
| » | | # of Trans: 3 | | Disc Rate: $0.00 | Amt: $696.15 | Net: $696.15 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204879 | 2/modem | 03/08/2003 | 2269212 | 4041 | 150.00 | 150.00 | |
| 204879 | 2/modem | 03/08/2003 | 3300174 | 4869 | 71.30 | 71.30 | |
| 204879 | 2/modem | 03/08/2003 | 2802674 | 5052 | 214.00 | 214.00 | |
| » | | # of Trans: 3 | | Disc Rate: $0.00 | Amt: $435.30 | Net: $435.30 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204879 | 2/modem | 03/09/2003 | 4231823 | 0785 | 29.40 | 29.40 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $29.40 | Net: $29.40 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204879 | 2/modem | 03/10/2003 | 6413185 | 5055 | 79.00 | 79.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $79.00 | Net: $79.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204879 | 2/modem | 03/12/2003 | 514861 | 0506 | 59.00 | 59.00 | |
| 204879 | 2/modem | 03/12/2003 | 926090 | 1595 | 346.00 | 346.00 | |
| 204879 | 2/modem | 03/12/2003 | 572064 | 1689 | 210.00 | 210.00 | |
| » | | # of Trans: 3 | | Disc Rate: $0.00 | Amt: $615.00 | Net: $615.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204879 | 2/modem | 03/13/2003 | | 0563 | 0.00 | 0.00 | |
| 204879 | 2/modem | 03/13/2003 | | 0563 | 0.00 | 0.00 | |
| 204879 | 2/modem | 03/13/2003 | 2358407 | 0795 | 201.00 | 201.00 | |
| 204879 | 2/modem | 03/13/2003 | 2737774 | 1173 | 721.25 | 721.25 | |
| 204879 | 2/modem | 03/13/2003 | 2227976 | 1733 | 285.00 | 285.00 | |
| 204879 | 2/modem | 03/13/2003 | 2551444 | 2634 | 530.25 | 530.25 | |
| » | | # of Trans: 6 | | Disc Rate: $0.00 | Amt: $1,737.50 | Net: $1,737.50 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204879 | 2/modem | 03/14/2003 | 4809202 | 1407 | 108.00 | 108.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $108.00 | Net: $108.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204879 | 2/modem | 03/15/2003 | 6615295 | 2626 | 118.00 | 118.00 | |
| 204879 | 2/modem | 03/15/2003 | 6344558 | 5049 | 132.00 | 132.00 | |
| 204879 | 2/modem | 03/15/2003 | 6454493 | 8643 | 19.20 | 19.20 | |
| » | | # of Trans: 3 | | Disc Rate: $0.00 | Amt: $269.20 | Net: $269.20 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204879 | 2/modem | 03/17/2003 | 492817 | 1439 | 112.00 | 112.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $112.00 | Net: $112.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204879 | 2/modem | 03/18/2003 | 3403207 | 2657 | 231.00 | 231.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $231.00 | Net: $231.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204879 | 2/modem | 03/19/2003 | 3454218 | 4868 | 194.71 | 194.71 | |
| 204879 | 2/modem | 03/18/2003 | 4849951 | 7242 | 359.36 | 359.36 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $554.07 | Net: $554.07 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204879 | 2/modem | 03/20/2003 | 7902537 | 4877 | 115.50 | 115.50 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $115.50 | Net: $115.50 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204879 | 2/modem | 03/21/2003 | 9559062 | 1567 | 300.00 | 300.00 | |
| » | | # of Trans: 1 | | Disc Rate: $0.00 | Amt: $300.00 | Net: $300.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204879 | 2/modem | 03/22/2003 | 1740985 | 5244 | 38.00 | 38.00 | |
| 204879 | 2/modem | 03/22/2003 | 786975 | 5383 | 85.00 | 85.00 | |
| » | | # of Trans: 2 | | Disc Rate: $0.00 | Amt: $123.00 | Net: $123.00 | |
| Terminal | Option | Date | Auth Code | Check # | Amt | Net | Voice Auth |
| 204879 | 2/modem | 03/24/2003 | 5263173 | 0534 | 110.00 | 110.00 | |
| 204879 | 2/modem | 03/24/2003 | 5204840 | 3590 | 120.00 | 120.00 | |
| 204879 | 2/modem | 03/24/2003 | 5155910 | 7380 | 90.00 | 90.00 | |
| » | | # of Trans: 3 | | Disc Rate: $0.00 | Amt: $320.00 | Net: $320.00 | |

| Merchant Terminal Sub Totals | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Terminal | Option | # Auth. | # Not Auth. | Auth. Volume | Disc.Rate | Net Deposits | Trans.Fee | Voice Auth. |
| 204873 | 2/modem | 15 | 3 | $1,773.15 | $0.00 | $1,773.15 | $5.40 | $0.00 |
| 204874 | 2/modem | 33 | 1 | $8,019.13 | $0.00 | $8,019.13 | $10.20 | $0.00 |
| 204875 | 2/modem | 13 | 0 | $2,026.36 | $0.00 | $2,026.36 | $3.90 | $0.00 |
| 204876 | 2/modem | 25 | 3 | $2,424.69 | $0.00 | $2,424.69 | $6.40 | $0.00 |
| 204877 | 2/modem | 11 | 0 | $1,642.33 | $0.00 | $1,642.33 | $3.30 | $0.00 |
| 204878 | 2/modem | 22 | 0 | $3,038.85 | $0.00 | $3,038.85 | $6.60 | $0.00 |
| 204879 | 2/modem | 48 | 3 | $11,021.16 | $0.00 | $11,021.16 | $15.30 | $0.00 |
| » Totals | | 167 | 10 | $29,945.67 | $0.00 | $29,945.67 | $53.10 | $0.00 |

| Merchant Weekend Sub Totals | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Weekend | Terminal | Option | # Auth. | # Not Auth. | Auth. Volume | Disc.Rate | Net Deposits | Trans.Fee | Voice Auth. |
| Fri/Sat/Sun 03/02/2003 | 204873 | 2/modem | 5 | 0 | $813.25 | $0.00 | $813.25 | $1.50 | $0.00 |
| Fri/Sat/Sun 03/02/2003 | 204874 | 2/modem | 5 | 0 | $550.50 | $0.00 | $550.50 | $1.50 | $0.00 |
| Fri/Sat/Sun 03/02/2003 | 204875 | 2/modem | 2 | 0 | $128.70 | $0.00 | $128.70 | $0.60 | $0.00 |
| Fri/Sat/Sun 03/02/2003 | 204876 | 2/modem | 2 | 0 | $119.70 | $0.00 | $119.70 | $0.60 | $0.00 |
| Fri/Sat/Sun 03/02/2003 | 204877 | 2/modem | 3 | 0 | $206.25 | $0.00 | $206.25 | $0.90 | $0.00 |
| Fri/Sat/Sun 03/02/2003 | 204878 | 2/modem | 3 | 0 | $357.05 | $0.00 | $357.05 | $0.90 | $0.00 |
| Fri/Sat/Sun 03/02/2003 | 204879 | 2/modem | 4 | 1 | $1,016.45 | $0.00 | $1,016.45 | $1.50 | $0.00 |
| Fri/Sat/Sun 03/09/2003 | 204873 | 2/modem | 1 | 1 | $100.00 | $0.00 | $100.00 | $0.60 | $0.00 |
| Fri/Sat/Sun 03/09/2003 | 204874 | 2/modem | 5 | 0 | $582.11 | $0.00 | $582.11 | $1.50 | $0.00 |
| Fri/Sat/Sun 03/09/2003 | 204875 | 2/modem | 1 | 0 | $310.61 | $0.00 | $310.61 | $0.30 | $0.00 |
| Fri/Sat/Sun 03/09/2003 | 204876 | 2/modem | 2 | 0 | $272.75 | $0.00 | $272.75 | $0.60 | $0.00 |
| Fri/Sat/Sun 03/09/2003 | 204879 | 2/modem | 7 | 0 | $1,160.85 | $0.00 | $1,160.85 | $2.10 | $0.00 |
| Fri/Sat/Sun 03/16/2003 | 204873 | 2/modem | 4 | 0 | $446.60 | $0.00 | $446.60 | $1.20 | $0.00 |
| Fri/Sat/Sun 03/16/2003 | 204874 | 2/modem | 1 | 0 | $151.16 | $0.00 | $151.16 | $0.30 | $0.00 |
| Fri/Sat/Sun 03/16/2003 | 204875 | 2/modem | 1 | 0 | $155.00 | $0.00 | $155.00 | $0.30 | $0.00 |
| Fri/Sat/Sun 03/16/2003 | 204876 | 2/modem | 2 | 1 | $323.70 | $0.00 | $323.70 | $0.90 | $0.00 |
| Fri/Sat/Sun 03/16/2003 | 204877 | 2/modem | 2 | 0 | $170.00 | $0.00 | $170.00 | $0.60 | $0.00 |
| Fri/Sat/Sun 03/16/2003 | 204878 | 2/modem | 2 | 0 | $193.40 | $0.00 | $193.40 | $0.60 | $0.00 |
| Fri/Sat/Sun 03/16/2003 | 204879 | 2/modem | 4 | 0 | $377.20 | $0.00 | $377.20 | $1.20 | $0.00 |
| Fri/Sat/Sun 03/23/2003 | 204873 | 2/modem | 4 | 0 | $359.30 | $0.00 | $359.30 | $1.20 | $0.00 |
| Fri/Sat/Sun 03/23/2003 | 204874 | 2/modem | 3 | 0 | $2,964.86 | $0.00 | $2,964.86 | $0.90 | $0.00 |
| Fri/Sat/Sun 03/23/2003 | 204876 | 2/modem | 5 | 0 | $400.58 | $0.00 | $400.58 | $1.50 | $0.00 |
| Fri/Sat/Sun 03/23/2003 | 204877 | 2/modem | 2 | 0 | $326.08 | $0.00 | $326.08 | $0.60 | $0.00 |
| Fri/Sat/Sun 03/23/2003 | 204878 | 2/modem | 4 | 0 | $452.00 | $0.00 | $452.00 | $1.20 | $0.00 |
| Fri/Sat/Sun 03/23/2003 | 204879 | 2/modem | 3 | 0 | $423.00 | $0.00 | $423.00 | $0.90 | $0.00 |
| » Totals | | | 77 | 3 | $12,361.10 | $0.00 | $12,361.10 | $24.00 | $0.00 |

Effective July 1, 2002 a fee of $2.50 per occurrence will be charged to NCS customers who want their statements faxed to them.
If you have your statements faxed to you on a daily basis this could add up to as much as $650 per year.
However, you can view the same information you see on your daily statement by accessing our website,
https://www.nationwidecheckservices.com/external

# Exhibit 9

to Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for the Venue Transfer Pursuant to 28 U.S.C. § 1404(a)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BES ENTERPRISES, INC. | ) | |
| | ) | Civil Action No. 05-10477 GAO |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **AFFIDAVIT OF VERED TAYLOR** |
| | ) | |
| RONY NATANZON, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

I, Vered Taylor, declare and affirm under penalty of perjury:

1.    I am one of the Defendants in this action. I have personal knowledge of all of the facts set forth in this affidavit and, if called to testify in this matter, I could and would competently testify to each of the facts set forth. I am over 18 years of age.

2.    I submit this affidavit in support of Defendants' motion to dismiss this action, or, in the alternative, to transfer it to the United States District Court for the District of Maryland.

3.    I was manager of check services for ERN, LLC ("ERN") during approximately 2002 through April 2004 when ERN filed bankruptcy. ERN's former CEO, Rony Natanzon, is my father.

4.    I have only visited Massachusetts once as an adult. This was in approximately March, 2003. The purpose of the trip was to visit my brother Amit Natanzon for the weekend. I stayed in my brother's apartment in Brookline, Massachusetts for the weekend. I did not engage in any business during this visit to Massachusetts. I visited my brother for 30-45 minutes in ERN's Brookline offices, which Amit managed, just to visit Amit and take a tour of the office. We did not

discuss business.  To the best of my recollection I did not discuss the Plaintiff or take any action concerning the Plaintiff while I was in Massachusetts.

     5.     My only other trip to Massachusetts was a family trip about 13 years ago when I was about 10 years old.

     6.     I own no property in Massachusetts and have never been the holder of any Massachusetts license.

     7.     As ERN's manager of check services I spoke by telephone with Mr. Clayton Stead, an officer of Bes Enterprises, Inc., the Plaintiff, approximately 5-10 times concerning account reconciliation and customer service issues.  I was in Baltimore during these telephone conversations with Mr. Stead.

     8.     I also spoke by telephone from Baltimore with an employee of Plaintiff named Mabel, who performed a bookkeeping-type type function for Plaintiff.  I spoke by telephone with Mabel approximately once or twice per month.  ERN processed checks for Plaintiff and I would notify Mabel by telephone when consumers' checks made payable to Plaintiff had been rejected.

     9.     Typically, I would initiate the telephone calls to Mabel when check issues arose, i.e. when a check that ERN processed was rejected by the bank, and Mr. Stead would initiate telephone calls to me if Plaintiff had customer service issues.  I have never met either of them or any other employee of Plaintiff personally.

     10.     These telephone contacts that I had with Mr. Stead and Mabel occurred over a 2-3 year period.  To the best of my recollection, I did not send emails to Plaintiff (or, at least, did not do so on a regular basis) and only sent facsimile transmissions to Plaintiff once every couple of months.

2

I DECLARE AND AFFIRM UNDER PENALTY OF PERJURY THAT THE
CONTENTS OF THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT.

Vered Taylor

Dated: 3/7/2005

3

# Exhibit 10 – PAGES 1-30

to Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for the
Venue Transfer Pursuant to 28 U.S.C. § 1404(a)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **BARON FINANCIAL CORPORATION** | * | |
| 10255 Higgins Road, Suite 500 | | |
| Rosemont, Illinois 60018 | * | |
| | | |
| **Plaintiff** | * | |
| | | |
| v. | * | |
| | | |
| **RONY NATANZON** | * | |
| c/o ERN Acquisition, LLC | | |
| 3102 Lord Baltimore Dr. | * | |
| Baltimore, Maryland 21244 | | |
| | * | |
| **TOVA NATANZON** | | |
| c/o ERN Acquisition, LLC | * | |
| 3102 Lord Baltimore Dr. | | |
| Baltimore, Maryland 21244 | * | |
| | | |
| **MARTIN TAYLOR** | * | **Civil Action No.: MJG03-CV-3563** |
| c/o ERN Acquisition, LLC | | |
| 3102 Lord Baltimore Dr. | * | |
| Baltimore, Maryland 21244 | | |
| | * | |
| **AMIT NATANZON** | | |
| c/o ERN Acquisition, LLC | * | |
| 3102 Lord Baltimore Dr. | | |
| Baltimore, Maryland 21244 | * | |
| | | |
| **VERED TAYLOR** | * | |
| c/o ERN Acquisition, LLC | | |
| 3102 Lord Baltimore Dr. | * | |
| Baltimore, Maryland 21244 | | |
| | * | |
| **HAROLD TAYLOR** | | |
| Serve at | * | |
| Antwerpen Dodge, Inc. | | |
| 9420 Liberty Rd. | * | |
| Randallstown, MD 21133 | | |
| | * | |
| **MAP, LLC** | | |
| Serve on Registered Agent: | * | |
| Stuart R. Rombro | | |

**Rosenberg, Martin, Funk & Greenberg**    *
**25 S. Charles St., Suite 2115**
**Baltimore, Maryland 21201**    *

**NATIONWIDE CREDIT CARD CENTER, LLC***
    Serve on Registered Agent:
    **Stuart R. Rombro**    *
    **Rosenberg, Martin, Funk & Greenberg**
    **25 S. Charles St., Suite 2115**    *
    **Baltimore, Maryland 21201**

    *

**NATIONWIDE CHECK SERVICES, LLC**
    Serve on Registered Agent:    *
    **Stuart R. Rombro**
    **Rosenberg, Martin, Funk & Greenberg**    *
    **25 S. Charles St., Suite 2115**
    **Baltimore, Maryland 21201**    *

**NATIONWIDE EQUIPMENT SALES, LLC**    *
    Serve on Registered Agent:
    **Stuart R. Rombro**    *
    **Rosenberg, Martin, Funk & Greenberg**
    **25 S. Charles St., Suite 2115**    *
    **Baltimore, Maryland 21201**

    *

**ERN ACQUISITION, LLC**
    Serve on Registered Agent:    *
    **Lonnie M. Ritzer, Esq.**
    **Shapiro, Sher, Guinot & Sandler, P.A.**    *
    **Suite 2000**
    **Baltimore, MD 21201**    *

**STUART R. ROMBRO**    *
    **Rosenberg, Martin, Funk & Greenberg**
    **25 S. Charles St., Suite 2115**    *
    **Baltimore, Maryland 21201**

    *

        **Defendants**
    *

*   *   *   *   *   *   *   *   *   *   *   *   *

## SECOND AMENDED COMPLAINT

Plaintiff, Baron Financial Corporation ("Baron"), by its attorneys, David B. Goldstein,

Brooke Schumm, III, and Daneker, McIntire, Schumm, Prince, Goldstein, Manning & Widmann,

P.C., pursuant to Fed.R.Civ.P. 15(a), hereby files this Second Amended Complaint against Rony

Natanzon, Tova Natanzon, Martin Taylor, Vered Taylor, Amit Natanzon, Harold Taylor, Stuart

Rombro, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, Nationwide

Credit Card Center, LLC, MAP, LLC, and ERN Acquisition LLC, and for its Second Amended

Complaint states as follows:

### Introduction

1.     This Second Amended Complaint is precipitated by Defendants' wrongdoing and

participation in the bankrupting of ERN, LLC ("ERN") with the objective of preventing any of

ERN's assets from being used to pay ERN's and Natanzon's debts and obligations to Plaintiff,

even if that meant destroying ERN in the process. The bankrupting of ERN was directed and

carried out principally by its former manager and sole owner, Defendant, Rony Natanzon. He

was assisted by his Defendant family members, Tova Natanzon, Martin Taylor, Vered Taylor,

and Amit Natanzon, and the other Defendants, Harold Taylor, Stuart Rombro, MAP, LLC

("MAP"), Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and

Nationwide Credit Card Center, LLC. Defendants bankrupted ERN through a series of

intentional and malicious breaches of their fiduciary, contractual and civil duties, obligations and

undertakings owed to ERN and Plaintiff, including specifically as follows:

(1)     Natanzon agreed in the MOU and Rider which resolved earlier litigation in this

Court to operate ERN in the ordinary course of business and to use his best efforts to

-3-

maximize the profitability of ERN going forward until all obligations under that settlement were discharged. Despite this agreement, Natanzon and his Defendant family members knowingly and intentionally caused ERN to divert corporate opportunities to other corporations, such as to MAP, LLC, with the specific intent to defraud Plaintiff as ERN's creditor.

(2)     ERN granted Plaintiff a security interest in certain credit card receivables related to credit card processing services agreements between ERN and EFS National Bank or its affiliates ("Concord"). Natanzon, with the assistance of his attorney, Stuart Rombro, terminated that perfected security interest so that he could direct ERN to sell those credit card receivables and divert the sale proceeds to himself and the Natanzon Defendant family members.

(3)     Natanzon directed ERN to misappropriate over $160,000 of Concord credit card account residual fees, which ERN had agreed in the MOU and Rider to deliver directly to Baron.

(4)     ERN contracted with persons and entities who sell ERN's credit and debit card processing and check clearing and guaranty services to retail merchants. Such a person or entity is called an "Independent Sales Organization" ("ISO"). In consideration of the ISOs agreement to sell ERN's services to retail merchants, and thereby build up ERN's portfolio of retail merchant accounts, ERN agreed to pay to the ISO a part of the credit and debit card residual fees and check clearing and guaranty fees paid by the retail merchants. This agreement between ERN and the ISO was called an Independent Sales Organization Agreement (the "ISO Agreement"). ERN agreed in its ISO Agreements to

-4-

pay the ISO responsible for soliciting a retail merchant account a lump sum payment representing 24 times the account's average monthly stream of residual fee income over the 3 months preceding the sale. As part of the MOU settlement of the earlier litigation in this Court, ERN sold its portfolio of credit card accounts to EFS National Bank to generate the settlement payment owed to Baron under the MOU. Upon completion of that credit card portfolio sale, ERN was therefore contractually obligated to pay its ISOs the agreed lump sum payment called for under the ISO Agreements. Notwithstanding its contractual obligations to its ISOs, after the sale Natanzon directed ERN instead to fabricate monthly reports to its ISOs purporting to show that the retail merchant accounts sold to Concord were still being serviced by ERN, that Concord was still reporting to ERN the accounts' monthly sale volume, and that ERN was still receiving from Concord residual fee income from the accounts based on reported credit card sales volume. These reports were a deliberate and knowing fraud by Natanzon, intended solely to defraud ERN's ISOs out of the ISOs' lump sum payments which were due on the sale of the ISOs' retail merchant accounts. The concealment of the sale of the credit card portfolio was an intentional and malicious breach of Natanzon's and ERN's covenant to operate ERN in the ordinary course of business and to use their best efforts to maximize the profitability of ERN going forward until all obligations under the settlement were discharged.

(5)    ERN operated a check clearing and guarantee business for retail merchants at various locations around the country. Despite receiving the proceeds of its retail merchants' cleared checks as agent for the merchants, with the knowledge and

cooperation of at least his daughter, Vered Natanzon, and her husband, Martin Taylor,

Natanzon intentionally and maliciously directed ERN to retain the collected proceeds of

the checks collected on behalf of and owed to the merchants, contrary to state and federal

law and ERN's contractual obligations and ERN's obligations under the National

Automated Clearing House Association ("NACHA") rules. The NACHA rules are

binding on ERN and govern its relationship with the financial institution which performs

ERN's check clearing house operations, without which ERN could not operate.

Natanzon's deceit and misappropriation of the ERN merchant check trust funds injured

and damaged merchants nationwide in the amount of over $2 million. The intentional

and malicious misappropriation of the merchant check trust funds was also an intentional

and malicious breach of Natanzon's and ERN's covenant to operate ERN in the ordinary

course of business and to use their best efforts to maximize the profitability of ERN going

forward until all obligations under the settlement were discharged.

(6)    With full knowledge of the worsening financial problems of ERN, Natanzon and

the Natanzon family Defendants cooperated and conspired to transfer ERN's funds and

assets to other Natanzon family-owned entities, including the Natanzon Family Trust,

MAP, LLC and ERN Israel, LLC. Natanzon and the Natanzon family members also

cooperated and conspired to transfer ownership of ERN Israel from Natanzon to his wife,

Tova Natanzon, for no consideration in order to defraud Baron.

2.    For these reasons and other reasons which Plaintiffs will prove at trial, judgment should

be entered against Defendants, jointly and severally, for compensatory and punitive damages in

an amount in excess of $11 million.

**Parties**

3.      Plaintiff, Baron Financial Corporation ("Baron"), is a corporation incorporated under the laws of the State of Illinois with its principal place of business in Rosemont, Illinois.  Baron is engaged in the financial services business.

4.      ERN, LLC d/b/a Nationwide Check Services or NCS ("ERN"), is a Maryland limited liability company with its principal place of business in Baltimore, Maryland.  ERN was engaged in the business of debit and credit card processing, and check processing and check guaranty, and leasing and selling point-of-sale terminals and other equipment for credit card, debit card and check transactions.  ERN has filed a chapter 11 bankruptcy under title 11, U.S. Code.  A trustee in bankruptcy, Lawrence D. Coppel, was appointed pursuant to section 1104(a) on the bases of gross mismanagement and incompetence.

5.      Defendant, Rony Natanzon ("Natanzon"), is a natural person who resides and works in Baltimore County, Maryland.  Mr. Natanzon is the sole member and manager of ERN, LLC.

6.      Defendant, Tova Natanzon, is a natural person who resides and works in Baltimore County, Maryland.  Ms. Natanzon is the spouse of Rony Natanzon.

7.      Defendant, Martin Taylor, is a natural person who resides and works in Baltimore County, Maryland.  Mr. Taylor is an owner, officer, or controlling person of MAP, LLC, and was a controlling person of ERN, LLC.  Mr. Martin Taylor performed services for MAP, LLC while on the ERN, LLC payroll.

8.      Defendant, Vered (nee Natanzon) Taylor, is a natural person who resides and works in Baltimore County, Maryland.  Ms. Taylor is the daughter of Rony Natanzon, and the wife of Martin Taylor.  Ms. Taylor performed services for MAP, LLC while on the ERN, LLC payroll.

9.     Defendant, Amit Natanzon, is a natural person who resides and works in Baltimore County, Maryland. Mr. Amit Natanzon is an owner, officer, or controlling person of MAP, LLC, and was a controlling person of ERN, LLC. Mr. Amit Natanzon performed services for MAP, LLC while on the ERN, LLC payroll.

10.     Defendant, Harold Taylor, is a natural person who resides and works in Baltimore County, Maryland. Mr. Taylor was, upon information and belief, an employee of Antwerpen Motorcars, Ltd. and conducted transactions for or on behalf of ERN, LLC and MAP, LLC. Harold Taylor is the father of Martin Taylor.

11.     Defendant, Stuart Rombro, is the former attorney for ERN, LLC, Rony Natanzon, and the other corporate Defendants.

12.     Defendant, MAP, LLC, is a Delaware limited liability company with its principal place of business, upon information and belief, in the former ERN premises in Baltimore, Maryland. MAP, LLC had three subsidiaries with the same names and doing the same business as divisions of ERN, LLC: Nationwide Check Services, LLC, Nationwide Credit Card Center, LLC, and Nationwide Equipment Sales, LLC, which are referenced below. Upon information and belief, MAP is owned by the Natanzon family.

13.     Defendant, Nationwide Check Services, LLC, is a Maryland limited liability company with its principal place of business in Baltimore, Maryland. Nationwide Check Services, LLC was engaged in the business of check processing and guaranty and did and does business from the same premises as ERN, LLC.

14.     Defendant, Nationwide Equipment Sales, LLC, is a Maryland limited liability company with its principal place of business in Baltimore, Maryland. Nationwide Equipment Sales, LLC

-8-

was engaged in the business of leasing and selling point-of-sale terminals and other equipment

for credit card, debit card and check transactions and did and does business from the same

premises as ERN, LLC.

15.    Defendant, Nationwide Credit Card Center, LLC, is a Maryland limited liability company

with its principal place of business in Baltimore, Maryland.  Nationwide Credit Card Center,

LLC was engaged in the business of debit and credit card processing and did and does business

from the same premises as ERN, LLC.

16.    Defendant, ERN Acquisition, LLC, is a Maryland limited liability company with its

principal place of business, upon information and belief, in the former ERN premises in

Baltimore, Maryland.  Upon information and belief, ERN Acquisition, LLC is owned by the

Natanzon family.

### Jurisdiction and Venue

17.    This Court has subject matter jurisdiction of this civil action pursuant to 28 U.S.C. § 1332

since the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and

costs, and is between citizens of different States.  The Plaintiff is an Illinois corporation, and the

Defendants are citizens of the State of Maryland or the State of Delaware.  The citizenship of the

members of the Defendant limited liability companies is that of Maryland and therefore is also

diverse from the Illinois citizenship of the Plaintiff corporation.  Venue is proper in this District

pursuant to 28 U.S.C. § 1391 since substantially all of the events complained of and giving rise

to Plaintiff's claims occurred in Maryland.

### ERN's business model

18.    ERN operated a business which sold services to retail merchants enabling the retail

merchant to transact business with consumers using credit cards, debit cards, and checks. ERN's business of credit card and debit card processing and check clearing and guaranty was part of the electronic payment industry in the United States. ERN sold these services to retail merchants, which ERN recruited directly and through independent sales agents called Independent Sales Organizations ("ISOs"). An ISO can be either a natural person or a corporate entity. Whether the retail merchant account was solicited directly by ERN or through an ISO, ERN's business income was generated predominantly by the sale of these credit card, debit card, and check processing services and the related sale or lease of point-of-sale terminals and other equipment for credit card, debit card, and check processing services. The fee ERN charged its merchants to provide these services is known in the electronic payment industry as a "residual."

19.     ERN's business model required capital to support the rapid expansion which Rony Natanzon considered essential to its long-term success. Mr. Natanzon approached a business acquaintance, Sam Buchbinder, to provide the required financing. Mr. Buchbinder agreed to provide financing through his company, Baron, and to take an ownership position in ERN through his company, Michelle Trading Corporation.

### The 2002 litigation

20.     In early 2002, Mr. Natanzon and Mr. Buchbinder had an irreconcilable disagreement over ERN's management under Mr. Natanzon, as its Manager, and litigation ensued in the Circuit Court for Baltimore County and in this Court, captioned as Michelle Trading Corporation v. Rony Natanzon, Civil Action No.: MJG-02-CV-1868 (the "Michelle litigation"). At the time of the Michelle litigation, Michelle and Natanzon were the only two members of ERN. In that litigation, on or about June 18, 2002, Plaintiff Michelle petitioned for appointment of a receiver,

-10-

and the Court scheduled a hearing on Michelle's petition for July 15, 2002.

### The MOU and Rider

21.    The litigation was settled on July 12, 2002, days before the receivership hearing, when the parties agreed at about 8 p.m. on the substance of a settlement agreement after several hours of settlement discussions.  The parties' agreement was memorialized in a writing called "Memorandum of Understanding Re: Settlement Agreement" ("MOU"), which was signed by Mr. Buchbinder, Michelle, and Baron.  The substance of that settlement agreement was changed by Mr. Natanzon unilaterally on Saturday morning, July 13, 2002, and then he signed the MOU on behalf of himself, ERN, and other ERN-related entities.  The altered agreement was then transmitted to counsel for Michelle.  On Saturday, July 13, Mr. Buchbinder, Michelle, and Baron agreed to the settlement agreement as unilaterally altered by Mr. Natanzon.  A copy of the MOU is attached hereto as Exhibit 1 (annotated by adding paragraph numbers in the left margin of the MOU to simplify reference to the MOU provisions mentioned in this complaint).  The parties amended the MOU by a "Rider to Memorandum of Understanding Re: Settlement Agreement," effective on July 12, 2002, a copy of which is attached hereto as Exhibit 2 (the "Rider").

22.    The ink was barely dry on the MOU and Rider when Defendant Natanzon, with the knowing assistance of his family members and others, commenced a pattern and practice of tortious conduct resulting in the material breach of every part of the MOU and Rider settlement. The tortious conduct of Natanzon and his family members and those acting in concert with them in breaching the MOU and Rider settlement was intentional and malicious, and was performed with actual malice and the specific intent to dishonor the settlement obligations owed to Baron and to damage and harm Baron.

-11-

## The misappropriation of $160,000 of Baron's residuals

23.     The parties to the MOU had agreed "to execute final written document(s) within 14 days consistent with this Memorandum of Understanding." Exhibit 1, MOU, at paragraph 16. In MOU paragraph 16, the parties also agreed to submit any irreconcilable disputes regarding the final written settlement document to the Court for a final binding decision. The MOU did not proceed smoothly to a "final written document."

24.     On August 26, 2002, after extensive negotiations, including the extension of the 14-day period for finalizing the settlement agreement, the parties were still unable to resolve their differences regarding the "final written agreement" specified in paragraph 16 of the MOU, and Michelle invoked the dispute resolution mechanism in the MOU and submitted the irreconcilable dispute, as provided in the MOU, to the Honorable Marvin J. Garbis.

25.     After briefing, on September 16, 2002, Judge Garbis rendered his decision (the "September 16 decision"). In the September 16 decision, Judge Garbis held, in pertinent part, as follows:

> The agreement most reasonably interpreted consistent with the MOU is that the $2,000,000 obligation was due on July 12, 2002 subject to restrictions. The primary pertinent restriction is that the obligation is payable only out of the assigned accounts and prospective residuals. There is no recourse to the Natanzon group. Moreover, interest (at an agreed 8%) would commence to accrue on any unpaid balance outstanding on October 10, 2002. Thus, there was a 90 day no interest period but not a 90 day "no collection of principal" period.
>
> The authority to sell the assigned accounts was effective immediately on July 12.
>
> I find that the agreement, best interpreted in context, calls for the immediate, July 12, 2002, assignment of accounts and prospective (after July 12, 2002) residual payments on said accounts. Therefore, any residual payments received after July 12, 2002 with respect to any assigned accounts were to be

"delivered directly" to Michelle and applied as a credit against the $2,000,000 due. The Natanzon parties had no right to retain any residuals and must pay the Buchbinder group the amounts of all such residuals plus interest from the date of receipt of each such residual payment. The interest rate shall be the "standard" prejudgment interest rate of 6% simple per annum.

I conclude that the accounts (and residuals associated therewith) assigned are limited to those extant on July 12, 2002 or, if greater, a group having residuals of $80,000 per month.

26.    After July 12, 2002, ERN had received residual payments from the portfolio of over

$80,000 on July 26, 2002, and of over $80,000 on August 26, 2002. The September 16, 2002,

opinion by Judge Garbis decided that ERN had agreed under the MOU to deliver those residual

payments to Baron, and that ERN therefore owed Baron the said $160,000, plus interest at 6%

simple interest per annum from the date of payment. Despite Judge Garbis' September 16 ruling

and Baron's due demand, Mr. Natanzon directed ERN to fail and refuse to pay to Baron the

$160,000, plus interest at 6% from the date of payment. Because ERN refused to cure its

misappropriation of the $160,000 in residual payments, Baron was forced to file a new action in

this Court to recover the misappropriated funds. That action, Civil Action No. 03-CV-168,

culminated in a summary judgment in favor of Baron for over $175,000, the $160,000 amount of

the misappropriated residuals, plus interest. In order to prevent Baron from collecting on that

judgment, ERN filed a chapter 11 bankruptcy on April 28, 2004.

27.    So long as the complete settlement payment specified in paragraph 2 of the MOU, as

amended by paragraph 3 of the Rider was unpaid, Paragraph 15 of the MOU, as clarified by

paragraph 7.4 of the Rider, restricted ERN and Mr. Natanzon from paying any relative of Mr.

Natanzon or his family anything other than ordinary salaries currently being paid and industry

standard commissions to Amit Natanzon, and no insider debt was to have been paid nor any

-13-

distribution made to any Natanzon family insider. Further, each Friday, a check register for ERN was to have been provided to Plaintiffs' counsel, certified as true and correct by ERN's comptroller, Beth Cooper, and by Mr. Natanzon, and all ERN bank statements were to have been provided to Plaintiffs' counsel. Mr. Natanzon directed ERN to fail and refuse to honor these obligations, thereby concealing Defendants' improper diversion of corporate assets to Natanzon and his family members and their corporate entities.

### Theft of corporate opportunity and corporate waste and abuse

28.     Following Judge Garbis' September 16 decision, ERN finally stopped obstructing the sale of its credit card portfolio as required by the MOU and Rider, and on October 15, 2002, ERN sold its credit card portfolio for $1,600,000. The result of ERN's delays, however, was that the credit card portfolio sold for almost $400,000 less than it could have been sold for if ERN had honorably cooperated in the sale of the portfolio.

29.     Having failed to prevent the sale of ERN's primary asset, its credit card portfolio, to satisfy ERN's settlement obligations and faced in the future with large financial obligations under the MOU and Rider in 2005 and 2007, Mr. Natanzon began to scheme to conceal and divert new ERN business opportunities and new credit card accounts so that Baron could not ultimately benefit from their value in recovering payment on ERN's $11,000,000 debt to Baron. Just as Mr. Natanzon had caused Stuart Rombro, Esquire, ERN's lawyer, in 2002 to create a new entity, "TRN, LLC," so that he could divert corporate opportunities to TRN during the 2002 Michelle litigation, in 2003 Mr. Natanzon directed Mr. Rombro to create MAP, LLC in order to move merchant accounts and residual income away from ERN and debase the perfected security interest of Baron under the MOU and Rider in ERN assets. Then, while employed by and

-14-

receiving employment compensation from ERN, LLC, Natanzon and his Defendant family members performed services for MAP, LLC and intentionally and maliciously diverted assets and business opportunities away from ERN and to MAP. Mr. Natanzon and his Defendant family members offered MAP, LLC as a new, alternative provider of credit card processing and check services to ERN's ISOs, deceptively using precisely the same trade dress and language of ERN. For example, in May 2003, Mr. Natanzon as "Manager and CEO" solicited ERN ISOs to enter into a new ISO Agreement which, in the fine print, would switch the ISO from being an ERN ISO to a MAP ISO. While still employed by and receiving wage compensation from ERN, Mr. Natanzon and Martin Taylor journeyed to Dallas, Texas on behalf of MAP, LLC to negotiate a credit card processing agreement for MAP, LLC with a credit card processing entity called First American Payment Systems.

30.    As ERN began to run out of cash in March and April, 2004, notwithstanding all of the efforts of the Natanzon family to delay payments to ERN creditors and continue to misappropriate merchant funds, and faced with Baron's judgment of over $175,000, Harold Taylor, Martin Taylor and Rony Natanzon, among other family members, conspired to transfer and transferred ERN check services accounts and contracts associated with Antwerpen Dodge from ERN to MAP.

31.    Defendants' diversion and theft of corporate opportunities was a direct violation of the "ordinary course of business" covenant in paragraph 4 on page 2 of the Rider (Exhibit 2): "Until all obligations of Natanzon, ERN and ERN Israel are satisfied hereunder, Natanzon further covenants and agrees that he shall operate ERN in the ordinary course of business and use his best efforts to maximize the profitability of ERN."

27.     Defendants' actions were intentional and malicious and were specifically designed to divert ERN's assets and old and new merchant accounts and their associated residual revenues to MAP, LLC, so as to prevent any ERN assets or collateral from being available to satisfy the Baron debt, even if that meant destroying and bankrupting ERN.

## Waste of corporate intellectual property assets

32.     In paragraph 14 of the MOU, ERN and Natanzon covenanted: "Natanzon shall diligently prosecute any and all patent applications and they shall be assigned to ERN, LLC."

33.     Mr. Natanzon breached this agreement and wasted this corporate asset by taking no action whatsoever, including by causing ERN not to pay its Chicago patent counsel some $50,000 owed for patent work completed prior to the MOU.  Because Mr. Natanzon directed that this bill not be paid, ERN's patent counsel withdrew from continuing to prosecute patent applications for ERN. Mr. Natanzon failed and refused either to prosecute the patent applications or to assign them to ERN, and he caused ERN to fail to retain replacement patent counsel, all in material breach of the MOU agreement.

## ERN's fraud directed at its ISOs

34.     ERN contracted with ISOs to market and sell ERN's credit card and check services to retail merchants using an Independent Sales Organization Agreement ("ISO Agreement"). The ERN ISO Agreement provided that ERN had the right to sell its portfolio of retail merchant accounts.  In the event of such a sale, the ISO Agreement provided that the ISO which solicited and serviced the retail merchant account was entitled to a lump sum payment based on a multiple of the account's average residual income from credit card and check services.  For example, in the case of ERN's sale of its portfolio of credit card accounts, the ISO Agreement provided as

-16-

follows: "Upon sale of the [credit card] portfolio by ERN, the ISO will receive twenty-four (24)

times the monthly *Visa/MasterCard Residuals*, as determined from the average of the last three

(3) months of the ISO's *Visa/MasterCard Residuals*." (Italics in original.)  Thus, upon ERN's

sale of its credit card portfolio on October 15, 2002, ERN was contractually obligated to pay its

ISOs whose retail merchant accounts were sold a sum of money equaling 24 times the average of

the ISOs accounts' last 3 months of Visa/MasterCard Residuals.

35.     Instead of paying its ISOs the lump sums due to them under the ISO Agreements upon the

October 15, 2002, sale of the credit card portfolio, Mr. Natanzon schemed to deceive and defraud

its ISOs out of the lump sum payment due to them.  That is, following the October 15 credit card

portfolio sale, Mr. Natanzon directed ERN to send the ISOs fraudulent monthly residual reports.

As in the months before the October 2002 portfolio sale, the report purported to show the

monthly volume of credit card transactions and the related residual income for each of the retail

merchant accounts, but these numbers were knowing and deliberate lies by Mr. Natanzon.  Mr.

Natanzon caused ERN to send ERN's ISOs fraudulent reports from the time of the October 15,

2002, sale up to the time ERN filed for bankruptcy, intentionally and maliciously

misrepresenting the supposed credit card sales volume for the retail merchant accounts that were

sold as if they had never been sold.

36.     ERN also hijacked its ISOs' retail merchant accounts, removing them from the ISOs'

reports and converting them to a direct ERN account, thereby diverting and misappropriating the

ISOs' residual income to ERN.  Retail merchant accounts disappeared and mysteriously

reappeared on ISO monthly reports, with sales volumes which were below the actual sales

volume, all in an elaborate scheme to defraud the ISOs out of residual income and to divert and

misappropriate the income to Mr. Natanzon and his family members.

### ERN's fraud directed at retail merchants

37.    ERN provided automated clearing house and check guaranty services to retail merchants. ERN was not a depository financial institution and therefore could not participate directly in the national automated check clearing system operated by the Federal Reserve. Therefore, ERN had to contract through an intermediary automated clearing house corporation (the "ACH Intermediary") with a depository financial institution (the "ACH bank") which participated in the Federal Reserve's network of automated clearing house ("ACH") bank operators. ERN also had to contract with each merchant and obtain authority to act as the merchant's agent to handle check debit and credit transactions on the merchant's behalf. Each time one of ERN's merchants accepted a check in payment of a transaction, the merchant caused certain information to be transmitted to ERN detailing that a customer had paid the merchant by a check written in a certain amount and drawn on a certain bank checking account. Each day after the close of business, ERN then batched all of its merchants' check transaction information and electronically transmitted the information to ERN's ACH Intermediary. ERN's ACH Intermediary then transmitted the information over the ACH electronic payment network presided over by the Federal Reserve so that the each customer's checking account was debited in the appropriate amount, and the collected funds were then credited by the ACH bank at the direction of ERN's ACH Intermediary to ERN's ACH account. ERN in turn was supposed to direct the ACH Intermediary to credit ERN's merchant's account, less the fees that ERN charged for the check clearing service. ERN was required to pledge that it would operate its check ACH services according to all applicable rules, regulations, and laws, including under the rules and guidelines

of the National Automated Clearing House Association ("NACHA").

35.     Mr. Natanzon and his Defendant family members and others acting in concert with them intentionally and maliciously directed ERN to violate those applicable rules, regulations, and laws by misappropriating and embezzling ERN's merchants' collected check trust funds altogether or by delaying the payment over of such collected check trust funds.

36.     Upon information and belief, this misappropriation and embezzlement out of trust of the ERN merchants' collected check trust funds appear to have commenced in early 2002. By 2004, Mr. Natanzon had directed the misappropriation and embezzlement out of trust of over $2 million of ERN's merchants' collected check trust funds. ERN's books and records showed the misappropriation and embezzlement amounted to over $3.8 million.

### Fraud directed at Internal Revenue Service

37.     When ERN would pay employees, including  Natanzon, Martin Taylor, Vered Taylor, Amit Natanzon, and Tova Natanzon, their payroll check or W-2 or equivalent would reflect a gross amount of pay less withholdings of income tax and Medicare and Social Security tax. At the end of the year, the Natanzon family members referenced in this paragraph could report that those taxes had been withheld and obtain a dollar-for-dollar credit against the taxes due.

38.     Because Defendants were diverting so much money and revenue from the company, ERN found itself unable to meet its employee payroll tax withholding obligations, and Mr. Natanzon directed that those withholding taxes not be paid. Thus, Mr. Natanzon had found yet another pool of trust fund dollars to dip into for the benefit of himself and his family to the detriment of creditors, including Baron.

## Count I -Breach of MOU and Rider Contract - Natanzon

39.     Plaintiff incorporates herein by reference all of the allegations contained in all paragraphs of this Second Amended Complaint as if set forth herein again.

40.     Mr. Natanzon agreed and covenanted in paragraph 4 of the Rider that he would operate ERN in the ordinary course of business and use his best efforts to maximize the profitability of ERN until all of the obligations of Mr. Natanzon, ERN and ERN Israel under the Rider and MOU were satisfied.

41.     Mr. Natanzon further agreed to diligently prosecute any and all patent applications and to assign the same to ERN.

42.     Mr. Natanzon has breached his agreement and covenant to operate ERN in the ordinary course and to use his best efforts to maximize its profitability until all of the obligations of Mr. Natanzon, ERN and ERN Israel under the Rider and the MOU have been satisfied.

43.     Mr. Natanzon has breached his agreement in the MOU and Rider to diligently prosecute all patent applications and to assign the same to ERN.

44.     So long as the settlement funds specified by paragraph 2 of the MOU, as modified by paragraph 3 of the Rider, or any portion thereof remains unpaid, ERN and Mr. Natanzon, as its sole member and manager, agreed there should be no payments to any relative of Mr. Natanzon or his family (referred to as an "insider") other than the ordinary salaries currently paid and industry standard commissions to Amit Natanzon, all as of July 12, 2002, and there should be no payments on any insider debt and no distributions of any type to any insider.  Further, on Friday of each week after July 12, 2002, a copy of ERN's check register, certified as true and correct by ERN's comptroller, Beth Cooper, and its manager, Mr. Natanzon, and showing all payments by

-20-

ERN to any person or entity, were to have been delivered to Plaintiffs' counsel. Further, Plaintiffs' counsel were to receive a copy of all of ERN bank statements as they were received by ERN, and Plaintiffs' counsel were to have been permitted to verify with ERN's bank any entries in said bank records.

45.   Mr. Natanzon breached his MOU and Rider obligations to limit payments of Natanzon family salaries and commissions and directed ERN in violation of such agreements to pay salaries to Mr. Natanzon and his family members which exceeded the ordinary salaries paid to them as of July 12, 2002.

46.   Mr. Natanzon breached his MOU and Rider obligations and directed ERN in violation of such agreements to pay insider debt and make distributions of ERN assets and property to insiders, including by transferring corporate assets to other Natanzon family entities, such as MAP, LLC and ERN Israel, LLC.

47.   Mr. Natanzon breached his MOU and Rider obligations and directed ERN in violation of such agreements not to deliver ERN's check registers and bank statements to Plaintiffs' counsel.

48.   As a result of Mr. Natanzon's breach of contract, Plaintiff Baron has sustained damages in an amount exceeding $75,000.00, exclusive of interest and costs.

WHEREFORE, Plaintiff, Baron Financial Corporation, prays the Court enter judgment in its favor against Defendant, Rony Natanzon, in an amount to be determined at trial exceeding $75,000.00, plus interest and costs, and that the Court grant such other and further relief as may be just and proper.

## Count II - Civil Conspiracy to Aid Breach of MOU and Rider Contract - Natanzon, T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC

49.    Plaintiff incorporates herein by reference all of the allegations contained in all paragraphs of this Second Amended Complaint as if set forth herein again.

50.    Mr. Natanzon agreed and covenanted in paragraph 4 of the Rider that he would operate ERN in the ordinary course of business and use his best efforts to maximize the profitability of ERN until all of the obligations of Mr. Natanzon, ERN and ERN Israel under the Rider and MOU were satisfied.

51.    Mr. Natanzon further agreed to diligently prosecute any and all patent applications and to assign the same to ERN.

52.    Natanzon, Tova Natanzon, Martin Taylor, Vered (nee Natanzon) Taylor, Amit Natanzon, Stuart Rombro, Harold Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC knew of the existence of the MOU and Rider, and the contractual obligations and undertakings of memorialized therein, including without limitation Rony Natanzon's covenant to operate ERN in the ordinary course and to use his best efforts to maximize its profitability until all of the obligations of Mr. Natanzon, ERN and ERN Israel under the Rider and the MOU were satisfied.

53.    Despite that knowledge, Natanzon, T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC, entered into an agreement, combination, and civil conspiracy knowingly to aid Natanzon and ERN in the breaching of the contractual

-22-

obligations and undertakings memorialized in the MOU and Rider, including without limitation Natanzon's covenant to operate ERN in the ordinary course and to use Natanzon's best efforts to maximize ERN's profitability until all of the obligations of Mr. Natanzon, ERN and ERN Israel under the Rider and the MOU were satisfied.

54.    Natanzon, T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC acted overtly to breach the MOU and Rider agreements, including without limitation Natanzon's covenant to operate ERN in the ordinary course and to use Natanzon's best efforts to maximize ERN's profitability until all of the obligations of Mr. Natanzon, ERN and ERN Israel under the Rider and the MOU were satisfied, including as follows:

a.    knowingly organizing and operating MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC as competing businesses and knowingly diverting ERN corporate and business opportunities to MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC with the expectation and intent to disadvantage ERN and to advantage MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC, thereby minimizing ERN's profitability;

b.    knowingly embezzling ERN's merchants' check funds collected through the automated clearing house system by not paying the merchants timely or at all and knowingly destroying and spoliating documents and evidence of such misconduct, thereby causing

-23-

merchants to terminate their business relationship with ERN and minimize ERN's profitability;

c.    knowingly transferring ERN merchant account contracts from ERN to MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and/or Nationwide Credit Card Center, LLC, without any proper corporate purpose or benefit to ERN, thereby minimizing ERN's profitability;

d.    knowingly diverting cash and other value from ERN to Natanzon family owned entities, including without limitation to the Natanzon Family Trust, without any proper corporate purpose or benefit to ERN, thereby minimizing ERN's profitability;

e.    knowingly using and permitting the use of ERN's trade names, trade dress, and trademarks by other Natanzon family owned entities, including without limitation by MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and/or Nationwide Credit Card Center, LLC, without any proper corporate purpose or benefit to ERN, thereby minimizing ERN's profitability;

f.    knowingly operating ERN outside the ordinary course of business, knowingly minimizing the profitability of ERN, and knowingly using their best efforts to maximize the profitability of MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and/or Nationwide Credit Card Center, LLC to the detriment of ERN, by, *inter alia*, using automated clearing house funds received by ERN from Intercept Corporation to pay obligations of MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and/or Nationwide Credit Card Center, LLC;

g.    knowingly paying ERN cash and transferring ERN value to ERN Israel, LLC, without any

-24-

proper corporate purpose or benefit to ERN, thereby minimizing the profitability of ERN;

h. knowingly permitting and encouraging MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and/or Nationwide Credit Card Center, LLC to use ERN's facilities, employees, equipment and assets, trademarks, trade dress, and trade names without any proper corporate purpose or benefit to ERN, thereby minimizing ERN's profitability;

I. knowingly permitting and encouraging ERN employees to work for MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and/or Nationwide Credit Card Center, LLC, while the employees were still on the ERN payroll and receiving compensation from ERN, and owing fiduciary duties to ERN as employer;

j. knowingly misrepresenting to ERN's business partners and creditors the employment and ownership relations of Natanzon, M. Taylor, A. Natanzon, and others to MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and/or Nationwide Credit Card Center, LLC, thereby minimizing the profitability of ERN by causing ERN's business partners in some instances to terminate or reduce their business relations with ERN, and to form new business relations with MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and/or Nationwide Credit Card Center, LLC

k. knowingly operating ERN contrary to the requirements of generally accepted accounting principles and the law, by *inter alia* not reconciling the books and records of ERN for over two years prior to the filing of the bankruptcy petition in April 2004, and not paying taxes timely or at all;

l. knowingly encouraging and assisting ERN's former corporate lawyer to fraudulently

-25-

terminate Baron's perfected security interest in certain ERN assets; and

m.    knowingly using ERN's funds to pay Natanzon's personal obligations, without any proper

corporate purpose or benefit to ERN, thereby minimizing ERN's profitability.

55.    Mr. Natanzon and ERN, with the active and knowing assistance of T. Natanzon, M.

Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services,

LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC, breached the

agreements in the MOU and Rider.

56.    Mr. Natanzon, with the active and knowing assistance of T. Natanzon, M. Taylor, V.

Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC,

Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC, has breached his

agreement in the MOU and Rider to diligently prosecute all patent applications and to assign the

same to ERN.

57.    So long as the settlement funds specified by paragraph 2 of the MOU, as modified by

paragraph 3 of the Rider, or any portion thereof remains unpaid, ERN and Mr. Natanzon, as its

sole member and manager, agreed there should be no payments to any relative of Mr. Natanzon

or his family (referred to as an "insider") other than the ordinary salaries currently paid and

industry standard commissions to Amit Natanzon, all as of July 12, 2002, and there should be no

payments on any insider debt and no distributions of any type to any insider.  Further, on Friday

of each week after July 12, 2002, a copy of ERN's check register, certified as true and correct by

ERN's comptroller, Beth Cooper, and its manager, Mr. Natanzon, and showing all payments by

ERN to any person or entity, were to have been delivered to Plaintiffs' counsel.  Further,

Plaintiffs' counsel were to receive a copy of all of ERN bank statements as they were received by

ERN, and Plaintiffs' counsel were to have been permitted to verify with ERN's bank any entries in said bank records. Mr. Natanzon, with the active and knowing assistance of T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC, has breached his agreement in the MOU and Rider to perform these duties.

58.    Mr. Natanzon, with the active and knowing assistance of T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC, has breached his agreement in the MOU and Rider to limit payments of Natanzon family salaries and commissions and directed ERN in violation of such agreements to pay salaries to Mr. Natanzon and his family members which exceeded the ordinary salaries paid to them as of July 12, 2002.

59.    Mr. Natanzon, with the active and knowing assistance of T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC, has breached his agreement in the MOU and Rider and directed ERN in violation of such agreements to pay insider debt and make distributions of ERN assets and property to insiders, including by transferring corporate assets to other Natanzon family entities, such as MAP, LLC and ERN Israel, LLC.

60.    To the extent that T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, and/or H. Taylor, were agents, officers, or employees of ERN, LLC, they acted outside the scope of their authority and/or employment and/or their actions were not intended or calculated to advance the legitimate business interests and purposes of ERN, LLC.

61.    As a result of Defendants' unlawful and improper actions, Natanzon and ERN became unable to perform the contractual obligations and undertakings under the MOU and Rider.

62.    Natanzon, T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC acted with actual malice and with the intent to cause harm to Baron in their conspiracy to breach the MOU and Rider.

63.    As a result of the intentional and malicious wrongdoing of Natanzon, T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC in their conspiracy to breach the MOU and Rider, Baron sustained damages in excess of $75,000.00, exclusive of interest and costs.

    WHEREFORE, Plaintiff, Baron Financial Corporation,  prays the Court enter judgment for compensatory and punitive damages in its favor against Defendants, Rony Natanzon, Tova Natanzon, Martin Taylor, Vered Taylor, Amit Natanzon, Stuart Rombro, Harold Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC, jointly and severally, in an amount to be determined at trial exceeding $75,000.00, plus interest and costs, and attorneys fees, and that the Court grant such other and further relief as may be just and proper.

### Count III - Intentional Interference with MOU and Rider Contractual Relations - T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC

64.    Plaintiff incorporates herein by reference all of the allegations contained in all paragraphs

-28-

of this Second Amended Complaint as if set forth herein again.

65.     Tova Natanzon, Martin Taylor, Vered (nee Natanzon) Taylor, Amit Natanzon, Stuart

Rombro, Harold Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment

Sales, LLC, and Nationwide Credit Card Center, LLC knew of the existence of the MOU and

Rider, and the contractual obligations and undertakings memorialized therein, including without

limitation Natanzon's covenant to operate ERN in the ordinary course and to use Natanzon's best

efforts to maximize ERN's profitability until all of the obligations of Mr. Natanzon, ERN and

ERN Israel under the Rider and the MOU were satisfied.

66.     Despite that knowledge, T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H.

Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and

Nationwide Credit Card Center, LLC, jointly and severally, intentionally interfered with those

contractual relations and intentionally induced Natanzon and ERN to materially breach the MOU

and Rider or otherwise to render Natanzon and ERN unable to perform those contractual

obligations and undertakings.

67.     To the extent that Natanzon, T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S.

Rombro, and/or H. Taylor, were agents, officers, or employees of ERN, LLC, they acted outside

the scope of their authority and/or employment and/or their actions were not intended or

calculated to advance the legitimate business interests and purposes of ERN, LLC.

68.     As a result of Defendants' unlawful and improper actions, Natanzon and ERN became

unable to perform their contractual obligations and undertakings under the MOU and Rider.

69.     Natanzon, T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP,

LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide

Credit Card Center, LLC acted with actual malice and with the intent to cause harm to Baron in interfering with the contractual relations between and among Baron, Natanzon and ERN, and in inducing Natanzon and ERN to materially breach the MOU and Rider.

70.     As a result of the intentional and malicious wrongdoing of T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC in interfering with the contractual relations between and among Baron, Natanzon and ERN, and in inducing Natanzon and ERN to materially breach the MOU and Rider, Baron sustained damages in excess of $75,000.00, exclusive of interest and costs.

WHEREFORE, Plaintiff, Baron Financial Corporation,  prays the Court enter judgment for compensatory and punitive damages in its favor against Defendants, Tova Natanzon, Martin Taylor, Vered Taylor, Amit Natanzon, Stuart Rombro, Harold Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC, jointly and severally, in an amount to be determined at trial exceeding $75,000.00, plus interest and costs, and attorneys fees, and that the Court grant such other and further relief as may be just and proper.

### Count IV – Civil Conspiracy to Intentionally Interfere with MOU and Rider Contractual Relations- Natanzon, T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC

71.     Plaintiff incorporates herein by reference all of the allegations contained in all paragraphs of this Second Amended Complaint as if set forth herein again.

# Exhibit 10 – PAGES 31-60

to Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for the
Venue Transfer Pursuant to 28 U.S.C. § 1404(a)

72.     Natanzon, Tova Natanzon, Martin Taylor, Vered (nee Natanzon) Taylor, Amit Natanzon,

Stuart Rombro, Harold Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide

Equipment Sales, LLC, and Nationwide Credit Card Center, LLC knew of the existence of the

MOU and Rider, and the contractual obligations and undertakings memorialized therein.

73.     Despite that knowledge, Natanzon, T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S.

Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales,

LLC, and Nationwide Credit Card Center, LLC, entered into an agreement, combination, and

civil conspiracy knowingly, intentionally and improperly to interfere with those contractual

relations, to intentionally induce the material breach of the MOU and Rider and to otherwise

prevent the performance of the MOU and Rider contractual obligations and undertakings.

74.     Natanzon, T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP,

LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide

Credit Card Center, LLC agreed, combined and conspired and acted on said agreement,

combination, and conspiracy knowingly, intentionally and improperly to interfere with those

contractual relations, to intentionally induce the material breach of the MOU and Rider and to

otherwise prevent the performance of the MOU and Rider contractual obligations, undertakings,

and agreements, including without limitation Natanzon's covenant to operate ERN in the

ordinary course and to use Natanzon's best efforts to maximize ERN's profitability until all of

the obligations of Mr. Natanzon, ERN and ERN Israel under the Rider and the MOU were

satisfied, including as follows by:

a.      knowingly organizing and operating MAP, LLC, Nationwide Check Services, LLC,

        Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC as

-31-

competing businesses and knowingly diverting ERN corporate and business opportunities

to MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and

Nationwide Credit Card Center, LLC with the expectation and intent to disadvantage

ERN and to advantage MAP, LLC, Nationwide Check Services, LLC, Nationwide

Equipment Sales, LLC, and Nationwide Credit Card Center, LLC, thereby minimizing

ERN's profitability;

b.    knowingly embezzling ERN's merchants' check funds collected through the automated

clearing house system by not paying the merchants timely or at all and knowingly

destroying and spoliating documents and evidence of such misconduct, thereby causing

merchants to terminate their business relationship with ERN and minimize ERN's

profitability;

c.    knowingly transferring ERN merchant account contracts from ERN to MAP, LLC,

Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and/or Nationwide

Credit Card Center, LLC, without any proper corporate purpose or benefit to ERN,

thereby minimizing ERN's profitability;

d.    knowingly diverting cash and other value from ERN to Natanzon family owned entities,

including without limitation to the Natanzon Family Trust, without any proper corporate

purpose or benefit to ERN, thereby minimizing ERN's profitability;

e.    knowingly using and permitting the use of ERN's trade names, trade dress, and

trademarks by other Natanzon family owned entities, including without limitation by

MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC,

and/or Nationwide Credit Card Center, LLC, without any proper corporate purpose or

-32-

benefit to ERN, thereby minimizing ERN's profitability;

f.    knowingly operating ERN outside the ordinary course of business, knowingly minimizing the profitability of ERN, and knowingly using their best efforts to maximize the profitability of MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and/or Nationwide Credit Card Center, LLC to the detriment of ERN, by, *inter alia*, using automated clearing house funds received by ERN from Intercept Corporation to pay obligations of MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and/or Nationwide Credit Card Center, LLC;

g.    knowingly paying ERN cash and transferring ERN value to ERN Israel, LLC, without any proper corporate purpose or benefit to ERN, thereby minimizing the profitability of ERN;

h.    knowingly permitting and encouraging MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and/or Nationwide Credit Card Center, LLC to use ERN's facilities, employees, equipment and assets, trademarks, trade dress, and trade names without any proper corporate purpose or benefit to ERN, thereby minimizing ERN's profitability;

I.    knowingly permitting and encouraging ERN employees to work for MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and/or Nationwide Credit Card Center, LLC, while the employees were still on the ERN payroll and receiving compensation from ERN, and owing fiduciary duties to ERN as employer;

j.    knowingly misrepresenting to ERN's business partners and creditors the employment and ownership relations of Natanzon, M. Taylor, A. Natanzon, and others to MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and/or Nationwide

-33-

Credit Card Center, LLC, thereby minimizing the profitability of ERN by causing ERN's business partners in some instances to terminate or reduce their business relations with ERN, and to form new business relations with MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and/or Nationwide Credit Card Center, LLC

k.  knowingly operating ERN contrary to the requirements of generally accepted accounting principles and the law, by *inter alia* not reconciling the books and records of ERN for over two years prior to the filing of the bankruptcy petition in April 2004, and not paying taxes timely or at all;

l.  knowingly encouraging and assisting ERN's former corporate lawyer to fraudulently terminate Baron's perfected security interest in certain ERN assets; and

m.  knowingly using ERN's funds to pay Natanzon's personal obligations, without any proper corporate purpose or benefit to ERN, thereby minimizing ERN's profitability.

75.    The check processor which put ERN checks presented at merchants through the automated clearing house system was named Intercept Corporation ("Intercept"). The function of Intercept Corporation was to take the amount and encoded bank and bank account data from a customer check presented at a merchant and collect the funds through the Federal Reserve System's automated clearing house ("ACH") system. A debit, meaning a withdrawal, would occur against a customer's bank account, and a credit would be issued to ERN. ERN was then required as the merchant's agent and fiduciary to direct Intercept to credit the merchant's account with the funds collected, less the agreed processing fee, so the merchant would receive the customer's funds for the goods purchased.

76.    At all times after July, 2002 until July, 2004, Vered Natanzon Taylor was an employee at

-34-

ERN. While at ERN her job duties included receiving and transmitting the data files regarding merchant check guaranty to and from Intercept. Each day, she would receive electronically a data file in spreadsheet form showing each customer's check transaction with each ERN merchant, including the amount of the check received from the customer of the merchant and the customer's bank routing information. Such merchant had an agreement with ERN pursuant to which ERN agreed to convert the check transaction to an electronic transaction, to collect the funds represented by the check transaction using the ACH system, and to remit to the merchant the funds received from the check. Vered Taylor was aware of this contractual arrangement between ERN and each of its merchants.

77.     As part of her acts in furtherance of the conspiracy, Vered Taylor, in breach of her fiduciary duty as an employee and agent of ERN, and of ERN's duty to the Merchant as the agent for the merchant collecting the check from the customer, knowingly, deliberately and intentionally failed to remit funds for the checks to the merchants. Ms. Taylor, each day, would receive a spreadsheet from Intercept, the check processing company. She would prepare a spreadsheet of what amounts were due out to merchants for funds collected. She would give that spreadsheet showing amounts due out to merchants to her father, Rony Natanzon. Rony Natanzon would determine who would be paid based on whether he wanted to use the money for other, improper purposes, not on whether the check transaction funds had actually been collected using the ACH system. On days when, for example, Option 4 check guaranty merchants would not be paid, a whole class of merchants, many of whose customer's checks had already been collected using the ACH system and had already been received by ERN in ERN cash accounts, would be denied payment and their funds embezzled. After receiving Natanzon's instructions on

-35-

a marked spreadsheet, Vered Taylor would then perform operations to revise the spreadsheet so as to withhold the collected funds from the merchants, and then transmit the revised spreadsheet to Intercept, which entity would then follow the instruction given by Ms. Taylor, and merchants would not receive their funds.

78.     Then, each day, Ms. Taylor would destroy the evidence of the wrongdoing by destroying and spoliating the documents, both paper and electronic, both to and from Intercept, showing her father's instructions.  Ms. Taylor spoliated this evidence during the entire course of this litigation, even after discovery requesting such evidence had been received by Defendants.

79.     When merchants called asking for their check funds, Defendants would conceal their conspiracy and wrongdoing by stating that ERN did not have the information and that merchants had to do their own reconciliations with the ERN monthly statements and their bank account statements, and prove that they were entitled to the funds from an allegedly unpaid check, including producing each collected check (even though ERN had already collected the money). This false and fraudulent practice of Defendants was designed knowingly, intentionally and improperly to interfere with the MOU and Rider contractual relations, to intentionally induce the material breach of the MOU and Rider, and to otherwise prevent the performance of the MOU and Rider contractual obligations and undertakings, including with the expectation and intent to minimize or destroy the profitability of ERN, and to delay, hinder, and prevent ERN from using its cash to pay its just debts.

80.     After June, 2003, when Defendants, including Martin Taylor and Natanzon, formed and began to operate MAP, LLC, Vered Taylor performed the same function for MAP while she was on the ERN payroll.  Acting as agent for MAP while employed by ERN, Vered Taylor would

knowingly and improperly remit ERN merchant funds to MAP. By assisting in concealing information from ERN's merchants, by withholding collected check funds from ERN merchants, and by conducting unlawful embezzlement of ERN's merchants' check funds, Defendants implemented the destruction of the quality of the ERN merchant portfolio and precipitated claims against ERN that would interfere with ERN's obligations to pay its lawful debts to Baron. Thus, Defendants actively participated in knowing and intentional conspiracy and agreement to prevent and interfere with the performance of the MOU and Rider contract that Plaintiff Baron had with ERN and Rony Natanzon, including Natanzon's covenant to operate ERN in the ordinary course and to maximize ERN's profitability.

81.    Mr. Harold Taylor was employed by ERN and worked and operated out of the premises of ERN. He, too, had knowledge of the MOU and Rider. In April, 2004, contemporaneous to the time judgment was entered against ERN in favor of Baron, and over one month after summary judgment on liability had been entered against ERN in favor of Baron, Mr. Harold Taylor, working with his son Martin Taylor, an employee and officer of ERN, conspired and acted to accomplish the transfer of the ERN merchant account associated with Antwerpen, a multi-location car dealership, which generated significant revenue for ERN, from ERN to MAP or its subsidiaries. The amount of accounts appears to have aggregated approximately $100,000 in residual revenue volume per month.

82.    Nationwide Check Guaranty Services, LLC, Nationwide Card Center, LLC, and Nationwide Leasing, LLC were corporations set up by Stuart Rombro, Esquire, as corporate counsel to ERN and as personal counsel to Defendants, including Natanzon, with the same names as the three divisions of ERN, LLC, which divisions were named Nationwide Check

Guaranty Services, Nationwide Card Center, and Nationwide Leasing.

83.     Stuart Rombro, Martin Taylor and Rony Natanzon, all agreed the trademarks, trade dress, and trade names of Nationwide Check Guaranty Services, Nationwide Card Center, and Nationwide Leasing, would be the new trademarks, trade dress, and trade names of the new limited liability company entities to be created. Rombro, Martin Taylor, and Natanzon conspired and agreed that the new limited liability entities would be subsidiaries of MAP, LLC. Rombro, Martin Taylor, and Natanzon knew that their actions were improper and unlawful because *inter alia* they would violate the MOU and Rider covenants and agreements, including Natanzon's covenant to operate ERN in the ordinary course and to use Natanzon's best efforts to maximize ERN's profitability until all of the obligations of Mr. Natanzon, ERN and ERN Israel under the Rider and the MOU were satisfied.

84.     While on the ERN payroll, Martin Taylor and Rony Natanzon knowingly conspired and agreed to divert the trade name, trade dress, and trademark of ERN, LLC ( which did business under the name "Nationwide") for use by MAP, LLC and Nationwide Check Guaranty Services, Nationwide Card Center, and Nationwide Leasing (collectively "MAP") for no or inadequate consideration and without any written agreement.

85.     Their knowing and improper conspiracy to permit MAP to use ERN's trade name enabled Mr. Natanzon and Mr. Taylor to seamlessly and fraudulently divert revenue from ERN to MAP. For example, Defendants caused new ERN merchant agreements to be entered into in the name of Nationwide, and then Defendants would assert that the contract and its associated revenue stream belonged to MAP instead of to ERN.

86.     Upon information and belief, in addition to the unlawful and improper transfer of the

-38-

Antwerpen check guaranty business from ERN to MAP, by Harold Taylor, Rony Natanzon and Martin Taylor, Defendants were able to further tortiously interfere with Baron's rights under the MOU and Rider by transferring 900 other ERN merchant contracts, with significant associated revenue streams from ERN to MAP. Accompanying that illegal transfer was the value of the bank card (credit card) processing business. Most merchants prefer that their check guaranty and bank/credit processing be done by one company, so that business was lost to ERN through the actions of Defendants, principally Natanzon and Martin Taylor.

87.    Rony Natanzon, Martin Taylor and Vered Taylor tortiously interfered with the rights of Baron under the MOU and Rider by yet another technique. ERN had the sole and exclusive contract with Intercept Corporation which as the sole source of collected ACH funds. All of the merchant account contracts for check conversion and collection using the ACH system were under the name Nationwide and as a matter of contract belonged to ERN. First, Rony Natanzon and Martin Taylor wrongfully transferred the ERN merchant's account contract from ERN to MAP. Then, Vered Taylor would receive the ACH spreadsheet from Intercept showing the ACH funds collected by Intercept. All of those ACH funds came through the one account of ERN with Intercept. On the basis of their improper conspiracy and agreement, Martin Taylor and Rony Natanzon would decide which merchants under contract with ERN would be deemed MAP merchants and which would be left as ERN merchants. Vered Taylor would first use those ACH funds received by ERN from Intercept in ERN's bank account to pay the "MAP" merchants, by transmitting the spreadsheet directing the Intercept to pay the "MAP" merchants, and Rony Natanzon would determine with what money was left, who, if any, ERN merchants would be paid. Vered Taylor would then modify and transmit a spreadsheet to Intercept showing whether,

-39-

or to what degree, the money collected by Intercept for "ERN" merchants would be paid to those "ERN" merchants, based on whatever level Rony Natanzon decided, based on whether there was any cash remaining for that purpose.

88.     The damage resulting from this fraudulent practice was that ERN ended up owing its merchants, on the books of ERN, $3,800,000 for check funds ERN actually collected using the ACH system as fiduciary and agent for its merchants.  Instead, Defendants, particularly Natanzon, Martin Taylor, and Vered Taylor, agreed, combined and conspired to embezzle these funds knowingly, intentionally, and maliciously to minimize the profitability of ERN so as to prevent Baron from receiving the benefit of the MOU and Rider agreements.

89.     Martin Taylor and MAP, LLC further conspired to intentionally and tortiously interfere with Baron's rights under the MOU and Rider by transferring at least part of the funds misappropriated from merchants to an offshore company owned by Natanzon or Tova Nataznon called ERN Israel.  The ownership of that company was fraudulently transferred by Rony Natanzon to his wife Tova Natanzon, using the services of Mr. Rombro.

90.     By working together and aiding and abetting each other, Rony Natanzon, Martin Taylor, and Vered Natanzon would be able to take all funds coming in on check guaranty services which should have belonged to ERN, and use those ERN funds to pay merchants wrongfully claimed by MAP (operated by Martin Taylor and Rony Natanzon), and cheat the merchants who were due funds from ERN.

91.     In order to further damage ERN for the benefit of MAP and its subsidiaries, Defendants also tortiously conspired and agreed to interfere with Baron's rights under the MOU and Rider by causing MAP to pay nothing to ERN for MAP's use of ERN's trade name, ERN's premises

-40-

which ERN leased, ERN's employees, or ERN's computer and telephone equipment.

92.     Tova Natanzon, the wife of Rony Natanzon, also agreed and conspired to tortiously interfere with ERN's and Rony Natanzon's obligations to Baron under the MOU and Rider. Mrs. Natanzon was paid approximately $48,000.00 per year by ERN, but, upon information and belief, did not perform any corresponding substantial job duties for ERN for said compensation.

93.     Tova Natanzon, upon information and belief, was also the trustee and a beneficiary of an irrevocable insurance trust (the "Natanzon Family Trust"). In another way to draw funds out of the company in violation of the MOU, Tova Natanzon and Rony Natanzon agreed and conspired to cause ERN to pay the premiums for the insurance policy held by the Natanzon Family Trust apparently on the life of Rony Natanzon. The beneficiary(ies) of the trust and insurance policy was not the company ERN, but was(were) individual Natanzon family members. The payment of these insurance premiums had no proper business purpose or benefit to ERN.

94.     Mr. Rony Natanzon and Martin Taylor had consulted with Harold Rothman, C.P.A., the company's and their personal accountant, concerning fulfillment of Mr. Natanzon's obligations and ERN's obligations to Baron under the MOU and Rider.

95.     When Mr. Rothman indicated that ERN might not be able to pay the $10,000,000 obligation owed to Baron timely or in full, Mr. Rony Natanzon and Mr. Martin Taylor, and on information and belief, Mr. Amit Natanzon, discussed the matter and decided that Martin Taylor and Amit Natanzon should not continue to work to fulfill ERN's obligations to Baron under the MOU and Rider. Rather than quit ERN, LLC, and have to start over, Rony Natanzon conspired and agreed knowingly with Rombro, Martin Taylor, and Amit Natanzon to organize MAP, as a parallel company, and to divert ERN's corporate opportunities and revenue, in violation of

-41-

Natanzon's MOU and Rider covenant to operate ERN in the ordinary course and so as to maximize its profitability. Rony Natanzon, Martin Taylor, and Amit Natanzon organized MAP and diverted ERN's corporate opportunities and revenue to MAP. Even after the commencement of MAP's operations, Amit Natanzon and Martin Taylor continued to utilize ERN employees to service MAP and its subsidiaries, and continued on the ERN payroll, all as part of their improper conspiracy to intentionally interfere with Baron's MOU and Rider contractual relations.

96.     Because MAP would need a credit card processing entity, Defendants, Rony Natanzon, Martin Taylor, and Amit Natanzon conspired to misrepresent Rony Natanzon as the President of MAP, and Martin Taylor as the Vice President of MAP, even though both were still on the ERN payroll. By engaging in this misrepresentation, Defendants obtained a credit card processing contract for MAP with First American Payment Systems. In applying for the credit card processing contract for MAP, Mr. Rony Natanzon falsely represented the value of ERN to be $24,000,000 as of June, 2003. Within a year, ERN would be bankrupt with no assets for unsecured creditors as a result of the conduct recited herein by Natanzon family members and Mr. Rombro.

97.     Natanzon, T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC, acted on their conspiracy, jointly and severally, among other things, by intentionally and improperly interfering with the MOU and Rider contractual relations, and/or by intentionally inducing the material breach the MOU and Rider, and/or by otherwise preventing the performance of contractual obligations and undertakings under the MOU and Rider.

98.     To the extent that Natanzon, T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S.

-42-

Rombro, and/or H. Taylor, were agents, officers, or employees of ERN, LLC, they acted outside the scope of their authority and/or employment and/or their actions were not intended or calculated to advance the legitimate business interests and purposes of ERN, LLC.

99.     Natanzon, T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC acted with actual malice and with the intent to cause harm to Baron in their conspiracy, combination and agreement to interfere with the contractual relations between Baron and ERN, to cause the material breach the MOU and Rider, and to prevent the performance of the contractual obligations and undertakings under the MOU and Rider.

100.    As a result of Defendants' conspiracy and unlawful and improper actions in furtherance thereof to interfere with the performance of the contractual obligations and undertakings under the MOU and Rider, Baron sustained damages in excess of $75,000.00, exclusive of interest and costs.

        WHEREFORE, Plaintiff, Baron Financial Corporation,  prays the Court enter judgment for compensatory and punitive damages in its favor against Defendants, Rony Natanzon, Tova Natanzon, Martin Taylor, Vered Taylor, Amit Natanzon, Stuart Rombro, Harold Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC, jointly and severally, in an amount to be determined at trial exceeding $75,000.00, plus interest and costs, and attorneys fees, and that the Court grant such other and further relief as may be just and proper.

-43-

**Count V - Claim for Unlawfully Aiding and Abetting Breach of MOU and Rider Contract-
Natanzon, T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor,
MAP, LLC, Nationwide Check Services, LLC,
Nationwide Equipment Sales, LLC,
and Nationwide Credit Card Center, LLC**

101.    Plaintiff incorporates herein by reference all of the allegations contained in all paragraphs
of this Second Amended Complaint as if set forth herein again.

102.    Each of Natanzon, Tova Natanzon, Martin Taylor, Vered (nee Natanzon) Taylor, Amit
Natanzon, Stuart Rombro, Harold Taylor, MAP, LLC, Nationwide Check Services, LLC,
Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC knew of the
existence of the MOU and Rider, and the contractual obligations and undertakings memorialized
therein.

103.    Despite his knowledge of the MOU and Rider, Natanzon unlawfully breached his
agreements and obligations in the MOU and Rider as previously recited, including breaching
Natanzon's covenant to operate ERN in the ordinary course of business and maximize
profitability, breaching the covenant to limit his and his family's compensation, and breaching
his covenant not to repay insider loans.

104.    Despite their knowledge of the MOU and Rider, T. Natanzon, M. Taylor, V. Taylor, A.
Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide
Equipment Sales, LLC, and Nationwide Credit Card Center, LLC, each aided and abetted the
unlawful breach of contract by Natanzon by their actions as set forth in this Complaint.

105.    Each of T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP,
LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide
Credit Card Center, LLC committed tortious acts to aid and abet the unlawful breach of the MOU

and Rider by Natanzon.

106.    Each of T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP,
LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide
Credit Card Center, LLC, by their actions recited in this complaint, and their tortious acts recited
in this complaint, aided and abetted Natanzon in achieving the full damage from Natanzon's
unlawful conduct in breaching the MOU and Rider.

107.    T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC,
Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide Credit
Card Center, LLC encouraged, cooperated in, and approved the unlawful actions of Natanzon of
breaching the MOU and Rider.  Natanzon, T. Natanzon, M. Taylor, V. Taylor, A. Natanzon, S.
Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales,
LLC, and Nationwide Credit Card Center, LLC benefitted from their aiding and abetting the
unlawful breach of contract, including by deriving compensation or payment, and/or drawing,
taking or receiving transfers of goodwill, business opportunity and/or revenues from ERN.

108.    Having aided and abetted Natanzon in his unlawful breaches, T. Natanzon, M. Taylor, V.
Taylor, A. Natanzon, S. Rombro, H. Taylor, MAP, LLC, Nationwide Check Services, LLC,
Nationwide Equipment Sales, LLC, and Nationwide Credit Card Center, LLC are jointly and
severally liable with Natanzon for the damage resulting from the aiding and abetting the unlawful
breach by Natanzon of the MOU and Rider.

WHEREFORE, Plaintiff, Baron Financial Corporation,  prays the Court enter judgment
for compensatory and punitive damages in its favor against Defendants, Rony Natanzon, Tova
Natanzon, Martin Taylor, Vered Taylor, Amit Natanzon, Stuart Rombro, Harold Taylor, MAP,

-45-

LLC, Nationwide Check Services, LLC, Nationwide Equipment Sales, LLC, and Nationwide

Credit Card Center, LLC, jointly and severally, in an amount to be determined at trial exceeding

$75,000.00, plus interest and costs, and attorneys fees, and that the Court grant such other and

further relief as may be just and proper.

### Count VI - Intentional Interference with UCC Contractual Relations - Natanzon and Rombro

109.    Plaintiff incorporates herein by reference all of the allegations contained in all paragraphs

of this Second Amended Complaint as if set forth herein again.

110.    On or about November 1, 2002, ERN, LLC granted Baron a security interest in ERN's

Concord credit card portfolio. Baron properly perfected said security interest by filing a UCC

Financing Statement with the Maryland Department of Assessments and Taxation on November

1, 2002.

111.    Natanzon and Rombro knew that Baron had filed a UCC Financing Statement with the

Maryland Department of Assessments and Taxation on November 1, 2002, perfecting Baron's

security interest in ERN's Concord credit card portfolio. Natanzon and Rombro also knew that

this was a binding, ongoing contract obligation of ERN which Baron had not authorized them to

interfere with or to terminate.

112.    With full knowledge of Baron's legally protected interest in its perfected security interest

in ERN's Concord credit card portfolio, Rombro intentionally and falsely represented that he had

authority from Baron to terminate Baron's security interest in ERN's Concord credit card

portfolio by filing a UCC Financing Statement Amendment, terminating Baron's UCC Financing

Statement and perfected security interest in ERN's Concord credit card portfolio. Natanzon and

-46-

Rombro acted jointly and severally, and intentionally and without justification, to terminate Baron's perfected security interest in ERN's Concord credit card portfolio and induced ERN to breach its contractual obligations to Baron in relation thereto and/or otherwise to render impossible ERN's performance of its contractual obligations.

113.    Natanzon and Rombro terminated Baron's perfected security interest in ERN's Concord credit card portfolio with actual malice and with the intent to cause injury and damage to Baron, knowing that they were acting without justification or authority.

114.    To the extent that Natanzon and/or Rombro were agents, officers, or employees of ERN, LLC, they acted outside the scope of their authority and/or employment and/or their actions were not intended or calculated to advance the legitimate business interests and purposes of ERN, LLC.

115.    Natanzon subsequently directed ERN to breach its contractual obligations to Baron in relation to the Concord credit card portfolio by selling the Concord credit card portfolio free and clear of Baron's security interest.

116.    After the credit card portfolio was sold, notwithstanding that the debt was still due to Baron, and that the Baron debt was secured by the Concord credit card portfolio, Natanzon directed ERN not to pay any part of the sale proceeds to Baron. Instead, Natanzon diverted the sale proceeds to pay his own personal debts and for other improper purposes.

117.    As a result of the intentional and malicious interference of Natanzon and Rombro with Baron's perfected security interest in ERN's Concord credit card portfolio, Baron sustained damages in excess of $160,000.00, exclusive of interest and costs.

WHEREFORE, Plaintiff, Baron Financial Corporation, prays the Court enter judgment

for compensatory and punitive damages in its favor against Defendants, Rony Natanzon and

Stuart Rombro, jointly and severally, in an amount to be determined at trial exceeding

$160,000.00, plus interest and costs, and attorneys fees, and that the Court grant such other and

further relief as may be just and proper.

## Count VII - Conversion - Natanzon and Rombro

118.    Plaintiff incorporates herein by reference all of the allegations contained in all paragraphs

of this Second Amended Complaint as if set forth herein again.

119.    Natanzon and Rombro knew that Baron had filed a UCC Financing Statement with the

Maryland Department of Assessments and Taxation on November 1, 2002, perfecting Baron's

security interest in ERN's Concord credit card portfolio.  Natanzon and Rombro also knew that

this was a binding, ongoing contract obligation of ERN which Baron had not authorized them to

interfere with or to terminate.

120.    On or about August 14, 2003, Natanzon and Rombro exercised improper ownership or

dominion over and converted Baron's UCC Financing Statement and the value of the perfected

security interest rights merged therein by preparing and filing a UCC Financing Statement

Amendment, terminating Baron's UCC Financing Statement and perfected security interest in

ERN's Concord credit card portfolio.

121.    With full knowledge of Baron's legally protected interest in its UCC Financing Statement

and the related value of the perfected security interest rights in ERN's Concord credit card

portfolio, and with full knowledge that Baron had not authorized their exercise of ownership or

dominion over Baron's UCC Financing Statement and the perfected security interest rights

merged therein, Natanzon and Rombro intentionally and without justification filed a UCC

-48-

Financing Statement Amendment, improperly converting and terminating Baron's UCC

Financing Statement and perfected security interest in ERN's Concord credit card portfolio.

122.    Natanzon and Rombro converted and terminated Baron's UCC Financing Statement and

the value of Baron's perfected security interest in ERN's Concord credit card portfolio with

actual malice and with the intent to cause injury and damage to Baron, knowing that they were

acting improperly without justification or authority.

123.    To the extent that Natanzon and/or Rombro were agents, officers, or employees of ERN,

LLC, they acted outside the scope of their authority and/or employment and/or their actions were

not intended or calculated to advance the legitimate business interests and purposes of ERN,

LLC.

124.    After their intentional and malicious actions in the unauthorized, intentional, and

unjustified conversion and termination of Baron's UCC Financing Statement and the value of

Baron's perfected security interest in ERN's Concord credit card portfolio, Natanzon directed

ERN to sell the credit card portfolio free and clear of Baron's security interest.

125.    After the credit card portfolio was sold, notwithstanding that the debt was still due to

Baron, and that the Baron debt was secured by the Concord credit card portfolio, Natanzon

directed ERN not to pay any part of the sale proceeds to Baron.

126.    As a result of the intentional and malicious wrongdoing of Natanzon and Rombro in

converting and terminating Baron's UCC Financing Statement and the value of the perfected

security interest in ERN's Concord credit card portfolio, and thereby effectively preventing

Baron from exercising its perfected security interest in the Concord credit card portfolio and the

proceeds from the sale thereof, Baron sustained damages exceeding $160,000.00, exclusive of

-49-

interest and costs.

WHEREFORE, Plaintiff, Baron Financial Corporation, prays the Court enter judgment for compensatory and punitive damages in its favor against Defendants, Rony Natanzon and Stuart Rombro, in an amount to be determined at trial exceeding $160,000.00, plus interest and costs, and attorneys fees, and that the Court grant such other and further relief as may be just and proper.

### Count VIII - Civil Conspiracy to Intentionally Interfere With UCC Contractual Relations - Natanzon and Rombro

127.    Plaintiff incorporates herein by reference all of the allegations contained in all paragraphs of this Second Amended Complaint as if set forth herein again.

128.    Natanzon and Rombro knew that Baron had filed a UCC Financing Statement with the Maryland Department of Assessments and Taxation on November 1, 2002, perfecting Baron's security interest in ERN's Concord credit card portfolio, as part of the MOU and Rider. Natanzon and Rombro also knew that this was a binding, ongoing contract obligation owed by ERN to Baron which Baron had not authorized them to interfere with or to terminate. Natanzon and Rombro also knew that Baron had sued ERN for ERN's continuing refusal to remit $160,000 in funds received by ERN and due to Baron from that credit card portfolio as part of the MOU and Rider settlement.

129.    Baron held a perfected security interest in ERN's credit card residual payments due from merchants pursuant to a credit card processing contract with Concord and its subsidiaries ("ERN's Concord credit card portfolio"). That Baron security interest in ERN's credit card portfolio had been perfected by Baron's filing of a UCC Financing Statement with the State of

-50-

Maryland.

130.    Natanzon wanted to sell ERN's Concord credit card portfolio free and clear of Baron's perfected security interest and without paying Baron anything to release and satisfy the obligation.

131.    Natanzon therefore contacted his and ERN's attorney, Rombro, and they entered into an agreement, combination, and conspiracy to intentionally and improperly interfere with Baron's contract rights represented by the UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio, and to convert and terminate Baron's UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio, by unlawfully filing a UCC Financing Statement Amendment terminating Baron's UCC Financing Statement and thereby extinguishing Baron's perfected security interest in ERN's Concord credit card portfolio.

132.    On or about August 14, 2003, Natanzon and Rombro acted on their agreement, combination, and conspiracy by Rombro's preparation and filing of a UCC Financing Statement Amendment, terminating Baron's UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio.  Rombro has admitted that he had no authority from Baron to prepare and file the UCC Financing Statement Amendment, terminating Baron's UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio. Instead, Rombro has admitted that he falsely represented to the State of Maryland that he was an agent of Baron and authorized to file a UCC Financing Statement Amendment, terminating Baron's UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio.

-51-

133.    In filing the UCC Financing Statement Amendment, terminating Baron's UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio, Rombro acted unlawfully and without authority. Rombro engaged in this unlawful and unauthorized action at the direction and instigation of Rony Natanzon. When Rombro advised Rony Natanzon of his actions, Natanzon expressed his appreciation and approval, and thereafter caused ERN to pay some of the significant indebtedness of ERN to Rombro and his firm.

134.    Rombro's filing of the UCC Financing Statement Amendment, terminating Baron's UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio, was an unlawful act, intentionally and improperly interfering with Baron's contract rights represented by the UCC Financing Statement and perfected security interest.

135.    Rombro's filing of the UCC Financing Statement Amendment, terminating Baron's UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio, was an unlawful act, constituting conversion of the value of Baron's UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio.

136.    As a result of Rombro's unlawful, tortious and wrongful filing of the UCC Financing Statement Amendment, pursuant to the agreement, combination, and conspiracy of Natanzon and Rombro, Rombro and Natanzon enabled ERN to sell the Concord credit card portfolio for over $300,000 free and clear of Baron's lien.

137.    Natanzon and Rombro entered into their agreement, combination, and conspiracy to terminate Baron's perfected security interest, and acted on that conspiracy by filing the UCC Financing Statement Amendment terminating and extinguishing Baron's perfected security interest in ERN's Concord credit card portfolio with actual malice and with the intent to cause

-52-

injury and damage to Baron, knowing that they were acting improperly without justification or authority.

138.    To the extent that Natanzon and/or Rombro were agents, officers, or employees of ERN, LLC, they acted outside the scope of their authority and/or employment and/or their actions were not intended or calculated to advance the legitimate business interests and purposes of ERN, LLC.

139.    After their conspiracy and their intentional and malicious actions in furtherance thereof in the unauthorized, intentional, and unjustified termination of Baron's UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio, Natanzon directed ERN to sell the credit card portfolio free and clear of Baron's security interest.

140.    After the credit card portfolio was sold, notwithstanding that the ERN debt was still due to Baron, and that the Baron debt was secured by the Concord credit card portfolio, Natanzon directed ERN not to pay any part of the sale proceeds to Baron.

141.    As a direct result of the intentional and malicious conspiracy of Natanzon and Rombro to intentionally and improperly interfere with, and to convert the value of, Baron's contract rights represented by the UCC Financing Statement and perfected security interest, Baron sustained damages exceeding $160,000.00, exclusive of interest and costs.

WHEREFORE, Plaintiff, Baron Financial Corporation, prays the Court enter judgment for compensatory and punitive damages in its favor against Defendants, Rony Natanzon and Stuart Rombro, in an amount to be determined at trial exceeding $160,000.00, plus interest and costs, and attorneys fees, and that the Court grant such other and further relief as may be just and proper.

## Count IX - Claim for Unlawfully Aiding and Abetting Intentional Interference With UCC Contractual Relations and Conversion- Natanzon and Rombro

142.    Plaintiff incorporates herein by reference all of the allegations contained in all paragraphs of this Second Amended Complaint as if set forth herein again.

143.    Natanzon and Rombro knew that Baron had filed a UCC Financing Statement with the Maryland Department of Assessments and Taxation on November 1, 2002, perfecting Baron's security interest in ERN's Concord credit card portfolio, as part of the MOU and Rider. Natanzon and Rombro also knew that this was a binding, ongoing contract obligation owed by ERN to Baron which Baron had not authorized them to interfere with or to terminate. Natanzon and Rombro also knew that Baron had sued ERN for ERN's continuing refusal to remit $160,000 in funds received by ERN and due to Baron from that credit card portfolio as part of the MOU and Rider settlement.

144.    Baron held a perfected security interest in ERN's credit card residual payments due from merchants pursuant to a credit card processing contract with Concord and its subsidiaries ("ERN's Concord credit card portfolio"). That Baron security interest in ERN's credit card portfolio had been perfected by Baron's filing of a UCC Financing Statement with the State of Maryland.

145.    Natanzon wanted to sell ERN's Concord credit card portfolio free and clear of Baron's perfected security interest and without paying Baron anything to release and satisfy the obligation.

146.    Natanzon therefore contacted his and ERN's attorney, Rombro, to review ERN secured debt and encouraged him to eliminate some or all of it.

-54-

147.    On or about August 14, 2003, Rombro with Natanzon's active encouragement, acted to eliminate the Baron secured debt by the preparation and filing of a UCC Financing Statement Amendment, terminating Baron's UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio.  Rombro has admitted that he had no authority from Baron to prepare and file the UCC Financing Statement Amendment, terminating Baron's UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio. Instead, Rombro has admitted that he falsely represented to the State of Maryland that he was an agent of Baron and authorized to file a UCC Financing Statement Amendment, terminating Baron's UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio.

148.    In filing the UCC Financing Statement Amendment, terminating Baron's UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio, Rombro acted unlawfully and without authority.  Rombro engaged in this unlawful and unauthorized action at the direction and instigation of Rony Natanzon and with Rony Natanzon's active encouragement. When Rombro advised Rony Natanzon of his actions, Natanzon expressed his appreciation and approval, and thereafter caused ERN to pay some of the significant indebtedness of ERN to Rombro and his firm.

149.    Rombro's filing of the UCC Financing Statement Amendment, terminating Baron's UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio, was an unlawful act, intentionally and improperly interfering with Baron's contract rights represented by the UCC Financing Statement and perfected security interest.

150.    Rombro's filing of the UCC Financing Statement Amendment, terminating Baron's UCC

Financing Statement and perfected security interest in ERN's Concord credit card portfolio, was an unlawful act, constituting conversion of the value of Baron's UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio.

151.    Natanzon encouraged and aided and abetted Rombro's unlawful conduct, and as a result of Rombro's unlawful filing of the UCC Financing Statement Amendment, Rombro and Natanzon enabled ERN to sell the Concord credit card portfolio for over $300,000 free and clear of Baron's lien.

152.    Natanzon encouraged Rombro to file the UCC Financing Statement Amendment terminating and extinguishing Baron's perfected security interest in ERN's Concord credit card portfolio with actual malice and with the intent to cause injury and damage to Baron, knowing that they were acting improperly without justification or authority.  Rombro filed the UCC Financing Statement Amendment terminating and extinguishing Baron's perfected security interest in ERN's Concord credit card portfolio with actual malice and with the intent to cause injury and damage to Baron, knowing that he was acting improperly without justification or authority.

153.    To the extent that Natanzon and/or Rombro were agents, officers, or employees of ERN, LLC, they acted outside the scope of their authority and/or employment and/or their actions were not intended or calculated to advance the legitimate business interests and purposes of ERN, LLC.

154.    After the unauthorized, intentional, and unjustified termination of Baron's UCC Financing Statement and perfected security interest in ERN's Concord credit card portfolio, Natanzon directed ERN to sell the credit card portfolio free and clear of Baron's security interest.

155.    After the credit card portfolio was sold, notwithstanding that the ERN debt was still due to Baron, and that the Baron debt was secured by the Concord credit card portfolio, Natanzon directed ERN not to pay any part of the sale proceeds to Baron.

156.    As a direct result of the intentional and malicious actions of Natanzon, in aiding and abetting Rombro's intentional and improper interference with, and conversion of the value of, Baron's contract rights represented by the UCC Financing Statement and perfected security interest, Baron sustained damages exceeding $160,000.00, exclusive of interest and costs. As a direct result of Rombro's intentional and improper interference with, and conversion of the value of, Baron's contract rights represented by the UCC Financing Statement and perfected security interest, Baron sustained damages exceeding $160,000.00, exclusive of interest and costs.

WHEREFORE, Plaintiff, Baron Financial Corporation, prays the Court enter judgment for compensatory and punitive damages in its favor against Defendants, Rony Natanzon and Stuart Rombro, in an amount to be determined at trial exceeding $160,000.00, plus interest and costs, and attorneys fees, and that the Court grant such other and further relief as may be just and proper.

### Count X - Fraudulent Transfer - ERN Acquisition, LLC

157.    Plaintiff incorporates herein by reference all of the allegations contained in all paragraphs of this Second Amended Complaint as if set forth herein again.

158.    On or about July 1, 2004, Natanzon entered a bid to purchase certain assets of ERN, LLC from the Trustee in Bankruptcy of ERN, LLC.

159.    On or about July 9, the Bankruptcy Court approved the Trustee's sale of certain assets of ERN, LLC to Natanzon (the "Trustee sale").

160.    Prior to the closing of the Trustee sale, while Natanzon was insolvent and without receiving fair consideration, Natanzon transferred his contract rights to purchase said ERN, LLC assets in the Trustee sale to ERN Acquisition, LLC.

161.    Natanzon made the transfer of his contract rights to purchase said ERN, LLC assets in the Trustee sale to ERN Acquisition, LLC with the actual intent to hinder, delay, or defraud Baron as his present and future creditor, and/or at a time when he intended or believed that he would incur debts beyond his ability to pay such debts as they matured and/or he would leave himself with unreasonably small capital to satisfy his outstanding obligations.

162.    Natanzon's transfer left him with insufficient assets to meet his obligations as they came due and left him unable to meet his current obligations.

163.    Pursuant to Md. Code Ann. Comm. L. Art. §§15-201 through 15-209, such transfer to ERN Acquisition of Natanzon's rights was voidable.

WHEREFORE, Plaintiff, Baron Financial Corp., prays the Court enter judgment against Defendant, ERN Acquisition, LLC, as follows:

1.    Setting aside the transfer; and/or

2.    Levying on or garnishing the assets obtained by ERN Acquisition, LLC pursuant to the contract rights conveyed as if the transfer had not been made; and/or

3.    Appointing a receiver to take charge of the assets obtained by ERN Acquisition, LLC pursuant to the contract rights conveyed as if the transfer had not been made; and/or

4.    For such other and further relief as may be just and proper.

-58-

## Count XI - Fraudulent Transfer - Tova Natanzon

164.    Plaintiff incorporates herein by reference all of the allegations contained in all paragraphs of this Second Amended Complaint as if set forth herein again.

165.    On or about 2003, while Natanzon was insolvent, Natanzon purported to transfer his 100% ownership interest in ERN Israel, LLC for no consideration to his spouse, Tova Natanzon.

166.    Natanzon made the transfer of his ownership interest in ERN Israel, LLC to his spouse, Tova Natanzon, with the actual intent to hinder, delay, or defraud Baron as his present and future creditor, and/or at a time when he intended or believed that he would incur debts beyond his ability to pay such debts as they matured and/or he would leave himself with unreasonably small capital to satisfy his outstanding obligations.

167.    Natanzon's transfer left him with insufficient assets to meet his obligations as they came due and left him unable to meet his current obligations.

168.    Pursuant to Md. Code Ann. Comm. L. Art. §§15-201 through 15-209, such transfer to Tova Natanzon of Natanzon's ownership interest in ERN Israel, LLC was voidable.

WHEREFORE, Plaintiff, Baron Financial Corp., prays the Court enter judgment against Defendant, Tova Natanzon, as follows:

1.    Setting aside the transfer; and/or

2.    Levying on or garnishing the ownership interest in ERN Israel, LLC obtained by Tova Natanzon pursuant to the transfer as if the transfer had not been made; and/or

3.    Appointing a receiver to take charge of the assets obtained by Tova Natanzon pursuant to the contract rights conveyed as if the transfer had not been made;

and/or

4.    For such other and further relief as may be just and proper.

_____/s/_____
David B. Goldstein, Fed Bar No. 03499
Brooke Schumm, III, Fed. Bar No. 05001
DANEKER, McINTIRE, SCHUMM, PRINCE,
 GOLDSTEIN, MANNING & WIDMANN, P.C.
One North Charles Street, Suite 2450
Baltimore, MD 21201
Telephone (410) 649-4755
Facsimile (410) 649-4758

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of December, 2004, I electronically

filed and served the foregoing Second Amended Complaint on Paul Mark Sandler, Esquire,

Robert B. Levin, Esquire, Shapiro, Sher, Guinot & Sandler, 36 S. Charles Street, 20th floor,

Baltimore, Maryland 21201.

_____/s/_____
David B.  Goldstein

-60-